
FILED
2004 Nov-18 PM 03:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **SERRA CHEVROLET, INC.** | ) |
| | ) |
| **PLANTIFF,** | ) |
| | ) |
| **V.** | ) |
| | ) |
| **GENERAL MOTORS CORPORATION** | ) |
| | ) |
| **DEFENDANTS.** | ) |

### AFFIDAVIT OF MICHAEL J. ILEO, PH.D.

Before me, the undersigned authority, personally appeared Michael J. Ileo, who is over the age of 19 years and after being duly sworn stated the following:

1.      My name is Michael J. Ileo.  I am President and Chief Economist of Technical Associates, Inc. ("TAI"), which is an economic and financial consulting firm that I co-founded in 1969. TAI's business address is Suite 601, James Center III, 1051 East Cary Street, Richmond, VA 23219.

2.      I have practiced as an economic consultant to business and government organizations for approximately 35 years, as well as taught economics at the Universities of Missouri and Rhode Island, Virginia Commonwealth University, and Virginia Tech.  During my professional career, I have appeared as an expert witness on a wide variety of business litigation issues before state, provincial, and federal courts and administrative bodies throughout the United States and Canada.  These include matters pertaining to utility and insurance regulation, antitrust complaints, economic damages, patent infringements, bankruptcy filings, and contract disputes.  I hold a Ph.D. (1972) in Economics from Virginia Tech, as well as B.S. (1965) and M.S. (1967) degrees in Economics from the University of Rhode Island.  A more complete statement of my professional background is contained in Exhibit A.

3.      For more than 25 years, a significant part of my work on behalf of TAI's clients has pertained to the motor vehicle industry.  As outlined in Exhibit B, I have supervised or participated in numerous studies of motor vehicle dealerships and markets in many states

1

(including Alabama) conducted by TAI with respect to essentially all major makes (e.g., Ford, Chevrolet, Chrysler, Honda, Toyota, etc.) and types of vehicles such as passenger cars, light and other classes of trucks, motorcycles, and heavy equipment. These studies have addressed various issues involving the establishment or relocation of dealerships, the determination of relevant product and geographic markets, the appropriateness of new vehicle supply systems, and the economic losses sustained due to unfair competition and/or unlawful acts.

4.      In connection with TAI's motor vehicle industry engagements, I have appeared as an expert witness before divisions of motor vehicles, state departments of transportation, and state and federal courts. My clients have included new vehicle manufacturers (e.g., American Motors, General Motors, and Freightliner), importers and regional distributors, and existing and proposed dealerships. To illustrate the nature of my work, I assisted some 50 Honda dealerships across the U.S. during the years 1996-98 in determining how shortages of new vehicle supplies caused by a long-standing, nationwide bribery scheme impacted their inventories, operations, and profits.

5.      Over the course of the indicated many years and projects, I have gained substantial knowledge as to the workings of the motor vehicle industry, including policies and practices pertaining to the production, allocation, and distribution of new vehicles and related products by a manufacturer destined for its dealerships. I am also aware of the business and economic matters specifically at issue in this proceeding.

6.      I make this Affidavit in support of the Plaintiff's Motion For Sanctions, with specific respect to delineating for the Court: (1) the considerable deficiencies in the Defendants' responses to Plaintiff's discovery to date involving new Chevrolet vehicle allocation records; and, (2) how these deficiencies impose an insurmountable burden on the ability of the Plaintiff to meaningfully analyze the allocation issues before the Court. In short, GM has not produced the actual and complete information on which it made previous new vehicle allocation decisions as requested by Serra Chevrolet.

7.      In or about the year 2000, General Motors ("GM") introduced a new online electronic system governing the ordering, production, allocation, and delivery of new model year vehicles (including Chevrolet) for its dealership body. GM titled this new system, which continues in use today, as Vehicle Order Management ("VOM"). Accompanying the introduction of VOM, GM prepared a Common Systems Reference Guide (referenced herein as

2

the "VOM Manual") to inform its dealerships as to the detailed workings of VOM, as to how VOM can be accessed and utilized electronically by a dealership upon the entering of a password, and as to the new vehicle allocation data and reports available to a dealership (normally on a weekly basis) pertaining to its operations. As represented in the VOM Manual, therefore, the entirety of GM's new vehicle allocation records across all of its divisions, models, and dealerships resides in VOM. Page 7-1 of the Revised July 2003 VOM Manual, for example, states the following in this regard: "All of the reports from the GM Allocation Reports website have been moved to the VOM application within GM DealerWorld."

8.     During discovery to date in this case, Serra Chevrolet has requested from GM a limited number of these new vehicle allocation records; i.e., new Chevrolet allocation pertaining only to Serra Chevrolet and to each of the other Chevrolet dealerships physically located in what GM circumscribes as the Birmingham Multiple Dealer Area ("MDA"). GM has fulfilled the part of this request applicable to Serra Chevrolet by producing two electronic files (designated herein as "Files A and B") containing various allocation, sales, and related data by new Chevrolet model from January 2001 to April 2004. I also understand that GM has produced identical files applicable to each of the other Birmingham MDA Chevrolet dealerships. Thus, and while I have not had access to the latter, the comments in this Affidavit are equally applicable to those files assuming they are truly identical to Files A and B.

9.     Exhibit C hereto, consisting of five pages, contains a comparison between the contents of Files A and B applicable to Serra Chevrolet using the November 2001 data shown therein for the new model year 2002 Chevrolet brand known as Avalanche ("AVALAN"). Pages 1 through 3 of Exhibit C present the comparison, while Pages 4 and 5 contain definitions of the Column Titles on the first three pages. Note that interpretations of these Titles for File B (listed on Page 5 of Exhibit C) have been necessary in a number of instances at this juncture, since Title definitions have not been included in GM's File B discovery responses. I have utilized the VOM Manual for many of these interpretations.

10.     Of greater significance than the lack of specific Column Title definitions from GM are the notable differences between File A data and File B data in terms of reporting periods and amounts as set forth in Exhibit C. Taken either individually or collectively, moreover, the contents of Files A and B are far less extensive than what is contained in the various reports identified in the VOM Manual. These difficulties are compounded by the fact that certain data

3

reported in Files A and B relate to prior periods by as many as 12 months, such that without access to this prior period information, the data and calculations in Files A and B cannot be tested for accuracy in many instances.

11.     This void extends to the incompleteness of new Chevrolet model year information in Files A and B.  More specifically, automobile manufactures (including GM) typically begin building new model year vehicles in May or June of the previous calendar year for delivery and introduction at dealership showrooms in August and September of that calendar year; e.g., 2001 model year vehicles were built in June 2000 and delivered to dealerships in September 2000. Allocation records for new 2001 model year vehicles parallel this manufacturing and delivery temporal pattern, which is especially important when new model year supplies are first made available to the public typically in September of each year.  But since Files A and B produced by GM start with information for only January 2001, complete allocation records for the new 2001 AVALAN and all other Chevrolet models are missing from GM's discovery responses.

12.     Coupled with the information voids noted, many differences in data are encountered within Files A and B.  As an illustration, consider Column (22) of File A, titled Daily Sales Rate, which reports that Serra Chevrolet's Daily Sales Rate for new model year 2002 AVALAN applicable to November 2001 was 0.176.  Column (27)) of File A lists a 3 for the corresponding Sales History Code of Serra Chevrolet, which means three months of AVALAN sales data were used in the Daily Sales Rate calculation of 0.176.  Three months at the end of November 2001 translates into a 91-day period, since September has 30 days, October has 31 days, and November has 30 days.  Dividing 91 days into the AVALAN Sales Quantity of 16 shown for Column (9) of File A, produces a Daily Sales Rate at the end of November 2001 of 0.176; i.e., $(16/91) = 0.176$.

13.     However, Column (30) of File B lists the AVALAN Daily Sales Rate of Serra Chevrolet at 0.133 applicable to both November 8 and 15, 2001, which is about 25% less than 0.176.  Such a significant difference is puzzling for a variety of reasons.  In the first instance, as File B reports information for specific dates during a month, which is comparable to the form of many VOM reports, a logical premise is that the specifically dated information in File B should comprise the raw data from which the monthly amounts reported in File A were derived by GM. But this is not the case.

4

14.     While titled as Number of Deliveries, the true meaning of the figure 20 listed for Column (29) of File B is Serra Chevrolet's AVALAN sales for some period of time (see VOM Manual, pg. 7-20). AVALAN sales of 20 in File B surely differs from the 16 reported in Column (9) of File A. Further, given AVALAN sales of 20 and a corresponding Daily Sales Rate of 0.133 in File B, the period of time used in the File B Daily Sales Rate calculation is 150 days for both November 8 and 15, 2001; i.e., 0.133 = (20/150), as listed for Column (28) of File B in Exhibit C. Thus, not only are the 2002 model year AVALAN sales of Serra Chevrolet during November 2001 reported differently in Files A and B, but the time periods employed by GM in its calculations vary sharply -- 91 days or 3 months in File A and 150 days or about 5 months in File B.

15.     Consider additionally Columns (10) and (11) of File A, respectively titled as In System Quantity (reported at 6 for AVALAN) and In Stock Quantity (reported at 25 for AVALAN). As presented on Page 4 of Exhibit C, GM has stated that: (i) In System Quantity means the sum of new vehicles being built for a dealership and those that have been built, but have not yet been shipped from a manufacturing plant to the dealership (a total of 6); and, (ii) In Stock Quantity means new vehicles on the ground (in inventory) at a dealership and those in-transit from GM to the dealership (a total of 25). Comparable titles appear for Columns (24) and (25) in File B as depicted in Exhibit C, but corresponding amounts differ materially as summarized below for AVALANs applicable to Serra Chevrolet during November 2001:

| File A | | | File B | | | |
|------|----------------|-------|------|-----------------------|---------|----------|
| | | 11/01 | | | 11/8/01 | 11/15/01 |
| Col. | Title | Amt. | Col. | Title | Amt. | Amt. |
| (10) | In System Qty. | 6 | (25) | In-System | 18 | 16 |
| (11) | In Stock Qty. | 25 | (24) | Grnd. Stk./In Transit | 11 | 17 |

16.     Daily Sales Rates, In System Quantities, In Stock Quantities, Ground Stocks, and In Transit amounts all play pivotal roles in the new vehicles allocated and delivered to a dealership by GM as explained in the VOM Manual. Depending on whether File A or File B produced by GM is considered, however, different interpretations and implications for new vehicle allocations and deliveries applicable to Serra Chevrolet invariably result. The matters as to which File is correct and which File underlies GM's previous allocation decisions further loom.

17.    In order to analyze the reasonableness of new vehicle allocations by model across several competitive dealerships for a given period of time, one necessarily must begin with an accurate, complete, and consistent set of data. Such an analysis is impossible in the instant case at this time given GM's discovery production to date as reflected by the information conflicts among Files A and B demonstrated in Exhibit C. Accuracy, completeness, and consistency, as well as reconciliation of information conflicts, are achievable only thorough production by GM of all the data that it actually relied upon in making past allocation decisions starting with the new 2001 model year in May/June 2000; i.e., data contained in the reports identified in the VOM Manual as available at each relevant point in time for each dealership as outlined below:

Estimated Shipment Reports (VOM Manual, pgs. 6-11 & 12)

    Section 1: Estimated Shipments

    Section 2: Sales and Availability

Sales History Reports (VOM Manual, pgs. 6-13 & 14)

Dealer Allocation Requests Reports (VOM Manual, pgs. 6-21 & 22)

Final Allocation Reports (VOM Manual, pgs. 7-9 to 13)

    Section 1: Final Allocation

    Section 2: Sales and Availability

Weekly Constraint Distribution Reports (VOM Manual, pgs. 7-14 to 16)

Weekly Order Placement Reports (VOM Manual, pgs. 7-17 to 20)

Weekly National Constraint Reports (VOM Manual, pgs. 7-29 & 30)

Total Availability Reports (VOM Manual, pgs. 7-32 to 38)

18.    Information in the above VOM Reports comprise the complete set of actual data upon which new vehicle allocation decisions for a dealership were made by GM at each relevant point in time. Some of this information pertains to various timeframes before January 2001, as GM made allocation decisions in and subsequent to January 2001 utilizing data applicable to prior periods. Unlike what is exhibited in Files A and B, moreover, no extraction, manipulation, or transformation of raw data would be found within the information comprising the VOM Reports, which is the case with GM's discovery responses particularly in File A. VOM Report data also would never suffer from the prospects of inaccuracies and inconsistencies as reflected in the comparison of Files A and B in Exhibit C, nor would they be subject to open interpretation given the specific meanings reported in the VOM Manual.

6

20.     Page 4 of Exhibit C highlights a further matter of significance; i.e., what GM has produced to date in File B is essentially limited to the contents of the Weekly Order Placement Reports identified in the VOM Manual. This response surely does not constitute the complete allocation records of GM applicable to Serra Chevrolet and the other Birmingham MDA Chevrolet dealers. Only upon production of the complete new model year information contained in the other VOM Reports referenced earlier in this Affidavit, coupled with the data in the Weekly Order Placement Reports, can it be said that GM has fulfilled the requests of Serra Chevrolet pertaining to new vehicle allocation records.

**FURTHER THE AFFIANT SAYS NOT**

MICHAEL J. ILEO, Ph.D.

**STATE OF VIRGINIA**
**CITY OF RICHMOND**

Before me, the undersigned authority, personally appeared Michael J. Ileo, Ph.D., who is known to me and who, after being duly sworn, read the contents of the above document and stated that the facts contained therein are true and correct.

Sworn to and subscribed before me this _12th_ day of _November_, 2004.

Notary Public _Susan W. Crew_
My Commission Expires: _03/31/06_

7

BACKGROUND AND EXPERIENCE PROFILE
## DR. MICHAEL J. ILEO
PRESIDENT/CHIEF ECONOMIST
TECHNICAL ASSOCIATES, INC.

## EDUCATION

| | |
|---|---|
| 1969-1972 | Ph.D., Economics, Virginia Polytechnic Institute & State University |
| 1967-1969 | Graduate Economics, University of Missouri |
| 1965-1967 | M.S., Economics, University of Rhode Island |
| 1963-1965 | B.S., Economics, University of Rhode Island |
| 1961-1963 | A.S., Accounting, Roger Williams College |

## POSITIONS

| | |
|---|---|
| 1995-Present | President/Chief Economist, Technical Associates, Inc. |
| 1993-1995 | President/Chief Economist, C. W. Amos of Virginia |
| 1972-1993 | President/Senior Economist, Technical Associates, Inc., Adjunct Professor of Economics, Virginia Commonwealth University |
| 1971-1972 | Vice President and Senior Economist, Technical Associates, Inc. |
| 1969-1971 | Staff Economist, Technical Associates, Inc. Economics Instructor, Department of Economics, Virginia Polytechnic Institute & State University |
| 1968-1969 | Research Associate, Department of Electrical Engineering, University of Missouri |
| 1967-1968 | Economics Instructor, Department of Economics, University of Missouri |
| 1965-1967 | Consulting Economist, National Economic Research Associates, Inc. |

## EXPERIENCE

**Utility Economics** -- Appeared before numerous municipal, state, provincial, and federal bodies in the United States and Canada concerning various regulatory issues in the electric, gas, telephone and water utility industries. Expert testimony addressed such issues as rate levels and structures, depreciation, cost allocations and separations, rate of return, capital structure and costs, revenue requirement, demand forecasting, capacity planning, site location, business integration, avoidable costs, marginal cost pricing, accounting treatments, computer modeling, affiliate transactions, and corporate cost allocations. Conducted jurisdictional, interclass, and intraclass cost of service studies using embedded, marginal, and incremental cost methodologies such as TSLRIC and TELRIC. Presented computer based sensitivity analyses of alternative cost allocation and separation procedures employing different measures of utilization such as time and volume of use. Prepared alternative rate designs based on cost, elasticity, and other factors. Developed computer based transmission and distribution system routing models. Prepared numerous rate of return studies incorporating cost of equity determinations based on DCF, CAPM, comparable earnings, and other financial models. Developed procedures for identifying differential risk characteristics by customer class, type of service, and business division.

**Anti-Trust Economics** -- Performed analyses of relevant product and geographic markets related to such lines of business as retail automobile sales, natural gas sales and transportation, heating appliance repair and maintenance, radiological services, and financial institution deposits and loans. Conducted demand and supply elasticity studies to define relevant markets, as well as tests which account for product and consumer characteristics. Testified as to the existence and magnitude of predatory pricing using short-run and long-run costing standards. Calculated damages resulting from such anti-competitive practices as tying arrangements, discriminatory supply restrictions, dumping, and predation.

**Health Care Economics** -- Conducted econometric studies of hospital cost functions using data in Medicare Cost Reports. Testified in Certificate of Need proceedings regarding medical facility expansions. Served as a book reviewer for the Journal of Risk and Insurance on health care and other insurance matters. Conducted surveys of the

## DR. MICHAEL J. ILEO
## PAGE 2

health insurability characteristics of "high risk" consumers. Performed a management audit of BC/BS of Virginia regarding the relationship between diversification and insurer solvency. Wrote Master Thesis on the role of organized medicine in the pricing and delivery of health care services.

**Insurance Economics** -- Testified before insurance regulatory authorities in Maine, Massachusetts, Oregon, New Jersey, Rhode Island, South Carolina, and Virginia regarding the appropriate profit & contingency factor to be incorporated in rates for workers' compensation, medical malpractice, and other lines of insurance. Performed internal rate of return analyses of line of business insurance transactions using temporal cash flow modeling of premium collection and loss and expense payout patterns. Conducted studies as to the competitiveness of various property and casualty insurance markets using structure, behavior, and performance criteria. Ph.D. Thesis consisted of a statistical application of a mathematical model of insurance company pricing under different degrees of investment portfolio and insurance exposure risks.

**Energy Economics** -- Prepared studies on the relationship between utility pricing practices and the demand and supply of oil for residential heating purposes. Analyzed the relative energy efficiencies of rail versus truck transportation. Conducted studies of the structure and performance of the petrochemical industry. Testified on the long-run costs of coal versus nuclear use for electricity generation. Performed analyses of the fuel use decision in generation plant planning.

**Transportation Economics** -- Conducted cost of service studies of railroads, oil pipelines, water carriers, motor carriers and taxicabs. Testified before the ICC in numerous proceedings on the cost of transporting coal by rail with specific consideration of such issues as constant cost allocation, differential pricing and inverse elasticity, long-run marginal costs, Ramsey pricing, and stand-alone costing. Served as a consultant to the ICC's Rail Services Planning Office on the reorganization of rail service in the U.S. Testified before the FMC on the cost of capital to water carriers. Served as consultant to a number of shippers and the State of Alaska on the economics of oil pipelines. Testified on many occasions on the cost of service of moving crude and oil products by pipeline before the ICC, FERC, and the Alaska Pipeline Commission. Presented papers to various forums on the theory of cost allocation in transportation systems.

**Financial Economics** -- Prepared studies of the sustainability of LBOs, particularly with respect to the ability to meet debt service obligations set forth in due diligence reports. Critically examined the financial performance of firms that sought bankruptcy protection due to an inability to meet LBO forecasts, as well as environmental trust fund requirements. Analyzed benefit/cost ratios for businesses involved in mergers or acquisitions. Conducted economic feasibility studies of market and service expansion by financial institutions. Advised state regulators on the appropriateness of interest rate structures and loan maturities. Testified regarding industry financial standards in bankruptcy proceedings and valuation methodologies for state severance tax purposes.

**Damage & Valuation Economics** -- Appeared before federal and state courts regarding the economic loss sustained through personal and business injury due to bodily harm, non-performance, and anti-competitive practices. Testimony presented on behalf of private individuals, as well as business firms such as automobile dealers, equipment manufacturers, creditor committees, insurance companies, and heating contractors. Established the economic value of various businesses at given points in time, as well as in anticipation of future events. Evaluations have involved the application of times earnings, historical profit trends, equivalent business exchanges, discounted cash flow, and other market tests.

### SELECTED REPORTS, ARTICLES, AND TESTIMONY

"Forward-Looking Economic Revenue And Cost Studies Of Advanced Network Communications Services," prepared for the City of Bristol, Virginia, August, 2003 (with D. Parcell & K. Strobl).

Expert Reports and Testimony On Depreciation Rates For TransCanada Pipeline Ltd., prepared for the Canadian Association of Petroleum Producers, presented before the National Energy Board, 2001-2003.

## DR. MICHAEL J. ILEO
## PAGE 3

"An Economic And Actuarial Analysis Of Financial Incentives In Oregon's Workers' Compensation Insurance Market," prepared for the Oregon Legislature (April, 2001) in conjunction with William M. Mercer, Inc.

Expert Testimony On The Inmate Telephone System In Virginia, prepared for Special Consumer Counsel to the Governor, November, 2000.

"Competitive Impact Implications Of The Fleet/BankBoston Merger On Middle Market Lending In New England," prepared for the Connecticut Attorney General, April, 1999.

"Determination OF Economic Damages Caused By Power Plant Failure," prepared for Doswell Limited Partnership, Inc., August, 1998.

"An Assessment Of The Competitive Impact Of Lawyers Title Corporation's Proposed Acquisition Of The Title Insurance Subsidiaries Of Reliance Group Holdings, Inc.," prepared for the Virginia Bureau of Insurance, December, 1997 (With D. Parcell).

"Lost Profits Of Great Lakes Toyota Due To The Improper Business Practices Of Toyota Motor Sales And Related Organizations," confidential expert damage reports, January and June 1996.

"Request Of US West Communications, Inc. For Approval Of Changed Depreciation Rates," expert testimony presented before the Public Service Commission of Utah, November, 1995.

"Retail Wheeling and Other Electricity Competition: Small Business Concerns About Tripping The Light Fantastic," prepared for the Pennsylvania Office of Small Business Advocate, September, 1994 (with K. Strobl).

"Competition, Regulation, And The Public Interest In Telecommunications: Towards A Plan For Maryland," prepared for Maryland People's Counsel, June, 1994 (with K. Strobl).

Book Review of "Health Care Finance: Economic Incentives and Productivity Enhancement," by Steven R. Eastaugh (Auburn House), in The Journal of Risk and Insurance, December, 1993.

"On The NOPR's Failure To Provide Guidelines Regarding The Role Of Cost In Determining Appropriate Oil Pipeline Rates," presentation to Executive Enterprise's Conference on Oil Pipeline Ratemaking For The '90's: Impact Of Anticipated FERC NOPR, Washington, D.C., September, 1993.

"An Investigation Into The Structure And Operation Of Southwestern Bell Telephone Company's Affiliate Transactions," prepared for the Missouri Public Service Commission, January, 1993 (with K. Strobl & A. Yontz).

Book Review of "Regulating Doctors Fees: Competition Benefits and Controls Under Medicare," edited by H.E. Frech, III (The AEI Press), in The Journal of Risk and Insurance, June, 1992.

"Standards For Utility Cost Studies Used To Justify Indirect Costs Assigned To HHS Grants," prepared for the U.S. Department of Health & Human Services, September, 1991 (with K. Strobl & T. Bayliss).

"Forecasts of On-Line Lottery Sales and the Required Number and Distribution of On-Line Agents in Virginia," prepared for General Instrument, Inc., 1988 (with G. Watkins).

"Performance and Diversification of the Blue Cross/Blue Shield Plans in Virginia," prepared for the Bureau of Insurance, Virginia State Corporation Commission, 1987 (with D. Parcell & A. Skirpan).

"The Regulation of Accounting in Virginia," prepared for the Virginia Department of Commerce, 1987 (with J. Bayliss).

## DR. MICHAEL J. ILEO
### PAGE 4

"A Simple Method to Evaluate the Economic Feasibility of Streetlighting Purchase and Operation by Municipalities," prepared for Montgomery County Pennsylvania Consortium of Communities, 1985 (with K. Strobl & W. Lowe).

"An Analysis of the InterLATA Access Charges Applicable to the State of Missouri's Electronic Tandem Network," prepared for Spectra Associates, Inc. and the State of Missouri's Telecommunications Planning Department, 1985 (with K. Strobl).

"Towards An Understanding of the Economics of Undue Cross-Subsidization: The Case of Natural Gas Rate Structures," prepared for the Ontario Ministry of Energy, September, 1983.

"Measuring the Economic Value of a Coal Slurry Pipeline to Hampton Roads, Virginia," prepared for the Virginians for Competitive Coal Transportation, 1983 (with K. Strobl & J. McKnight).

"Toward An Understanding of Ramsey Pricing," expert testimony presented before the Interstate Commerce Commission, April, 1982.

"Guide For Evaluating the Community Impact of Rail Service Discontinuance," prepared for the Rail Services Planning Office, Interstate Commerce Commission, January, 1975 (with K. Strobl).

"Connecticut State Rail Plan," prepared for the Connecticut Department of Transportation, 1975 (with J. McKnight & K. Strobl).

"Evolution of the Virginia Banking Structure, 1962-1974: The Effects of the Buck-Holland Bill," William and Mary Law Review, Vol. 16, No. 3, 1975 (with Dr. Parcell).

"An Analysis of the Virginia Consumer Finance Industry to Determine the Need for Restructuring the Rate and Size Ceilings on Small Loans in Virginia and the Process by Which They Are Governed", prepared for the Virginia Consumer Finance Association, 1975 (with D. Parcell).

"The Economic Objectives of Regulation: The Trend in Virginia," William and Mary Law Review, Vol. 14, No. 2, 1973 (with D. Parcell).

An Economic Analysis of the Role of Investment Income in the Insurance Supply Process, Doctorate Dissertation, Virginia Polytechnic Institute and State University, 1972.

"Revision of the Property and Casualty Insurance Ratemaking Process Under Prior Approval in the Commonwealth of Virginia," prepared for the Bureau of Insurance of the Virginia State Corporation Commission, 1971 (with C. Schotta & D. Parcell).

Organized Medicine In Rhode Island: A Case Study of Local Medical Societies, Masters Thesis, University of Rhode Island, 1967.

## MEMBERSHIPS
American Economic Association
American Risk & Insurance Association
Industrial Organization Society

**MOTOR VEHICLE INDUSTRY STUDIES**
**PERFORMED BY TECHNICAL ASSOCIATES, INC.**

| YEAR | DESCRIPTION OF STUDY | PURPOSE OF STUDY | CLIENT |
|------|----------------------|-------------------|--------|
| 1977 # 77.39 | An economic analysis of the Jeep market in the Covington, VA trade area to determine if it could viably support an additional Jeep franchise. | To be presented as evidence before DMV hearing examiner, but settlement reached. | Dressler Motors |
| 1978 # 78.15 | An economic analysis of the market impact of an additional Chrysler products franchise in the Roanoke/Salem, VA area. | To be presented as evidence before DMV hearing examiner, but settlement reached. | Salem Motors |
| 1978 # 78.18 | An economic impact study to determine lost profits due to dealer franchise termination. | Presented as evidence in Federal Court in Richmond. | Fawcett Motor Co. |
| 1979 # 79.19 | An economic analysis of the market impact of an additional Honda franchise in the Norfolk/Portsmouth, VA SMSA. | Presented as evidence before DMV hearing examiner. | Tidewater AMC/Jeep/Honda, Riddle Chrysler-Plymouth/Honda, Checkered Flag Motors |
| 1979 # 79.45 | A critique of an economic analysis of the market impact of an additional Renault franchise in the Tyson's Corner area of the Washington, D.C. Metro Region. | To critically examine study by client which was to be presented as evidence before DMV hearing examiner. | American Motors Corporation |
| 1980 # 80.08 | An economic impact study to determine lost profits due to dealer franchise termination. | Presented as evidence in Federal Court in Richmond. | Kenbridge Motors |
| 1980 # 80.35 | An economic analysis of the market impact of an additional Fiat franchise in the Tyson's Corner area of the Washington, D.C. Metro Region. | To be presented as evidence before DMV hearing examiner, but settlement reached. | Manhatten Auto, American Service Center Associates, Temple Motor Co. |
| 1980 # 80.56 | An economic analysis of the Norfolk, VA SMSA to determine the trade area for a Pontiac dealership located in Virginia Beach, VA. | Presented as evidence before DMV hearing examiner. | Hall Pontiac, General Motors Corp. |
| 1981 # 81.07 | An economic analysis of the market impact of an additional Chrysler products franchise in the Roanoke/Salem, VA area. | To be presented as evidence before DMV hearing examiner, but settlement reached. | Salem Motors, Dominion Car Co., |
| 1981 # 81.30 | An economic analysis of the market impact of an additional BMW franchise in Northern Virginia. | Presented as evidence before DMV hearing examiner. | BMW of Fairfax, Heishman BMW |
| 1982 # 82.24 | An economic analysis of the ability of the Motorcycle Market in the Newport News/Hampton, VA SMSA to support two Kawasaki franchises. | Presented as evidence before DMV hearing examiner. | Kawasaki Motors Corp., U.S.A. |

**MOTOR VEHICLE INDUSTRY STUDIES
PERFORMED BY TECHNICAL ASSOCIATES, INC.**

| YEAR | DESCRIPTION OF STUDY | PURPOSE OF STUDY | CLIENT |
|---|---|---|---|
| 1982 # 82.29 | An economic analysis of the ability of the motorcycle market in the Norfolk/Virginia Beach SMSA to support an additional Honda motorcycle franchise. | Presented as evidence before DMV hearing examiner. | Cycle World, Honda of Va. Beach, Honda of Norfolk, et. al. |
| 1983 # 82.30 | An economic analysis of the market impact of an additional Renault franchise in the Virginia Beach/Norfolk area. | To be presented as evidence before DMV hearing examiner, but settlement reached. | Eastern Auto Distributors |
| 1983 # 83.24 | An economic analysis of the market impact of the relocation of an Oldsmobile dealership in the Cincinnati, OH area. | Presented as evidence before DMV hearing examiner. | General Motors Corporation |
| 1983 # 83.29 | An economic analysis of the ability of the Cherry Hill, NJ market to support an additional Pontiac dealership. | To be presented before DMV administrative law judge, but settlement reached. | General Motors Corporation |
| 1983 # 83.46 | An economic analysis of the prices and distribution polices of International Harvester to determine the presence or absence of anti-competitive practices. | To be presented as evidence in Federal Court, but settlement reached. | International Harvester |
| 1984 # 83.02 | An economic impact study to determine lost profits due to a rural Subaru dealer franchise termination in Virginia. | To be presented as evidence in general district court, but settlement reached. | Turner GMC-Subaru |
| 1984 # 84.31 | An economic analysis of the market performance of a Volkswagen dealer in Roanoke, VA. | To be presented as evidence before DMV hearing examiner, but settlement reached. | Roanoke Valley Motors |
| 1985 # 85.05 | An analysis of national Peugeot shipments, inventory, and days supply to ascertain whether anti-competitive distribution practices were present. | Presented as proffered testimony in Federal Court. | Eastern Auto Distributors |
| 1985 # 85.06 | An analysis of Chrysler sales penetration and market strategy in the Roanoke, VA automobile market. | Presented as a confidential report to dealer. | Fulton Motors |
| 1986 # 86.33 | An economic analysis of the performance of the present Peugeot dealer body in the Hampton/Newport News, VA market. | Presented as evidence before DMV hearing examiner. | Eastern Auto Distributors |
| 1986 # 86.33 | An economic analysis of the ability of the Washington DC Metropolitan market to support an additional Peugeot dealership. | Presented as evidence before DMV hearing examiner. | Eastern Auto Distributors |
| 1987 # 87.16 | An economic analysis of the ability of the Washington DC Metropolitan market to support an additional Cadillac franchise. | Presented as confidential report to dealers. | Coleman Cadillac Capital Cadillac Lindsay Cadillac Moore Cadillac |

MOTOR VEHICLE INDUSTRY STUDIES
PERFORMED BY TECHNICAL ASSOCIATES, INC.

| YEAR | DESCRIPTION OF STUDY | PURPOSE OF STUDY | CLIENT |
|------|---------------------|------------------|--------|
| 1987<br># 87.27 | An economic analysis of the lost profits sustained due to unlawful franchise termination of a Subaru dealership in Huntsville, AL. | Presented as evidence in Federal Court in Alabama under the Dealer Day in Court Act. | Huntsville Subaru |
| 1988<br># 88.08 | A study to determine the primary uses of heavy trucks in western Virginia; equipment specifications needed to satisfy users requirements; and line-make preferences of heavy truck owners. | To be presented as evidence before DMV hearing examiner, but settlement reached. | Fulton Trucks, Inc. |
| 1988<br># 88.09 | An economic analysis of the ability of the South Hampton Roads market in Virginia to support an additional Toyota dealership. | Presented as evidence before DMV hearing examiner. | Checkered Flag Toyota; Tower Toyota; Colonial Toyota |
| 1988<br># 88.22 | An economic analysis of the ability of the Staunton/Harrisonburg, VA market to support an additional Toyota dealership. | To be presented as evidence before DMV hearing examiner, but settlement reached. | McDonough Toyota |
| 1988<br># 88.18 | An economic analysis of the comparative market performance and lost profits experienced by a Peugeot distributor as a result of the manufacturer selling directly to rental car companies in the distributor's trade area. | To be presented as evidence in Federal Court in Virginia, but settlement reached. | Eastern Auto Distributors |
| 1988<br># 88.45 | Analysis of the economic impact on a Buick dealership in West Palm Beach, FL due to the taking of property under eminent domain. | Presented as part of a report on condemnation. | Florida Department of Transportation |
| 1988<br># 88.49 | Analysis of the economic impact on a Mercedes-Benz/Rolls Royce dealership in West Palm Beach, FL due to the taking of property under eminent domain. | Presented as part of a report on condemnation. | Florida Department of Transportation |
| 1989<br># 89.07 | An economic analysis of the ability of the Northern Virginia/Washington D.C. market to support an additional Toyota dealership. | Presented as evidence before DMV hearing examiner. | Alexandria Toyota<br>Bill Page Toyota |
| 1989<br># 89.19 | An economic analysis of the market impact of the relocation of an Audi dealership in Montgomery County, MD. | To be presented as evidence before DMV hearing examiner, but settlement reached. | Manhattan Imported Cars, Inc. |
| 1990<br># 90.11 | An economic analysis of the performance of a Freightliner/Mercedes-Benz Truck dealer in the Tidewater/Hampton Roads, VA market. | Presented as evidence before DMV hearing examiner. | Freightliner/Mercedes Corp. |
| 1990<br># 90.05 | An economic analysis of the lost profits sustained by a Toyota dealer due to anti-competitive and other unlawful practices of a distributor. | Presented as evidence in State Court in Alabama. | Ivy Corp. (Anniston Toyota) |

## MOTOR VEHICLE INDUSTRY STUDIES
### PERFORMED BY TECHNICAL ASSOCIATES, INC.

| YEAR | DESCRIPTION OF STUDY | PURPOSE OF STUDY | CLIENT |
|------|----------------------|------------------|--------|
| 1990<br># 90.13 | Determination of the value of a Fruehauf Trailer Distributorship after reorganization under U.S. Bankruptcy Chapter 11. | Presented as evidence in U.S. Bankruptcy Court, Baltimore, MD. | Warner Fruehauf Corp. |
| 1990 | An economic analysis of the market impact of an additional Toyota dealership in Richmond, VA. | To be presented as evidence before DMV hearing examiner, but complaint withdrawn. | McGeorge Toyota |
| 1992<br># 92.27 | An economic analysis of the market impact of an additional Oldsmobile dealership in Dallas, TX. | To be presented as evidence before DMV hearing examiner (Texas), but settlement reached. | Freeman Oldsmobile/ Jim Atlee Oldsmobile |
| 1992<br># 92.32 | An economic analysis of the lost profits sustained by a Ford dealer in Western Virginia due to anti-competitive and other unlawful practices of the manufacturer. | Presented as evidence in Federal Court in Virginia. | Mountain Ford |
| 1992<br># 92.40 | An economic analysis of the lost profits sustained by a Toyota dealer in Alabama due to anti-competitive and other unlawful practices of a distributor. | To be presented as evidence in state court in Alabama, but settlement reached. | Village Toyota |
| 1993<br># 92.43 | An economic analysis of the lost profits sustained by a Toyota dealer in Florida due to anti-competitive and other unlawful practices of a distributor. | To be presented in Federal Court in Georgia, but settlement reached. | Milton Martin Toyota |
| 1993<br># 92.44 | An economic analysis of the lost profits sustained by an Oldsmobile dealer in St. Louis due to anti-competitive and other unlawful practices of the manufacturer. | To be presented in Federal Court in Illinois, but settlement reached. | Woodrum Oldsmobile |
| 1993<br># 93.17 | An analysis of the distinction between Economic and Statutory definitions of the "Relevant Market Area" of a Chrysler/Plymouth dealer in Richmond, VA. | To be presented as evidence before DMV hearing examiner, but complaint withdrawn. | Pence Chrysler/Plymouth/ Dodge |
| 1994<br># 94.15 | Determination of the Statutory "Relevant Market Areas" of existing Jeep Dealers in Tidewater, VA. | Confidential report to prospective dealer. | Confidential |
| 1995<br># 95.14 | Determination of fair and equitable allocations of new Jeep Vehicles in Virginia. | To be presented as evidence before DMV hearing examiner, but complaint withdrawn. | Greenbrier Jeep/Eagle Hall Jeep/Eagle |
| 1995<br># 95.25 | An economic analysis of the ability of the South Hampton Roads, VA market to support the relocation of an existing Honda Motorcycle dealership. | Presented as evidence before DMV hearing examiner. | Cycle World |

**MOTOR VEHICLE INDUSTRY STUDIES
PERFORMED BY TECHNICAL ASSOCIATES, INC.**

| YEAR | DESCRIPTION OF STUDY | PURPOSE OF STUDY | CLIENT |
|---|---|---|---|
| 1995<br># 95.32 | Determination of the Statutory "Relevant Market Area" of existing Chrysler Dealers in Tidewater Virginia. | Confidential report to prospective dealer. | Confidential |
| 1996<br># 95.42 | An economic analysis of the lost profits sustained by a Toyota Dealer in Holland, MI due to anti-competitive and other unlawful practices of the national importer. | To be presented as evidence in Federal Court in Michigan, but case dismissed pending appeal. | Great Lakes Toyota |
| 1996<br># 96.15 | Determination of the Statutory "Relevant Market Area" of existing Chrysler and Plymouth dealers in the Richmond, VA area. | Confidential report to prospective dealer. | Confidential |
| 1996<br># 96.18 | An economic analysis of preferential treatments of competing dealers in Grand Rapids, Michigan with respect to new vehicle supplies from the national importer. | To be presented as evidence in Federal Court in Michigan, but case dismissed pending appeal. | Harvey Toyota |
| 1996<br># 96.29 | An economic analysis of the ability of the Minneapolis/St. Paul market to support the relocation of an existing Jeep/Eagle dealer. | To be presented as evidence in State Court in Minnesota, but settlement reached. | Whitaker Buick/Jeep/Eagle |
| 1996<br># 96.36 | Valuation of an existing Dodge dealership in Hampton Roads, Virginia. | Confidential report to dealer. | Confidential |
| 1996-98<br># 97.04 | Economic analyses of the lost profits sustained by various Honda dealers as a result of the preferential treatment to certain dealers due to bribes paid to Honda executives. | Confidential reports to dealers and legal counsels for settlement discussion purposes regarding then pending lawsuits in Federal Court in Baltimore. | See Attached Client List on Page 8. |
| 1997<br># 97.14 | Determination of the Statutory "Relevant Market Areas" of existing Chrysler and Plymouth dealers in the Richmond, VA. area. | Confidential report to prospective dealer. | Confidential |
| 1997<br># 97.33 | Determination of the Statutory "Relevant Market Areas" of existing Jeep dealerships in the Northern Neck, VA. area. | Confidential report to prospective dealer. | Confidential |
| 1997<br># 97.35 | Determination of the Statutory "Relevant Market Areas" of existing Ford dealerships in the Fredricksburg, VA. area | Confidential report to existing dealer considering relocation. | Confidential |
| 1997<br># 97.36 | An economic analysis of the comparative market performance of an existing Nissan dealer in Hampton Roads, VA, including an assessment of the statistical validity of Nissan's Customer Satisfaction Indices ("CSI") | Presented as evidence before DMV hearing examiner. | Crumpler Nissan |

Exhibit B
Page 6 of 9

MOTOR VEHICLE INDUSTRY STUDIES
PERFORMED BY TECHNICAL ASSOCIATES, INC.

| YEAR | DESCRIPTION OF STUDY | PURPOSE OF STUDY | CLIENT |
|---|---|---|---|
| 1997 # 97.41 | An economic analysis of the comparative market performance of an existing Mazda dealer in the Washington, DC area. | To be presented as evidence before DMV hearing examiner, but complaint withdrawn. | Sheehy Mazda |
| 1997 # 97.46 | An economic analysis of the impact on a Chevrolet dealership in the Ft Worth/Dallas area as a result of the proposed appointment of a new Chevrolet dealership. | Presented as evidence before DMV hearing examiner. | Graff Chevrolet |
| 1997 # 97.53 | An economic analysis of the lost profits sustained by a Mercedes-Benz dealership in the Boston area as a result of improper acts by the manufacturer/distributor. | To be presented in Federal Court in Boston, but settlement reached. | Smith Motor Company |
| 1997 # 97.57 | Determination of the Statutory "Relevant Market Areas" of existing Jeep dealerships in the Washington, DC area. | Confidential report to prospective dealer. | Confidential |
| 1998 # 98.07 | Determination of the Statutory "Relevant Market Areas" of existing Jeep dealerships in the Richmond, VA area. | Confidential report to an existing dealer that was considering moving the dealership to a new location. | Confidential |
| 1998 # 98.14 | Determination of the Statutory "Relevant Market Areas" of existing Jeep dealers in the Roanoke, VA area. | Confidential report to an existing dealer that was considering moving the dealership to a new location. | Confidential |
| 1998 # 98.30 | An economic analysis of Volkswagen of America's new vehicle allocation policies and procedures. | Presented as evidence before DMV hearing examiner. | Miller Vokswagen |
| 1999 # 99.01 | An economic analysis of Chevrolet's distribution policies and practices to various dealers in the Birmingham, AL area. | Presented in Circuit Court in Alabama. | Serra Chevrolet |
| 1999 # 99.05 | Business Valuation of a Jaguar franchise in the metropolitan New York City area. | Determine value of franchise for estate and inheritance purposes. | Confidential |
| 1999 #99.29 | Economic and public policy analysis of a mega motorcycle dealer owning multiple franchises. | To be presented as evidence before Virginia DMV hearing examiner, but case settled beforehand. | PowerRide Motorsport |

MOTOR VEHICLE INDUSTRY STUDIES
PERFORMED BY TECHNICAL ASSOCIATES, INC.

| YEAR | DESCRIPTION OF STUDY | PURPOSE OF STUDY | CLIENT |
|------|---------------------|------------------|--------|
| 1999 #99.32 | Business valuation of two existing Virginia auto dealerships that are considering merging into a single dealership. One is a Jeep dealer, while the other a Dodge dealer. | Relative capital contribution requirements of each dealer to from the joint operation. | Confidential |
| 2000 #00.01 | Business valuation of a Freightliner dealership in Virginia. | Determine market value of franchise for the possible sale of the dealership. | Confidential |
| 2001 #00.36 | An economic analysis of the ability of the Bristol VA/TN market to support an additional Yamaha dealership. | To be presented as evidence before DMV hearing examiner. | Atlas Motorcycles, Inc. |
| 2001 #01.01 | Determinations as to the competitive impact of a Buick dealership relocation in Dallas. | To be presented as evidence before DMV hearing examiner. | Snell Buick |
| 2001 #01.05 | An economic analysis of a Volvo Truck dealership's business performance and market potential in the DC metropolitan area. | To be presented as evidence before DMV hearing examiner but case settled before hearing. | Central Motor Co. |
| 2002 #02.03 | An economic analysis of Chevrolet's new vehicle distribution practices in the Fort Worth, Texas area. | Confidential report to dealer and legal counsel. | Confidential |
| 2002 #02.07 | An economic analysis of Volkswagen's new vehicle allocation and distribution practices in Alabama. | To be presented in Circuit Court in Alabama but settlement reached beforehand. | Serra Volkswagen |
| 2002 #02.29 | Statutory relevant market area study in Virginia. | Prepared as confidential report to dealer. | Confidential |
| 2002 #02.35 | Economic consideration of competition issues as it relates to the constitutionality of the U.S. Commerce clause. | Presented as evidence in Federal District Court (Richmond, VA). | Atlas Yamaha/VA Attorney General |
| 2003 #03.09 | An economic analysis of damages sustained by a Lincoln Mercury dealer as a result of improper vehicle allocations and refusal to allow dealer relocation. | To be presented as evidence in Federal District Court (OH). (Trial Pending) | Confidential |
| 2003 #03.12 | Statutory relevant market area study in Virginia. | Prepared as confidential report to dealer. | Confidential |
| 2004 #04.20 | Market impact study of a potential Ford automobile dealership relocation. | Confidential report to client. | Confidential |

**MOTOR VEHICLE INDUSTRY STUDIES**
**PERFORMED BY TECHNICAL ASSOCIATES, INC.**

| 2004 #04.22 | Economic analyses of the damages sustained by a Chevrolet dealer in the Birmingham, Alabama area as a result of improper new vehicle allocations and improper closure of a satellite location. | To be presented in Federal District Court (AL). (Trial Pending) | Serra Chevrolet |
|---|---|---|---|

**MOTOR VEHICLE INDUSTRY STUDIES**
**PERFORMED BY TECHNICAL ASSOCIATES, INC.**

## 1996-1998 Honda Litigation Client List

**CALIFORNIA**
Beverly Hills Honda, Carmichael Honda, Dublin Honda,
Gene Gabbard Honda, Huntington Beach Honda, Bryand Honda,
Community Honda, Goodrum Honda, Honda of Santa Anna,
Kaiser Brothers Honda, Majestic Honda, Metro Honda, Nelson Honda,
Pasadena Honda, Sierra Autocars, Steward Honda, Harding Honda,
June Jensen Honda, Sierra Motors, Jim Clase Honda & Doten Honda

**NEW YORK**
Austin Motors, Yonkers Honda, & Honda City

**MASSACHUSETTS**
Porter Chevrolet/Honda, Balise Honda, Bernardi Honda,
Menard & Holmbery Honda, Clair Honda, & Lundgren Honda

**VERMONT**
Jorgensen Honda

**FLORIDA**
Robbin L. Toresco Honda

**CONNECTICUT**
Cardinal Honda

**VIRGINIA**
Edwards Oldsmobile/Honda

**SOUTH CAROLINA**
Breadaway Honda, & Vic Baily Honda

**NORTH CAROLINA**
Bryan Honda & Kimball Honda

**NEVADA**
Las Vegas Honda

**MARYLAND**
Luby Honda

**TEXAS**
Bell McDavid Honda

**NEW HAMPSHIRE**
Nault Honda

**PENNSYLVANIA**
Rocco Honda, Honda Village &
Dean Honda

COMPARISON OF GENERAL MOTORS (GM) NEW CHEVROLET MODEL ALLOCATION DATA APPLICABLE TO SERRA CHEVROLET
IN ELECTRONIC FILES PRODUCED BY GM IN RESPONSE TO SERRA CHEVROLET DISCOVERY

| (1) | (2) File A For 2002 Model Year Chevrolets Using Avalanche (AVALAN) Model As An Illustration | (3) | (4) | (5) File B For 2002 Model Year Chevrolets Using Avalanche (AVALAN) Model As An Illustration | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|
| Col. Title 1/ | | 11/01 Data | Col. Title 2/ | | 11/8/01 Data | 11/15/01 Data | 11/29/01 Data 3/ |
| (1) | Selling Source | 13 | (1) | Selling Source | 13 | 13 | None |
| (2) | Distribution Entity | RET | (2) | Distribution Entity | RET | RET | None |
| (3) | Allocation Group | AVALAN | (3) | Business Associate Code | 112669 | 112669 | None |
| (4) | Allocation Period | 200202 | (4) | Merge Indicator | N | N | None |
| (5) | Business Associate Code | 112669 | (5) | Report Date | 11/8/01 | 11/15/01 | None |
| (6) | Model Year | 2002 | (6) | Model Year | 2002 | 2002 | None |
| (7) | Availability Period | 200111 | (7) | Allocation Group | AVALAN | AVALAN | None |
| (8) | Sales Driver | N | (8) | Total Preliminary Orders | 0 | 0 | None |
| (9) | Sales Quantity | 16 | (9) | Allocation Quantity | 6 | 0 | None |
| (10) | In System Quantity | 6 | (10) | Desired Quantity | 0 | 0 | None |
| (11) | In Stock Quantity | 25 | (11) | Orders Placed Prior | 0 | 0 | None |
| (12) | Generated Quantity | 0 | (12) | Pass 1 Orders Placed | 0 | 0 | None |
| (13) | Balance To Go | 0 | (13) | Pass 2 Orders Placed | 0 | 0 | None |
| (14) | Variance Resolution Available Quantity | 0 | (14) | Pass 3 Orders Placed | 0 | 0 | None |

Exhibit C
Page 2 of 5

COMPARISON OF GENERAL MOTORS (GM) NEW CHEVROLET MODEL ALLOCATION DATA APPLICABLE TO SERRA CHEVROLET IN ELECTRONIC FILES PRODUCED BY GM IN RESPONSE TO SERRA CHEVROLET DISCOVERY

| (1) | (2) File A For 2002 Model Year Chevrolets | (3) | (4) | (5) File B For 2002 Model Year Chevrolets | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|
| | Using Avalanche (AVALAN) Model As An Illustration | | | Using Avalanche (AVALAN) Model As An Illustration | | | |
| Col. Title 1/ | | 11/01 Data | Col. Title 2/ | | 11/8/01 Data | 11/15/01 Data | 11/29/01 Data 3/ |
| (15) Temporary Protection Quantity | | 0 | (15) Pass 4 Orders Placed | | 6 | 0 | None |
| (16) Fleet To Retail | | 0 | (16) Weekly Total Placed | | 6 0 | 0 | None |
| (17) Total Availability | | 31 | (17) Quantity Balanced | | -6 | 0 | None |
| (18) Temporary Allocation Quantity | | NULL 4/ | (18) Total National Availability | | 896 | 281 | None |
| (19) Estimated Shipment Quantity | | 0 | (19) Dealer ADS | | 228 | 246 | None |
| (20) Available Days Supply | | 161.31 | (20) National ADS Bar | | 690 | LARGE | None |
| (21) National Bar Quantity | | 134.15 | (21) National Placement Attempts | | 189 | 180 | None |
| (22) Daily Sales Rate | | 0.176 | (22) Dealer Placement Attempts | | 0 | 0 | None |
| (23) Production Consensus Quantity | | 2 | (23) Sales/Availability For Pass 3 as of Date | | 11/6/01 | 11/13/01 | None |
| (24) Final Consensus Allocation Quantity | | 2 | (24) Ground Stock/In Transit | | 18 | 16 | None |
| (25) Calculation Indicator | | Y | (25) In-System | | 11 | 17 | None |
| (26) Allocation Method | | AD | (26) Selected Pass 1-2 | | 0 | 0 | None |
| (27) Sales History Code | | 3 | (27) Weighted Availability | | 30.4 | 32.8 | None |
| | | | (28) Number Of Days | | 150 | 150 | None |

COMPARISON OF GENERAL MOTORS (GM) NEW CHEVROLET MODEL ALLOCATION DATA APPLICABLE TO SERRA CHEVROLET
IN ELECTRONIC FILES PRODUCED BY GM IN RESPONSE TO SERRA CHEVROLET DISCOVERY

| (1) | (2) File A For 2002 Model Year Chevrolets Using Avalanche (AVALAN) Model As An Illustration | (3) | (4) | (5) File B For 2002 Model Year Chevrolets Using Avalanche (AVALAN) Model As An Illustration | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|
| Col. Title 1/ | | 11/01 Data | Col. Title 2/ | | 11/8/01 Data | 11/15/01 Data | 11/29/01 Data 3/ |
| | | | (29) Number of Deliveries | | 20 | 20 | None |
| | | | (30) Daily Sales Rate | | 0.133 | 0.133 | None |

1/ See Page 4 for Title definitions produced by GM.

2/ See Page 5 for interpretations of Title definitions as specific definitions have yet to be produced by GM.

3/ As shown in File B for a number of dates druing a year, no data are reported for certain (e.g., AVALAN) of the 27 or more new Chevrolet car and truck models listed therein. Presumably this mreans that allocation calculations were not made by GM as of that date for that model.

4/ GM has responded in discovery that NULL is the word used to fill a field with no data.

ELECTRONIC FILE A COLUMN TITLE DEFINITIONS PRODUCED BY GM IN RESPONSE TO SERRA CHEVROLET DISCOVERY AS FOLLOWS:

| Col. | Title Definition |
|------|------------------|
| (1) | Each GM Marketing Division is identified by a two digit number.   Example:   Chevrolet is 13. |
| (2) | Distribution Entity.   Retail and Commercial. |
| (3) | Allocation Group.   Identifies the vehicle brand name/model. |
| (4) | Allocation Period.   Indicates the production period.   Labeled in months, example 200105 is May 2001. |
| (5) | Business Associated Code.   A 6 digit numeric code that identifies the dealer. |
| (6) | Model Year. |
| (7) | Availability Period.   This refers to the time period used for Sales, Stock, In System columns of data that are used in calculating the Estimated Shipments.   Typically the availability period is two months prior to the Allocation Period. |
| (8) | Sales Driver.   Y or N.   When 'Y' is used in the example of Equinox it means that a combination of SB2, SB4, and Tracker model sales and availability data was used in calculating Estimated Shipment numbers.   'N' means that no other allocation group/models data were used in the calculation of Estimated Shipments. |
| (9) | Retail sales used to calculate estimated shipments.   Generally 3 or 12 months worth of sales depending on the calc months. |
| (10) | In System Quantity.   Includes orders at the plant not built and built but not shipped. |
| (11) | In Stock Quantity.   Includes vehicles on the ground and in-transit. |
| (12) | Generated Quantity.   These are allocated units to the dealer that are still in the generated tab for dealer changes and will be in the system soon. |
| (13) | Balance to Go.   These are previously allocated units that have been split into production weeks and will be in the system soon. |
| (14) | Variance Resolution Availability Quantity.   These are allocated units that have not gone into the system yet from the previous allocation period. |
| (15) | Temporary Protection Quality.   These are availability adjustments that are applied to the total Availability for a limited period which reduces the dealers availability for specifically defined situations which help the dealer generate greater Estimated Shipments. |
| (16) | Fleet to Retail.   This is a penalty for delivering fleet ordered vehicles to retail customers thus circumventing the allocation system.   No allocation sales credit is given the dealer.   A positive adjustment is made to a dealers availability. |
| (17) | Total Availability is the amount of vehicles available and includes In-stock, In-system, Genrtd Qty, Balance to Go and VR Avblty Qty minus Tmp Plct Qty and plus Fit to Ret. |
| (18) | Temporary Allocation Quantity.   Temporary allocation adjustment may be given to a dealer for specifically defined reasons.   If temporary allocation is loaded into VOM before a monthly allocation cycle begins, it will be included in the Estimated Shipment number.   If loaded after the cycle begins, it will be added to the Estimated Shipment/Variance Resolution quantity. |
| (19) | Estimated Shipment Quantity.   Estimated Shipment is the VOM term for initial allocation that is offered to the dealer. |
| (20) | Available Days Supply (ADS) refers to a dealers days supply of vehicles which includes In-stock, In-system, and Balance to Go units. |
| (21) | National Bar Quantity.   National Bar reflects by allocation group the Available Days Supply of the last dealer who received Estimated Shipments. |
| (22) | Daily Sales Rate is the dealers sales history divided by the days in the sales history period. |
| (23) | Production Consensus Quantity is the number of units the dealer consensus to. |
| (24) | Final Consensus Allocation Quantity.   This is the dealers final consensus allocation prior to order placement. |
| (25) | Calculation Indicator.   In most cases it is yes which indicates that allocation was spread to dealers.   Typically no is used for CUTVAN and 3500HD as allocation is not spread on these lines because unique nature of the vehicle.   Dealers just consense if they want some. |
| (26) | Allocation Method.   This indicates what mode the allocation was calculated on.   Typically most of the time AD is used which indicates Available Days Supply.   When demand is low SH can be used which indicates Sale History. |
| (27) | Sales History Code indicates the number of months of a dealers sales history that was used to determine Estimated Shipments. |

INTERPRETATION OF GM'S ELECTRONIC FILE B COLUMN TITLES AS FOLLOWS 1/:

| Col. | Title Definition |
|---|---|
| (1) | Same as for Col. (1) on Page 4. |
| (2) | Same as for Col. (2) on Page 4. |
| (3) | Same as for Col. (5) on Page 4. |
| (4) | Unknown, not included in Source 1/ or other VOM Reports reviewed. |
| (5) | The date that begins the weekly business cycle; for this report, Tuesday. |
| (6) | Same as for Col. (3) on Page 4. |
| (7) | Same as for Col. (6) on Page 4. |
| (8) | Total number of preliminary orders currently in the system for this BAC and allocation group at Event Code 1100. |
| (9) | Amount of allocation distributed. |
| (10) | Represents the amount of allocation requested. |
| (11) | The quantity of preliminary orders placed prior to the weekly order placement batch selection cycle. |
| (12) | The quantity of orders placed for Pass 1. |
| (13) | The quantity of orders placed for Pass 2. |
| (14) | The quantity of orders placed for Pass 3. |
| (15) | The number of orders placed in Pass 4.  May include a dealer's preliminary orders or national patterns. |
| (16) | Total orders placed prior to the Monday weekly order placement process plus all preliminary orders placed in Pass 1 through 4. |
| (17) | Desired quantity minus weekly total placed orders, but titled as Desired Quantity Balance in Source 1/. |
| (18) | Total quantity available nationally for Pass 3.  Includes GM and dealer funded. |
| (19) | Number of days it would take to sell all stock, in system, in transit and placed orders at the current sales rate for the allocation group. |
| (20) | Days' supply of the last dealer to have an order placed.  Dealers over the bar will not typically have additional orders placed. |
| (21) | Number of times nationally that the system attempted to place orders in Pass 3. |
| (22) | Number of times the system attempted to place a dealer's orders in Pass 3 until the national placement is complete. |
| (23) | Unknown, not included in Source 1/ or other VOM Reports reviewed. |
| (24) | Number of vehicles in grounded stock and in transit as of the report date. |
| (25) | Number of vehicles in-system as of the report date. |
| (26) | Preliminary Orders selected in Pass 1 and Pass 2. |
| (27) | Availability adjustment based on the event status of the order:  (1.2 x Grounded Stock and In-Transit) + [In-System + Selected in Pass 1-2 + Orders Placed Prior) x .8] |
| (28) | Number of days of sales history used in calculations. |
| (29) | Number of vehicles sold in an allocation group for the period defined in the previous column. |
| (30) | Average number of vehicles sold per day for the sales period calculated by taking the quantity in the Number of Deliveries column and dividing it by the quantity in the Number of Days column. |

1/ Unless otherwise noted, these interpretations are taken verbatim from the VOM Manual, pgs. 7-19 & 20, regarding GM's Weekly Order Placement Report.