IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| SERRA CHEVROLET, INC.            ) | |
|                                                              ) | |
|           PLAINTIFF,                         ) | |
|                                                              ) | |
| V.                                                         )  CASE NO:  2:01 cv-2682-HS | |
|                                                              ) | |
| GENERAL MOTORS CORPORATION, ) | |
|                                                              ) | |
|           DEFENDANT.                        ) | |

### PLAINTIFF'S MOTION FOR SANCTIONS

Comes now the Plaintiff, Serra Chevrolet, Inc. (hereinafter Serra), and hereby files this Motion for Sanctions against the Defendant General Motors Corporation (hereinafter GM), and as grounds therefore states as follows:

**Deficiencies in GM's Satellite Data Production**

1.      That by Order dated February 7, 2005, the Court granted, in part, the Plaintiff's Motion for Sanctions, finding that GM had violated the Court's August 28, 2004 Order on the Plaintiff's Motion to Compel by failing to provide documents in its possession and control relating to specific satellite dealerships.  Pursuant to the Court's Order, GM was afforded fourteen (14) days in which to purge its noncompliance, after which time sanctions of $50,000 would be imposed for each day GM remained out of compliance.

2.      That on February 11, 2005, the Plaintiff took the deposition of William Hepburn, GM's designated representative most knowledgeable regarding its document production related to GM's Satellite program and its Chevrolet satellite dealerships.  As GM's designated representative, Hepburn submitted an Affidavit in opposition to the

Plaintiff's Motion for Sanctions, stating that he had **personal knowledge** of the matters set forth in his affidavit relative to GM's production obligations with respect to the satellite program and Chevrolet satellite dealerships.

    3.    That Mr. Hepburn's deposition testimony revealed the following:

    a.    That in early November 2004, in response to the Plaintiff's request for satellite information, a computer search of GM's mainframe database was performed concerning the satellite information. (Hepburn dep. pp. 59-60,62,87)

    b.    That while Hepburn executed an Affidavit stating he had personal knowledge that the information produced by GM was based upon a "review of available GM records," he acknowledged that his involvement in this search was limited to tasking another employee to obtain this information and thereafter briefly reviewing the information gathered. (Hepburn dep. pp.67) To this end, Hepburn testified that he instructed Susan Jackson within his department to contact Juanita Ferretta in the systems area of the Dealer Contract Group, to perform a computer search of GM's core system in order to pull a list of the dealers that either have satellite agreements or at some point had satellite agreements. (Hepburn dep. pp.54-55)  Hepburn further testified that he relied on this computer-generated report obtained by Ms. Ferretta, without any further effort to search or verify the accuracy and completeness of the report. (Hepburn dep. pp.70-71,74).  In fact, Hepburn acknowledged that his review of the results took approximately "two seconds." (Hepburn depo. pp. 59)

    c.    Hepburn stated that the source of all information concerning the Chevrolet satellite dealerships would be the dealer files, which were maintained within the Dealer Contract Group department.  To this end, Hepburn testified as follows:

> **Q**. You know of no system in place that could tell us the history of the satellites, how they came to be, what happened to them, that type of thing, other than what would be in the [dealer] files – the actual hardcopy files themselves, do you?
>
> **A**. That is correct.  Any information would be in the file.  That's right.
>
> **Q**. In your – I'm sorry.

2

> **A**.  Any information on satellite agreements would be in the dealer's file.  That's the only information that I'm aware of.

(Hepburn depo. pp.88-89).

> d.  Hepburn testified that while the hard copy dealer files which contained the satellite information were maintained in his Department, neither he, his staff nor anyone else reviewed the dealer files. (Hepburn depo. pp. 88).

> e.  Hepburn testified that to his knowledge, no request was made of the Chevrolet zone or branches for such information; (Hepburn depo. pp.71, 88).

> f.  That to Hepburn's knowledge, business records were readily available to GM; however, no such records were reviewed, but rather only electronic data was searched. (Hepburn depo. pp.88).

> g.  Hepburn does not know of any attempt made by anyone to review the hardcopy files to check for satellite agreements. (Hepburn depo. pp. 81).

> h.  Hepburn testified that he never saw or reviewed the Court Order which directed GM to provide the satellite information. (Hepburn dep.pp. 77)

4. On February 17, 2005, the deadline for GM to produce all responsive documentation, GM provided the Plaintiff with supplemental responses to the Plaintiff's Request for Production numbered 2, 3, and 4, as well as documents bates numbered S-GMFED985 to S-GMFED1314.  In its supplemental pleading, GM called upon the Plaintiff to furnish any additional information it may have, stating, "if Plaintiff is aware of any Chevrolet dealers with satellite locations that GM inadvertently has not identified, GM requests Plaintiff to identify these dealers by name and location and GM will search its records for any responsive information."  GM's pleading further stated that it "has reviewed the contract dealer files of all Chevrolet dealers with a satellite or additional facilities **that have been identified** and will produce copies of documents in those files pertaining to the satellite agreements." (emphasis added)  This statement appears to

3

suggest that GM simply reviewed those dealer files which had been previously identified by its computer search.

5. That while GM has produced additional documentation, such production remains deficient.

6. Through correspondence dated February 18, as well as March 2, 2005, the Plaintiff advised counsel for GM of existing deficiencies, stating that it was evident from William Hepburn's deposition testimony that GM was in violation of the Court's order and further that there were other satellite facilities which had not been disclosed by GM. (See letters attached as Exhibits A and B)

7. That by letter under date of February 28, 2005, counsel for GM refuted the testimony of its own designated representative stating that GM had, in fact, contacted its "field organization" seeking satellite information.  GM further responded by asking the Plaintiff for the names of any other satellite dealerships, so that GM could search for such records. (See letter attached as Exhibit C).

8. By letter dated March 2, 2005, while Plaintiff's counsel responded that it was not obligated to make such disclosures when such information was readily available to GM, Plaintiff's counsel nevertheless advised that GM's own witnesses had testified in their depositions as to the existence of several other satellite dealerships which did not appear on the list of satellites produced to the Plaintiffs. (See Exhibit B)  Despite such disclosures by the Plaintiff, absolutely no further response by GM has been forthcoming.

9.      Evidence of the deficiencies in GM's satellite data production can be gleaned from the testimony of GM's own witnesses who have testified to satellite facilities which have yet to be disclosed by GM:

a)      On July 15, 2004, William Powell, Chevrolet's Regional General Manager over the Southeastern United States, testified that a dealer in Savannah, Georgia (Vaden Chevrolet) had a satellite dealership which was later converted by GM into a full point dealership. (Powell dep. pp.54-55).

b)      On March 16, 2005, Chevrolet's Regional Sales Manager Ronte Smith testified that he was involved in Vaden Chevrolet's conversion from a satellite to a full point dealership. (Smith Depo. pp. 41) He also testified that he has not received any request from GM's Central Office seeking information regarding the names of any and all satellite dealerships. (Smith Depo pp.28-29).

c)      On February 22, 2005, former GM representative Stan Moore testified that Hilo Motors had a satellite dealership in Kona, Hawaii in the early 1980's. (Moore dep. pp. 28-29).

d)      On June 3, 2004, Jim Astorga, GM's Zone Manager for the Birmingham Multiple Dealer Area, testified to a satellite facility in Anchorage, Alaska. (Astorga Dep. pp 185-186).

e)      On June 29, 2000, in the prior state court action, GM's Director of Dealer Organization testified to a satellite in Utah. (Desmond Dep. pp. 35)

Given the foregoing testimony provided by GM's own witnesses, it cannot be disputed that GM has failed to furnish all information available concerning its Chevrolet satellite dealerships. It further underscores the fact that, despite the Court's repeated admonitions and threatened sanctions, GM did not perform a diligent search of its records, including but not limited to its dealer files, in order to determine all responsive documents. If GM had contacted its field organizations across the country as it has claimed, how did it fail to detect the existence of each of the entities identified by its **own witnesses**? The Plaintiff submits that such glaring omissions raise serious doubts as to the completeness of GM's disclosures.

**Deficiencies in GM's Allocation Data Production**

Similar to its failure to comply with the Court's order regarding the Chevrolet satellite program and all satellite dealerships, the Plaintiff submits that GM's production of the requested allocation data and records is incomplete and otherwise deficient in several material respects. To illustrate, while the Court ordered GM to produce new Chevrolet allocation records applicable to each Birmingham MDA Chevrolet dealership covering the period January 2001 to date, GM's resulting production contains data and information voids extending over five months in one instance and ten months in another. Moreover, these gaps in information involve differing sets of Birmingham MDA Chevrolet dealerships, such that a meaningful analysis cannot be performed on a consistent basis of the new Chevrolets allocated to these dealerships over the period January 2001 to date.

    10.    That by Order dated February 7, 2005, the Court denied the Plaintiff's Motion for Sanctions with respect to the vehicle allocation data for the Birmingham MDA Chevrolet dealers as **premature** given that the deposition of Tim Jones, GM's designated representative most knowledgeable regarding its vehicle allocation system, as well as GM's production of vehicle allocation data as ordered by the Court, was scheduled to be taken on March 8, 2005.

    11.    That the Plaintiff took the deposition of Tim Jones on March 8 and 9, 2005, which revealed the following:

> a.    Jones acknowledged that in order to determine whether a dealer has been discriminated against or treated unfairly in the allocation process required a review of its competing dealers' allocation records. (Jones dep. pp.91).

b.      That GM instituted a 36-month document retention policy in 1999. However, Jones acknowledged that GM would place a "hold" on a dealer's files and preserve all such documents and data if there was litigation or anticipated litigation. (Jones dep. pp.51, 87) (See also Hepburn dep.pp.45 – "If there's litigation then I know that they retain information.").

c.      Jones stated that there was a hold placed on Serra Chevrolet and Edwards Chevrolet's dealer files, but no hold was placed on any other Birmingham MDA Chevrolet dealer. (Jones dep. pp.87).

d.      Jones stated that with respect to placing a "hold" on a dealer's files, he acts at the direction of GM's legal staff. (Jones dep. pp.94).

e.      That GM's VOM's allocation system is comprised of two steps: (1) **consensus allocation process** -- the monthly determination of the number and type of vehicles the dealer has earned and has committed to receive; and (2) **dealer order submission process** --the weekly process of determining how this committed volume of vehicles will be delivered and received by the dealership. (Jones dep. pp.32-33)[1]

f.      That GM's production of File A, for the period from January 2001 through May 2001, does not include any data for the other Birmingham area dealers, except Serra Chevrolet and Edwards Chevrolet.(note paragraph 11a above)

g.      Jones stated that the lack of any File A data produced with respect to the other Birmingham MDA dealers for the period January through May 2001 is due to GM's document retention policy of 36 months. (Jones dep. pp.94). Contrary to this position, Judge Proctor's January 28, 2004 Order specifically set out the permissible areas of discovery and included the allocation of vehicles since 2001.  This Order clearly put GM on notice of the Plaintiff's right and interest in    such vehicle allocation data.  Furthermore, GM was already on notice of the Plaintiff's misallocation claims by virtue of the Plaintiff's earlier document request for such information prior to 2004, as well as the  fact that the Plaintiff and Defendant had disputed the scope of relevant discovery, including such allocation records, which precipitated Judge Proctor's January  2004  Order.  Finally, such notice was afforded GM by the Plaintiff's Complaint and Amended Complaint filed in 2001 and 2002, respectively, given that the Plaintiff repeatedly alleged that GM violated the ADDCA through a "course of conduct," which included GM's allocation of vehicles.

---

[1] File A discussed hereinafter refers to the monthly consensus data, while File B refers to the weekly breakdown as to how and when the committed vehicles will be shipped and received by the dealer.

      h.      Jones acknowledged that GM has failed to produce any File B weekly allocation data for **any of the Birmingham MDA dealers** for the period from January 2001 through November 8, 2001. Jones explained that this lack of production stems from the fact that GM had changed its dealer order submission process around this time frame, and only started retaining such data as of November 2001. (Jones dep. pp.119-120). As a result, Jones admitted that none of the weekly allocation data prior to November 2001 was saved. (Jones dep.pp. 120, 244). Inconsistent with this position is the undisputed fact that GM places a "hold" (and had admittedly placed a hold on Serra Chevrolet and Edwards Chevrolet) on its dealer file documentation regarding any dealer involved in pending or anticipated litigation. As a result, pursuant to its own policies, GM should not have destroyed documents with respect to Serra Chevrolet or any other Birmingham MDA Chevrolet dealer.

      i.      Jones admitted that while GM produced the File A monthly allocation data for Serra and Edwards Chevrolet beginning in January 2001, GM's vehicle allocation system computes its vehicle allocations for January 2001 based, in part, upon the prior sales history of each dealer, going back as far as 12 months. (Jones depo. pp.235-236).

      j.      Given GM's production of data beginning January 2001, Jones admitted that there is no way for the Plaintiff to verify the accuracy of such vehicle allocations by GM. (Jones dep. pp.237-238).

      k.      Jones also acknowledged that in several respects, there is no way for the Plaintiff to verify the accuracy of the allocation data produced by GM. For instance, Jones acknowledged that he could not discern from the data available to the Plaintiff when the production date for a new model year begins. (Jones dep. pp.281) Jones further acknowledged that he could not tell from the data produced when new vehicles arrived at the dealer's lot. (Jones dep. pp281) However, Jones stated that such information could be ascertained from other sources. (Jones dep.pp. 281) Finally, when confronted with the actual allocation data produced, Jones was repeatedly forced to admit that the basis for GM's allocation decisions was not readily apparent from the data produced by GM, and would require further research. (See Jones dep. pp.254-256; 262, 266, 267)

      l.      Jones admitted that his prior Affidavit stating that GM's File A consisted of 30 columns of data was incorrect (Jones dep. pp.98).

      12.      The Plaintiff submits that there are substantial reasons to believe that the new Chevrolet allocation practices of GM in the Birmingham MDA have exacerbated the unfair competition to which Serra has been subjected as a result of GM's other actions. The Plaintiff has asserted, with respect to the latter, that its treatment by GM has exposed

8

the Plaintiff to a pattern of undue discrimination and unreasonable preference in at least the following respects:

(A) the unjustified termination by GM of Serra's Gardendale facility as a Chevrolet satellite franchise, the construction and operation of which enabled the Plaintiff to fulfill GM's performance standards by better serving Chevrolet customers in the western part of its unduly large geographical market in the Birmingham MDA that GM has assigned to Serra and designated as Area of Geographic Sales and Service Advantage (AGSSA) #4;

(B) the failure of GM to more narrowly reconfigure AGSSA #4 upon the termination of Serra's Gardendale facility as a Chevrolet franchise, in order to recognize that Serra would no longer be able to adequately serve the distant western part of this large geographical market from Serra's Centerpoint Chevrolet location in the eastern portion of AGSSA #4, and so that Serra would not be unreasonably cited for inferior Chevrolet sales and service under GM's performance standards; and,

(C) the encouragement and approval by GM of the purchase of Century Chevrolet (now Edwards East) by Edwards Chevrolet, where the latter has been the Plaintiff's primary Chevrolet rival in the Birmingham MDA, such that the Centerpoint facility of Serra now faces Chevrolet competition from two Edwards Chevrolet locations in close proximity to AGSSA #4.

13. Evidence to date in this case also establishes that, in conjunction with the take-over of Century Chevrolet by Edwards Chevrolet, GM provided the resulting Edwards East with some yet to be determined level and mix of additional supplies of new Chevrolets -- beyond those to which Century Chevrolet would have been otherwise

9

entitled under the present system utilized by GM for the ordering, allocation, production, and delivery of new vehicle supplies destined for dealerships; i.e., the Vehicle Order Management or VOM distribution system. While the discretionary component (as distinguished from the mechanized component) of the VOM distribution system allows such additional new vehicle supplies under certain circumstances, the exercise of this discretion by GM in the instant case has compounded the unfair competition resulting from GM's treatment of Serra.

14. The fact that Edwards East received an additional level and mix of new Chevrolets from GM upon the ownership conversion from Century Chevrolet is clear. Not only does the deposition of GM's designated representative Tim Jones confirm that the VOM system permits such dealings within its discretionary component, but the corporate representative of Edwards Chevrolet and Edwards East has acknowledged the receipt of a special supply of new Chevrolets from GM in connection with the take-over of Century Chevrolet.

15. GM's failure to comply with the Court's orders and produce complete allocation records and data effectively thwarts the Plaintiff's effort to probe the nature of these discretionary supplies of new Chevrolets delivered by GM upon the ownership transfer of Century Chevrolet, as well as to investigate whether Serra was unduly disadvantaged in other new vehicle supply respects in the Birmingham MDA. This is true in the first instance because, other than for Serra and Edwards Chevrolet, GM has produced no information related to new Chevrolet allocations applicable to any other Birmingham MDA Chevrolet dealership (including Edwards East) for months prior to June 2001 -- five months after the Court-ordered date of January 1, 2001. To the best of

the Plaintiff's knowledge and belief, Edwards Chevrolet began fully operating Century Chevrolet in the fourth quarter of 2000. As a result, new vehicle allocation information starting in June 2001 is too far removed from the time Edwards Chevrolet actively assumed control of Century Chevrolet. In fact, new vehicle allocation information starting January 1, 2001 is too far removed without the benefit of the underlying data upon which such allocation decisions were made. As Tim Jones acknowledged, GM's allocation system, in part, uses a 3 to 12 month prior sales history of a dealer in making its allocation decisions. (Jones dep. pp.301, 315) As a result, without the 3 – 12 months prior sales history for each dealer, there is no way for the Plaintiff to verify the January 2001 allocation data which has been provided by GM. (Jones dep. pp. 235-238, 313,315-316)

16.  As stated above, the explanation offered by GM for this five-month void in information is not credible. In particular, while GM alleges that allocation records for the other Birmingham MDA Chevrolet dealerships have been destroyed pursuant to its 36-month document retention policy, GM was on notice at least no later than January 2004 that the Court-ordered production of new vehicle allocation information pertained to all Birmingham MDA Chevrolet dealerships. Thirty-six months prior to January 2004 is January 2001, not June 2001.

17.  Through another claimed aspect of its document retention/destruction practices, a ten-month void also prevails with respect to the relevant File B weekly allocation records and data produced by GM for all Birmingham MDA Chevrolet dealerships. Ordering, allocation, and production of new Chevrolets under the VOM distribution system occur in accordance with weekly schedules that are aggregated into

monthly cycles consisting normally of three to six week periods. Whereas the five-month gap noted above pertains to these latter monthly cycles for Birmingham MDA Chevrolet dealerships other than Serra and Edwards Chevrolet, the ten-month void in GM's production relates to weekly allocation records for all Birmingham MDA Chevrolet dealerships. As a result, for no week during 2001 until November 8, 2001 has GM produced any Chevrolet allocation data applicable to the weekly ordering, allocation, and production schedules under the VOM distribution system despite the Court's mandate. Again, GM ascribes this ten-month gap to the destruction of allocation information that existed in a form which was no longer useful, even though such a destruction of allocation records pertinent to all Birmingham MDA Chevrolet dealerships poses an obvious conflict with the 36-month document retention policy of GM noted previously, and is further inconsistent with the "hold" policy as stated by GM's own employees. More specifically, since GM clearly knew that it had to retain allocation information applicable to at least Serra and Edwards Chevrolet for the period starting January 2001, no circumstances could have justified the destruction of any allocation records applicable to these two dealerships for the first ten months of 2001. Further, assuming arguendo that GM was not obligated to retain allocation information for the other Birmingham MDA Chevrolet dealerships until June 2001, GM has no justification for the destruction of allocation records and data applicable to these dealerships covering the monthly cycles from June through October 2001.

18. Finally, GM should not be able to assert that since its File A monthly cycle allocation information has been retained and produced to some limited degree, it has compiled with the order of the Court. First and foremost, GM has not done so for all

12

Birmingham MDA Chevrolet dealerships. Of comparable significance is that actual new Chevrolet ordering, allocation and production decisions under the VOM distribution system occur on a weekly basis -- including the important distinction between the mechanized and discretionary allocation components of VOM. GM claims to have destroyed these weekly allocation records for the first ten months of 2001, such that the actual weekly decisions noted during this lengthy time period cannot be observed.

19. Along with GM's failure to produce a complete set of allocation data, its non-compliance with the Court's order is evident in another material respect. None of the incomplete allocation reports produced by GM contain the data or calculations documenting the results shown therein, such that they cannot be verified through any form of auditing. However, the fact that these underlying calculations and data existed at the time allocation decisions were actually made by GM is undeniable. The manual prepared by GM to familiarize its dealerships with the workings of VOM shows, for example, that the mechanized allocation component of VOM for each type of new model year Chevrolet car and truck is based (in part) on the corresponding sales history of a dealership, extending back in time by as many as 12 months. As set out hereinabove, Jones readily acknowledged that this prior sales history is used in GM's allocation process, yet neither this sales history information nor other underlying data is contained in the incomplete allocation records produced to date by GM, compounding the problems created by the five-month and ten-months voids discussed previously.

20. In addition to levying sanctions against GM for its deficiencies in document production, the Plaintiff respectfully requests that the Court require GM to produce a complete set of information regarding the levels and compositions of its new

Chevrolet supplies to each Birmingham MDA Chevrolet dealership since January 2001. This complete set should contain all of the inputs and outputs pertaining to prior decisions in this timeframe on the ordering, allocation, production, and delivery of each new model year Chevrolet car and truck for each of these dealerships since January 2001, on a weekly, monthly cycle, and accumulated new model year basis. The Plaintiff submits that any claim by GM that it cannot produce all or a significant portion of these data also should be rejected by the Court. In fact, to the extent that relevant allocation records have been purged or destroyed by GM, comparable information exists in other forms. Specifically, from records retained by GM pertaining to dealership financing of new Chevrolet inventories, to customer warranties covering new Chevrolet purchases, and to possible recalls of new Chevrolets sold, GM can identify the type and timing of all new model year Chevrolets delivered to and sold by each Birmingham MDA Chevrolet dealership on a weekly, monthly, and accumulated basis since and including January 2001.

## CONCLUSION

GM's conscious decision to withhold the production of pertinent satellite information and material allocation data during the pendency of this litigation constitutes a gross abuse of discovery, as well as a deliberate refusal to comply with the Court's Orders for which the severest of penalties and sanctions is warranted. Such deliberate conduct constitutes an obstruction of justice and demonstrates GM's flagrant disregard for the discovery process. Further, such tactics have resulted in a manifest injustice against the Plaintiff's attempt to obtain necessary and discoverable information.

Such tactics to conceal information and hamper the Plaintiff's discovery have greatly prejudiced the Plaintiff's ability to compare its allocation and delivery of new Chevrolets by GM with those of the other Birmingham MDA Chevrolet dealers.  GM is well aware that such a comparison is critical in demonstrating the disparate and unlawful treatment of the Plaintiff by GM.

Due to GM's piecemeal approach to discovery, including its refusal to produce complete data as requested, the Plaintiffs and the Plaintiff's experts have been caused to expend substantial time and cost to continually revisit and reassess GM's productions of data, and has imposed an onerous burden on the Plaintiff.  Furthermore, GM's piecemeal approach to discovery has significantly hampered and delayed the discovery process and has repeatedly placed the Plaintiff up against the Court's scheduling order deadlines, and thereby necessitated the Plaintiff to seek repeated extensions of the Court's Scheduling Order.  Finally, the Plaintiff has exhausted all reasonable efforts to resolve these discovery disputes with GM, to no avail.

Based upon GM's utter disregard for the rules of evidence as well as the Court's prior Orders, the Plaintiff respectfully requests that the Court severely sanction the Defendant for its intentional misconduct.  In the alternative, the Plaintiff moves the Court to enter a default judgment, pursuant to Rule 37(b)(2)(C), based upon GM's consistent failure to produce requested information which has been specifically ordered by the Court.

Respectfully submitted,

**s/ Thomas E. Baddley, Jr.**
Bar Number: ASB-2867-E42T
**s/ Jeffrey P. Mauro**
Bar Number: ABS-0478-U71J
Attorneys for Plaintiff
Baddley & Mauro, LLC
2545 Highland Avenue, Ste. 201
Birmingham, Alabama 35205
(205) 939-0090
(205) 939-0064 Fax
badmaur@bellsouth.net – E-mail

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 1, 2005, I electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Jere White, Esq. and Terrence McCarthy, Esq.

**s/ Thomas E. Baddley, Jr.**
Bar Number: ASB-2867-E42T
**s/ Jeffrey P. Mauro**
Bar Number: ABS-0478-U71J
Attorneys for Plaintiff
Baddley & Mauro, LLC
2545 Highland Avenue, Ste. 201
Birmingham, Alabama 35205
(205) 939-0090
(205) 939-0064 Fax
badmaur@bellsouth.net – E-mail