IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SERRA CHEVROLET, INC., | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | |
| v. | ) | CV-01-02682-VEH |
| | ) | |
| GENERAL MOTORS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT GENERAL MOTORS' OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS

Defendant, General Motors Corporation ("GM" or "Defendant"), submits this Response in opposition to Plaintiff Serra Chevrolet, Inc.'s ("Plaintiff") Motion for Sanctions.

## INTRODUCTION

Plaintiff's latest motion for sanctions is simply part of its discovery plan to use motions for sanctions as a matter of first, rather than last, resort. GM had hoped that Plaintiff would change this strategic plan after the frustrations expressed by the Court at the hearing on Plaintiff's prior motions. Instead, the Plaintiff has sunk to a new low. As GM will show, there was absolutely no reason for Plaintiff to waste this Court's time with yet another motion for sanctions. Plaintiff repeatedly refuses to follow this Court's standing order requiring that the parties "exhaust[] all efforts to resolve the dispute" (which, in this case, is wholly manufactured by the Plaintiff) before filing such motions. See Court's Scheduling Order, Docket No. 68, p. 3. GM respectfully asserts that enough is enough and respectfully requests that the Court require Plaintiffs' counsel to comply with the standing order.

Plaintiff says GM should be sanctioned for not producing information related to satellite facilities, but the truth is that GM has produced every satellite related document that it has been

able to find. Plaintiff says that GM should be sanctioned for not producing allocation related

data, but the truth is that GM has produced all the relevant allocation data it has for the time

period established by this Court. There is simply no basis whatsoever for this motion, and it

must be denied.

## ARGUMENT

**I.      GM Has Performed a Diligent Search to Identify Chevrolet Dealers with Satellite
         Sales Agreements and Produced Copies of Those Records. The True Facts Show
         That Plaintiff Is Merely Attempting to Manufacture a Dispute Where None Exists.**

Plaintiff contends that GM should be sanctioned for purported "deficiencies" in its

production of information containing Chevrolet Sales Satellite Agreements. This is truly

remarkable. In making this assertion, Plaintiff, as usual, takes great liberty with the facts, omits

others, and simply makes allegations that it knows are untrue. The true, complete facts, show

that Plaintiff is simply wrong.

A.      GM Performed a Diligent Search and Produced Copies of All Documents it Could
        Locate Pertaining to the "Satellite Program" and the Individual Chevrolet Satellite
        Locations.

GM has bent over backwards trying to accommodate Plaintiff. This Court previously

ordered GM to produce all documents responsive to Plaintiff's Request for Production No. 2,

which states as follows:

> Any and all documents, in hard copy or in electronic format,
> regarding General Motors' Satellite Program, including but not
> limited to its implementation, when it was first made available to
> the Chevrolet dealer body, the purpose of the program, the
> parameters of the program, and the name, address and telephone
> number of the GM officials who were responsible for the
> implementation and overall oversight of the program to date.

Exhibit A, Pl.'s First Interrogs. & Request for Prod. to Def.

In response to this Order, GM produced every document it could find that could even remotely be construed as relating to the "satellite program" as a whole. In addition, GM also took steps to find any documents pertaining to any individual Chevrolet satellite locations. In conducting this search, GM (1) performed a computer search of its records system to search for dealers with satellite dealerships, (2) contacted personnel in its regional offices across the country regarding the same, (3) produced all the satellite agreements between GM and Chevrolet dealers it could locate, and (4) produced all other documents it could locate regarding these specific satellite locations. Once this was complete, GM filed a Notice of Compliance (Doc. No. 114) with this Court which outlined all the steps that were taken, and even invited Plaintiff's counsel to identify any other dealerships that he believed had satellites so it could perform a more narrowly tailored search for responsive documents. Plaintiff cannot now complain that GM has been anything but diligent, and Plaintiff certainly cannot argue that GM has acted in bad faith.

B.  GM Repeatedly Offered to Address Any Deficiency Which Plaintiff Could Specifically Identify and to Provide Follow-up Information to Plaintiff, But Plaintiff Did Not Specifically Tell GM What Was Allegedly Deficient.

Despite the fact that GM produced every responsive satellite related document that it could find, Plaintiff, who asked for the documents, has called the documents "meaningless" and wants this Court to think that GM is trying to withhold responsive documents. Exhibit B, 5/7/05 Letter. This allegation could not be further from the truth. From a common sense standpoint, Plaintiff has failed to articulate any alleged reason why GM would withhold documents or information relating to the Chevrolet Sales Satellites. The truth is that GM has made a diligent effort to produce all responsive documents, and has acted in good faith.

At the deposition of William Hepburn, Plaintiff's counsel implied that he was aware of certain "other" Chevrolet dealers with satellite sales agreements that GM had not identified and for which GM had not produced documents. Because Plaintiff's document request was unlimited in time (the first satellite was instituted well over 20 years ago) or geographical scope (satellites are or have been located across the country), GM was aware that there was a chance that responsive documents no longer existed, had been misplaced, or may not be found due to human error. Indeed, Plaintiff's counsel is well aware that GM does not have a central file where all Chevrolet Sales Satellite Agreements are located. Moreover, as the late GM executive Gerald Desmond testified, the creation of satellite facilities was not a sweeping national program; rather is was an informal Chevrolet pilot program conceived by Desmond over twenty years ago and that was experimental in nature. Exhibit C, Depo. of Gerald Desmond, p. 32. As such, GM welcomed the assistance of Plaintiff's counsel in searching for responsive documents. Consistent with its duties to supplement discovery, GM, on its own initiative, invited Plaintiff's counsel to identify any other Chevrolet dealers with satellite agreements of which he claimed to be aware and that GM had not found through its search. See Exhibit D, 2/14/05 Letter. The purpose of this inquiry was to permit GM to conduct a specific, narrowly tailored search for any documents pertaining to those dealers and to provide Plaintiff with any such documents.

Instead of cooperating, Plaintiff's counsel made clear that he had no interest in actually obtaining the documents as part of the discovery preparation of this case. Rather, he was more concerned with using discovery as a game and trying to manufacture a dispute for the inevitable sanctions motion. Instead of simply identifying which dealers he thought had Satellite Agreements so that GM could perform a more tailored search for the documents he purportedly sought, Plaintiff's counsel bluntly refused to do so, stating "it is not our job to ascertain the

existence and identity of the Chevrolet Satellites for GM." Exhibit A to Pl.'s Motion, 2/18/05

Letter. GM was understandably surprised. If Plaintiff truly knew the identities of other

Chevrolet dealers with satellite agreements and truly wanted the information, he presumably

would have identified those dealerships, rather than playing a game of "hide the ball."

So, in the continuing spirit of cooperation, GM again asked Plaintiff's counsel to identify

the Chevrolet dealers he "knew" had satellite agreements. In making this request, GM explained

that it was not aware of any other satellites:

> GM is not aware of any Chevrolet satellite facilities other than
> those it has already identified and then produced the responsive
> documents. If you believe you are aware of other Chevrolet
> satellites locations, again please tell us the names of the dealers,
> and, provided the dealers did, in fact, have approved satellite
> locations and the documents still exist, we will get the information
> to you.

Exhibit E, 2/28/05 Letter. ·

Rather than identifying the dealers by name, Plaintiff once again was not fully

cooperative. Plaintiff's counsel stated that witnesses had testified about other satellite locations

in some of the depositions in this case and the state court case. The only time Plaintiff's counsel

ever identified a specific satellite location dealer by name was in a telephone conversation with

GM counsel on March 25, 2005. In that conversation, Plaintiff's counsel asked GM to search the

records of Vaden Chevrolet in Savannah, Georgia for any satellite information. GM agreed to do

so, and informed Plaintiff's counsel that it would likely take a couple of weeks before any

information could be retrieved because of vacation schedules of various GM personnel. Rather

than waiting for a response from GM, Plaintiff simply filed for sanctions on Friday, April 1,

merely one week later. As GM promised Plaintiff it would do one week before Plaintiff filed its

most recent motion, GM searched the records concerning Vaden, and has already produced the

responsive documents to Plaintiff.

In its Motion for Sanctions, Plaintiff's counsel identified the three satellites that he thought Chevrolet dealers had satellite agreements for, but for which GM allegedly had failed to produce documents. As promised, and as GM had offered to do in February had Plaintiff identified the dealers when asked to do so, GM searched its records to see if these dealers had satellite agreements and if there were any documents responsive to Plaintiff's request. The result of the search of the three dealerships identified by Plaintiff in its motion is as follows:

1.     Hilo Motors   Plaintiff is correct that Stan Moore, a former employee of GM, testified that he was aware of what he termed a "satellite dealership" in Kona, Hawaii. As Mr. Moore testified, this was over twenty years ago, stretching back to the early 1980s. There is currently no Chevrolet dealership in Hawaii called Hilo Motors. As one might expect for such a distant time period, GM does not have any records with respect to "Hilo Motors."

2.     Anchorage, Alaska   GM has located documents concerning dealers that had a Satellite Agreement from 1991 through 1997 called Alaska Sales and Service and has produced these documents to Plaintiff. No documents other than those produced were located.

3.     Utah satellite dealership   Plaintiff is correct that Gerald Desmond, who is now deceased, testified in the state court litigation that he was aware of a dealership with a location in Utah. Plaintiff conveniently ignores the fact that Mr. Desmond testified that the Utah satellite location was the first one he was aware was ever established, which would have been in the early 1980s. Exhibit C, Depo. of Gerald Desmond, p. 35. Mr. Desmond did not know the name of the dealership. GM is unable to locate any satellite sales agreements for any Chevrolet dealers located in Utah.

So, the truth is that GM informed Plaintiff that it had produced responsive documents for all Chevrolet dealers with Satellite Agreements that it could locate. GM repeatedly advised

Plaintiff it would work with Plaintiff to provide documents for any other such dealerships Plaintiff's counsel identified. Thus, there is no dispute over the production of these records. The entire "dispute" is simply one manufactured by Plaintiff so it could file this motion. GM has conducted a diligent search to find all the responsive documents it could locate and has produced them.

C.     The Plaintiff, Once Again, Makes Factual Misstatements in Support of its Motion.

As GM has shown, there is no genuine dispute about the production of satellite documents. GM has produced all satellite related documents it could locate. If Plaintiff had only acted in good faith and abided by the Court's standing order, the Court's time would not have been wasted by another motion for sanctions. However, in addition to the fact that the Motion for Sanctions regarding the satellite information has no basis and is merely a misguided strategic ploy by the Plaintiff, it is worth noting that, as the Court found in Plaintiff's last Motion for Sanctions, Plaintiff makes serious misrepresentations to the Court.

Most notably, Plaintiff erroneously states that GM designated William Hepburn as the person "most knowledgeable regarding its document production related to GM's Satellite program and its Chevrolet satellite dealerships." Pl.'s Motion, ¶ 2. This is false. GM never made any such designation with respect to Mr. Hepburn and Plaintiff's assertion that it did demonstrates a recurring pattern of Plaintiff playing fast and loose with the truth.

While Mr. Hepburn certainly was involved in determining the number of Chevrolet satellite locations, and while he did execute an affidavit regarding the work that he performed, he was not the only GM employee involved in the process – and GM never indicated otherwise. Mr. Hepburn performed only one part of GM's search for satellite information, and the remaining efforts in this search were explained in GM's Notice of Compliance (filed on February 17, 2005) and through communications with Plaintiff counsel. See GM's Notice of Compliance,

Doc. No. 114; Exhibit E, 2/28/05 Letter. In addition to the search Mr. Hepburn performed, and

in an effort to conduct the best search practicable, Mr. William Middlehauff, Mr. Hepburn's

supervisor, asked the Regional Dealer Support Manager in each of GM's regional offices to

review their records to see if they could identify any Chevrolet dealers with satellite facilities in

addition to those found by Mr. Hepburn.[1]

At the end of the day, the inescapable truth is that GM performed a diligent search and

produced to Plaintiff all responsive documents that it could locate. Simply put, GM cannot

produce what it does not have or cannot find. Plaintiff's arguments to the contrary have no basis

in fact.

## II.     Plaintiff's Complaint Regarding Allocation Data is Baseless.

Next, Plaintiff alleges that GM should be sanctioned for not producing allocation data.

Once again, this allegation is empty and misleading. The request for production at issue was No.

11, which states:

> Any and all reports, memoranda, correspondence, documents, files
> in electronic format, which indicate GM's allocation of vehicles to
> dealers within the Birmingham Metropolitan Area from 1998 to
> date, including but not limited to any and all documents or
> materials internally relied upon by the [sic] GM, whether in hard
> copy or electronic format, which reflect or relate to the allocation
> of new Chevrolet vehicles to all Chevrolet dealers within the
> Birmingham Metropolitan Area from 1998 to date. To the extent
> available, the Plaintiff requests that GM produce this information
> in electronic format.

Exhibit A, Pl.'s First Interrogs. & Request for Prod. to Def.

---

[1] Plaintiff is correct that Ronte Smith was not involved in gathering satellite related
information. Mr. Smith is a Regional Sales Manager, and his job function would not include file
review.

Tim Jones, one of the GM employees most knowledgeable about the GM allocation system, testified that GM has produced *all* the allocation data GM has for the Chevrolet dealers in the Birmingham multiple dealer area from January 2001 to the date the data was produced. Exhibit F, Depo. of Tim Jones, p. 23. Plaintiff, however, in typical fashion, seeks sanctions regardless of what the facts show. Be that as it may, Plaintiff's argument about allocation data appears to be divided into three main categories: (1) Monthly Allocation Data (File A); (2) Weekly Order Placement Data (File B); and (3) its "inability" to "verify" the data that has been produced. GM will address each of these in turn.

### A. Monthly Allocation Data

First, Plaintiff says that GM has not produced complete allocation data from File A, the Monthly Allocation data. Plaintiff makes this argument despite the fact that GM has repeatedly informed Plaintiff that it has produced all responsive allocation data in its possession from January 2001, the date that this Court and Judge Proctor set as the outer parameter for document production regarding allocation. Because of the prior state court action, where, just as in this case, Plaintiff sued GM alleging a misallocation of vehicles between Serra and Edwards Chevrolet, GM placed a document "hold" on the allocation data for Serra and Edwards Chevrolet such that data would not be discharged in the normal course of business. Thus, GM has the allocation data for Serra and Edwards Chevrolet from January 2001 forward and has produced it to Plaintiff.

Pursuant to its normal document retention policy, GM has allocation data for the Birmingham dealers other than Serra and Edwards Chevrolet ("the other dealers") from June 2001 forward, rather than January 2001. It has produced this data to Serra and told Plaintiff that GM does not have File A data for the other dealers prior to June 2001. Plaintiff argues that GM

should be "sanctioned" because it no longer has allocation data for the other dealers from

January through May 2001. This complaint has no merit.

In making this argument, Plaintiff relies heavily on the initial discovery order that Judge

Proctor entered on January 28, 2004, which states that Plaintiff is entitled to discovery

concerning "GM's misallocation of vehicles since 2001." Exhibit G, 1/28/04 Order, p. 3. In

interpreting this order, Plaintiff ignores the very basis of its underlying claims in this case.

Plaintiff's allegation regarding GM's purported misallocation has consistently been limited to

*Edwards Chevrolet*. In the first and second amended complaints, in which a wrongful allocation

claim was not even made, Plaintiff alleged as part of its "course of conduct" theory that GM

misallocated vehicles in favor of *Edwards Chevrolet* – not the other Birmingham dealers. See

Amended Complaint, ¶¶15; 36(d). Indeed, when Plaintiff finally brought a misallocation claim

on April 8, 2004 in its Third Amended Complaint, Plaintiff once again alleged that GM

misallocated vehicles *in favor of Edwards Chevrolet*. It makes no allegation that the other

dealers had any involvement in the alleged misallocation of vehicles. Third Amended

Complaint, ¶ 4(c).

Moreover, under the doctrines of res judicata and collateral estoppel, and by its own

admission, Plaintiff has informed GM and this Court that its claim for misallocation of vehicles

does not begin until "after the state court litigation." Pl.'s Opposition to GM's Mot. to Dismiss

Third Amended Comp., Doc. No. 51, p. 7. While not identified by Plaintiff, "after the state

court litigation" presumably means after April 13, 2001 (the date of the jury verdict), or April 16,

2001 (the date judgment was entered), or December 20, 2002, (the date the Alabama Supreme

Court, after rejecting Plaintiff's application for rehearing, finally ordered that judgment be

entered in favor of GM). In other words, Plaintiff has allocation data for the other Chevrolet

dealerships in Birmingham for the period that the claims in this lawsuit relate to. GM certainly

should not be sanctioned over data that, by Plaintiff's own admission, has nothing to do with this

case.

> B. <u>Weekly Order Placement Data</u>

Next, Plaintiff alleges that GM has not produced all responsive data for File B, the

Weekly Order Placement data. GM has told Plaintiff repeatedly that GM has no File B

allocation data for any dealers prior to November 2001. Tim Jones, GM's allocation

representative, testified that this is because GM changed how it did its weekly allocation process

in 2001 and that GM did not start retaining weekly order/placement data in normal business

practice until November 2001.[2] Thus, the data Plaintiff accuses GM of "not producing" is

---

[2] Q.   Mr. Jones, let me ask you this question on timing. I believe -- if I'm wrong, either
your memory will correct me, Jere will correct me or the disk will correct me.
> By my memory, File B contains data for dealers beginning November of '01.

A.   That's correct.

Q.   Why November of '01?

A.   We had changed our process in 2001 from an earlier process called order
generation where we generated orders to dealers and they had an opportunity to manage those
orders and change the orders and submit it back to us.
> They weren't happy with that process. So we changed the process to a new
process called the dealer order submission process, and there was no requirement in that process
at the beginning for reports. Our primary interest was getting a process that the dealers really
would embrace and use to manage their business.
> Over a period of time, they started asking questions. We saw patterns of
questions coming in that would suggest we needed some reports to manage the process, and we
put those reports in place and started retaining that data as of November 2001.

Q.   Where is the prior allocation date before November of '01.

> MR. WHITE: For File B.

A.   From file B?
BY MR. BADDLEY:

nonexistent and GM did not retain it prior to November 2001, so it obviously is not available to be produced now. All of the File B data for all Birmingham dealers has been produced from the time period of November 2001 forward.

In short, Plaintiff's argument appears to be that GM should be "sanctioned" because it did not produce data that it does not have, and never retained until November 2001. There is simply no basis for sanctions under these circumstances.

        C.     "Verification" data.

Finally, in what is simply a remarkable stretch even for this Plaintiff, Plaintiff alleges that GM should be sanctioned essentially for not producing data from 2000 because, Plaintiff claims, it is unable to "verify" the January 2001 allocation data that has been produced. The simple answer to this is that the January 2001 date was the outer parameter Judge Proctor established for discovery of allocation data. Plaintiff's motion is simply a transparent attempt by Plaintiff to circumvent Judge Proctor's initial discovery order and obtain data outside the scope of discovery. Judge Proctor's order says that Plaintiff could pursue discovery of alleged misallocation going back to 2001, not 2000. Exhibit G, 1/28/04 Order, p. 3. This Court has

---

Q.     Yeah.

A.     It does not exist.

Q.     Does that mean that it was destroyed or deleted.

A.     It was not saved.

Q.     So it never made it to EDS.

A.     Correct.

Exhibit F, Deposition of Tim Jones, pp. 119-120.

already ruled that it would not change that order. GM cannot be sanctioned - despite Plaintiff's argument to the contrary - for producing data in accord with the Court's orders.

In any event, as Plaintiff knows, Plaintiff already has at least some of the data it is complaining about. Plaintiff seeks sanctions for not having "Prior Sales History" data from portions of 2000, but Tim Jones testified that the historical sales numbers that GM uses to make allocation decisions is included in the data that was produced. Exhibit F, Jones Depo. p. 235. There is thus no basis for Plaintiff's complaint.

The Court will recall that in a prior motion for sanctions filed by Plaintiff's counsel, he attached an affidavit from his "expert" Dr. Ileo which called GM's production of allocation data "incomplete, inconsistent and inaccurate," among other things. Based on that affidavit, Plaintiff's counsel asked for sanctions and a default. It turned out Dr. Ileo did not know what he was talking about because he did not understand the data produced. At Mr. Jones's deposition, it was established that all the data was produced and Mr. Jones explained to Plaintiff's counsel and Dr. Ileo how the data worked. The current motion is more of the same, a cynical litigation strategy that has nothing to do with discovery into the merits of this case.

## III.    The Motion for Default Judgment Should Be Denied.

As Plaintiff did in its last Motion for Sanctions, it asks this Court in its pending motion to enter a default judgment against GM. Plaintiff's repeated attempt for sanctions is a perfect example of the cavalier attitude this Plaintiff has towards sanctions. As before, Plaintiff offers absolutely no authority for its draconian request. Plaintiff's failure to cite to any authorities is due to the fact that, under the law, such a sanction is completely unjustified:

> Entry of a judgment by default is a drastic remedy which should be used only in extreme situations, as the court has available to it a wide range of lesser sanctions. The former Fifth Circuit had

> adopted the view that such action is too harsh except in extreme
> circumstances.  Moreover, we must respect the usual preference
> that cases be heard on the merits rather than resorting to sanctions
> that deprive a litigant of his day in court.

Mitchell v. Brown & Williamson Tobacco Corp., 294 F.3d 1309, 1316-1317 (11th Cir. 2002)

(quoting Wahl v. McIver, 773 F.2d 1169, 1174 (11th Cir. 1985)).  The concept of seeking

sanctions is especially inappropriate in this case when GM has produced what was requested and

ordered by this Court.  Again, GM cannot produce what it does not have or cannot locate.

This "scorched earth" litigation strategy employed by the Plaintiff, with its repeated far-

fetched and baseless motions, shows a complete lack of respect for the Bar and the Judiciary.

The motion must be denied.

## CONCLUSION

There was no reason for the Plaintiff to file this motion.  Any "dispute" here is one

trumped up by Plaintiff as part of its litigation strategy.  Any real concerns about discovery could

have been resolved had Plaintiff merely cooperated.  Like the other motions for sanctions filed

by Plaintiff, this motion has no merit and should be summarily denied.  In addition, GM should

be awarded its costs for having to respond to yet another motion for sanctions.

Respectfully submitted,

One of the Attorneys for Defendant

OF COUNSEL:

Jere F. White, Jr. (WHI007)
Terrence W. McCarthy (MCC119)
Sanford G. Hooper  (HOO033)
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
The Clark Building
400 North 20th Street
Birmingham, Alabama  35203
(205) 581-0700
(205) 581-0799 (fax)

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 15, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Thomas E. Baddley, Jr., Esq. and Jeffrey P. Mauro, Esq.

_____
Of Counsel