IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| SERRA CHEVROLET, INC. ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| V. ) | CASE NO: 2:01 cv-2682-VEH |
| ) | |
| GENERAL MOTORS CORPORATION, ) | |
| ) | |
| DEFENDANT. ) | |

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR SANCTIONS**

Comes now the Plaintiff, Serra Chevrolet, Inc. (hereinafter Serra), and files this Reply to Defendant General Motors Corporation's (hereinafter GM) Opposition to the Plaintiff's Motion for Sanctions, and as grounds therefore states as follows:

Contrary to its contention, GM did not perform a diligent search of its records and produce all responsive documents with respect to its satellite facilities, nor has GM produced complete allocation records for the Birmingham MDA dealers. While GM contends that the Plaintiff's Motion is part of its "discovery plan," the Plaintiff has been forced to file these Motions as they are the only means by which the Plaintiff has been able to obtain and proceed with material discovery.

The Plaintiff's initial Motion for Sanctions was filed in November 2004, based upon GM's refusal to produce the Court-ordered vehicle allocation data and complete responses to the Plaintiff's satellite discovery.[1] The Plaintiff's Renewed Motion for Sanctions was filed on January 2005, after GM failed to produce fully responsive

---

[1] The Plaintiff voluntarily withdrew this Motion for Sanctions after reaching an agreement with counsel for the Defendant that the parties would conduct depositions of several GM representatives knowledgeable regarding the disputed discovery issues.

documents and further failed to timely submit its representatives for deposition, leaving the Plaintiff without the benefit of key discovery as the discovery deadlines were approaching. The Court granted, in part, this Motion and denied the remainder as premature. (Doc. No. 110) The Plaintiff's pending Motion for Sanctions has been precipitated by GM's continued refusal to produce fully responsive discovery, as well as its delay in producing other discovery which has effectively denied the Plaintiff an opportunity to complete necessary discovery before the expiration of the Court's discovery deadlines.

In short, GM's discovery abuse tactics have served to delay critical discovery, as well as to withhold other material information and documents which are crucial to the Plaintiff's prosecution of this matter. The Plaintiff submits that it has exhausted all reasonable efforts to resolve the discovery disputes with GM, to no avail. Time and time again, the Plaintiff has requested that GM follow up and supplement its production with respect to the satellite data, as well as regarding certain aspects of the allocation data. In response, GM has either provided piecemeal production or no production at all, stating that no further information or documents exist. In fact, the import of GM's Opposition, in large part, is that responsive documents have either been destroyed pursuant to its document retention policy, or that it has been unable to locate any further information.

Hereinbelow, rather than restating that which it has already set out in its Motion for Sanctions, the Plaintiff will address GM's counter-arguments to the Plaintiff's Motion for Sanctions.

**I.     Satellite Data Deficiencies**

GM's Opposition asserts that it has performed a diligent search to identify Chevrolet dealers with Satellite Agreements and has produced copies of all such documents. GM further contends that it repeatedly offered to address any deficiency which the Plaintiff could specifically identify.

Contrary to GM's contention, it did not perform a timely and diligent search of its records. GM was first instructed by the Court on August 27, 2004,[2] to perform a search of its records and produce responsive satellite documents. Thereafter, GM represented to the Court in its November 23, 2004 Opposition to the Plaintiff's Motion for Sanctions that it had performed a diligent search of its records and had produced a list of all dealerships having active satellite facilities, as well as those dealerships having satellite agreements which were terminated. (Doc. No. 100)  In support thereof, GM submitted an Affidavit from its Dealer Contractual Department Manager, William Hepburn, who stated that he had **personal** knowledge regarding GM's efforts to determine the names of its Chevrolet satellite facilities, when his subsequent deposition testimony revealed that he did not. Hepburn's Affidavit further indicated that GM's search, which consisted of a "review of available GM records," indicated that there were 23 Chevrolet dealers nationwide with currently approved satellite agreements, and 12 Chevrolet dealers who had satellites which were no longer in place. However, contrary to his Affidavit, Hepburn acknowledged during his February 11, 2005 deposition that all records had not been reviewed, as neither he nor anyone in his department had reviewed the dealer files. Instead, Hepburn testified that to his knowledge GM's efforts to produce responsive

---

[2] The Court granted the Plaintiff's Motion to Compel all responsive information and documents with respect to the satellite program and the status of the GM's Chevrolet satellite facilities on this date.

information consisted of a computer generated search of GM's database to determine the names of all Chevrolet dealers having satellite agreements. (Hepburn dep.pp 87-89)  As highlighted in the Plaintiff's Motion, it is undisputed that GM's own employees, and former employees, readily testified to satellite facilities which had not been disclosed by GM.

Next, GM contends that the Plaintiff is to blame for its deficiencies in production, alleging that the Plaintiff failed and refused to cooperate with its counsel to search for responsive documents.  To this end, GM erroneously states that the Plaintiff had no interest in actually obtaining the information, but rather was using discovery as a game to manufacture a dispute for a sanctions motion.  Such a contention is false.  The truth of the matter is that the strategy employed by the Defendant has unfortunately forced the Plaintiff to repeatedly file Motions for Sanctions in order to obtain additional information and documents.  Each time GM has advised the Plaintiff and the Court that a diligent search has revealed no further information, the Plaintiff later learns that additional information does exist.  Contrary to GM's claim that the Plaintiff has refused to cooperate, Plaintiff counsel's letter under date of March 2, 2005 to GM's counsel clearly discloses that GM witness Stan Moore recently testified in Nevada to a satellite in Hawaii; that GM representative Bill Powell testified **approximately nine months ago** to a satellite in Georgia which had been converted to a full point dealership[3]; and that GM employees Gerald Desmond and Jim Astorga had testified to other satellites.  It is noteworthy that all of this information, excluding Desmond's testimony, was testified to by GM's own employees in this litigation.  Given such record testimony and notice, how

---

[3] Despite such notice by its own employees, GM failed not disclose or produce any information regarding Vaden Chevrolet until April 13, 2005, nearly two months after the Court-imposed deadline of February 17, 2005.

4

could GM reasonably argue that it had performed a diligent search when such satellites had not been disclosed through its search? Furthermore, as stated above, Hepburn testified that neither he nor any other employee in his department had searched the dealer files which were maintained in his department.

An example of GM's insufficient discovery responses is depicted in its Opposition to the Plaintiff's Motion for Sanctions. Specifically, even after the Plaintiff's March 2nd letter reminding GM of Stan Moore's testimony regarding a dealership in Hawaii, GM provides a selective, if not evasive, response on page 6 of its Motion as follows:

> 1. <u>Hilo Motors</u>   Plaintiff is correct that Stan Moore, a former employee of GM, testified that he was aware of what he termed a satellite dealership in Kona, Hawaii. As Mr. Moore testified, this was over twenty years ago, stretching back to the early 1980s. **There is currently no Chevrolet dealership in Hawaii called Hilo Motors. As one might expect for such a distant time period, GM does not have any records with respect to Hilo Motors**. (emphasis added)

The Plaintiff submits that this response is both misleading and incomplete. GM's response essentially concludes that because Mr. Moore's testimony regarding Hilo Motors dates back to the early 1980s, there is no longer any information regarding this satellite facility and it is no longer in existence. However, an internet search of **www.islandchevrolet.com** appears to reveal that what was previously known as Hilo Motors is now owned by Clark Automotive Group, Inc. d/b/a Island Chevrolet, Buick Cadillac Pontiac and GMC. This website appears to reflect Chevrolet's continued presence on this island, including GM's continued authorization of two Chevrolet locations (see Exhibit A). As reflected on its web page, Island Chevrolet Buick Cadillac

5

Pontiac GMC currently maintains two locations: 1177 Kilauea Avenue, Hilo, HI 96720; and (2) 75-5570 Kuakini Hwy, Kailua Kona, HI 96740.

The Plaintiff submits that GM's response should have included this information. This information was readily available to GM and was relevant to the Plaintiff's request. The Plaintiff has a right to know that what was previously known as Hilo Motors, and had a satellite dealership, had changed ownership, but still maintains two separate locations – either as a full point dealership and a satellite, or two separate full point dealerships. Such information is relevant as its shows that GM has permitted this satellite facility to continue operations for more than 20 years through repeated renewals, or possibly authorized the satellite to convert to a full point dealership.

GM's Opposition also references its production of data regarding the satellite facility in Anchorage, Alaska. However, it is noteworthy that GM's production of such information was April 13, 2005, <u>after</u> the Plaintiff filed its Motion for Sanctions. Interestingly, included in the production regarding the Anchorage satellite was an October 3, 1997 letter written by GM's Director of Organization and Planning, Gerald Desmond, stating, "Our original plan to address growth in your market area began in 1960, when we authorized the establishment of a Satellite dealer location." (See Letter attached as Exhibit B)  This letter is inconsistent with GM's stated position that the Satellite program was instituted in the early 1980s as previously testified to by Desmond. (Desmond dep. pp. 35)

Perhaps most notably, GM's Opposition briefly glosses over its belated April 13, 2005 production relative to the Vaden Chevrolet satellite dealership located in Savannah, Georgia, despite the fact that the Plaintiff's March 2, 2005 letter specifically references

6

GM Regional Manager Bill Powell's testimony regarding a Georgia satellite which was converted to a full point dealership. GM's cursory statement regarding this satellite reflects that GM has absolutely no justifiable explanation for its failure to disclose Vaden Chevrolet, nor produce documentation related to this satellite facility within the time allowed by the Court pursuant to its February 7, 2005 Order, and certainly before the Plaintiff filed its Motion for Sanctions. Any contention that GM did not know of this satellite dealership is disingenuous as its Regional Manager, William Powell, testified to its existence in July 2004, and its Regional Assistant Sales Manager, Ronte Smith, testified to its existence in March 2005. Each of these GM employees testified that Vaden Chevrolet was located in Savannah, Georgia, was a part of the Atlanta Region, and more importantly acknowledged that this satellite was recently authorized by GM for conversion to a full point dealership. Perhaps the reason for GM's non-disclosure as to this satellite is that GM's authorization for Vaden Chevrolet's conversion into a full point dealership effectively dismantles its defense that all of its satellites were "temporary" facilities.

Next, GM's Opposition contends that the Plaintiff has failed to articulate any alleged reason why GM would withhold documents or information relating to the Chevrolet Sales Satellites. However, once the Court has ordered all responsive documents to be produced, there is no reason to articulate or speculate as to the reasons why GM would withhold such information. Nevertheless, the Plaintiff can articulate several reasons for GM's failure to produce fully responsive documents regarding its satellites. First, such information will reveal that GM's satellite program was entirely arbitrary, and that GM handled each satellite on a case-by-case basis. Second, complete

7

records may reveal that Serra Chevrolet was the only satellite which was terminated involuntarily. Third, while GM contends that its satellite program was experimental and is over, it nevertheless appears that GM's satellite program is still in existence to the extent that GM continues to renew its satellite agreements and has also advised that certain dealers have requests for satellite facilities which are pending. Fourth, a review of complete satellite records will reveal the disparate treatment accorded the Plaintiff relative to GM's other satellite dealers. Fifth, while GM's satellite agreements include language that the facilities are "temporary," these facilities were by no means temporary, or for a fixed term. In fact, GM's satellites in many cases have been continuously renewed. Further, based upon Bill Powell and Ronte Smith's testimony, we know that Vaden Chevrolet's satellite facility was converted to a full point dealership. We know that other satellite dealers were permitted to renew their satellite operations for many years and presumably indefinitely. In fact, former General Sales Manager of GM's Chevrolet Division, Ron Sobrero, acknowledged that "temporary" could mean 20 years, or possibly 30 years, depending upon whether the dealership was performing satisfactorily.(Sobrero dep. pp.77-78)

Finally, GM's Opposition regarding the satellite data states that "most notably" the Plaintiff's Motion has misled the Court by stating that GM designated William Hepburn as the person most knowledgeable regarding its satellite program and satellite dealerships. The irony is that if this statement is so egregiously in error, why did GM fail to correct such a statement made repeatedly in the Plaintiff's January 27, 2005 Renewed Motion for Sanctions, (see Doc. No 106, pages 4 and 11), as well as when Plaintiff's counsel's referenced Mr. Hepburn as GM's "designated representative" in the March 2,

8

2005 letter to GM's counsel? The truth of the matter is that GM was the one who specifically identified Mr. Hepburn as having personal knowledge of GM's efforts in reviewing and producing responsive satellite program and satellite dealership data when it submitted his Affidavit in its February 2, 2005 Opposition to the Plaintiff's Renewed Motion for Sanctions. Interestingly, after identifying Hepburn as possessing personal knowledge of GM's efforts to review its records and produce responsive satellite data, GM's Opposition takes great pains to limit Hepburn's involvement in GM's search, including accessing records, to determine the number of satellite dealership locations. The reason for this change of stance is that Hepburn's deposition does not remotely indicate that a diligent review of records was performed. In fact, Hepburn testified that GM's search efforts did not include reviewing the dealer files which were maintained in his department, but rather were limited to a computer search of its database. To this end, Hepburn testified as follows:

> Q. As I understand it, in response to [GM's counsel's] request, basically, a computer search was done relative to the court order concerning the satellite information.
>
> A. Yes.
>
> Q. You had the hard copy files, but you did not review them, or when I say "you," your staff or anyone.[4]
>
> A. That's correct.
>
> Q. An there was information and perhaps documents retained by zones or branches, whatever the terminology is, but no request was made of them.
>
> A. No.

---

[4] While GM's Opposition refers to William Middlekauf's efforts to ask each regional office to review their records for satellite facilities, Mr. Middlekauf is Hepburn's immediate supervisor, and serves as general director for the dealer contract group.

> Q. Is that accurate?
>
> A. Yes.
>
> Q. So there were certain business records available to GM that were not utilized, but only the electronic information was checked in response to the court's order.
>
> A. That is correct.
>
> Q. . . . You know of no system in place that could tell us the history of the satellites, how they came to be, what happened to them, that type of thing, other than what would be in the files – the actual hardcopy files themselves, do you?
>
> A. That is correct. Any information would be in the file. That's right.
>
> Q. In your – I'm sorry.
>
> A. Any information on satellite agreements would be in the dealer's file. That's the only information that I'm aware of.

(Hepburn dep. pp.87-89)

It bears noting that in its prior Opposition, GM charges the Plaintiff with relying on a "guess" that there are more satellite facilities in existence, and then stating that the list previously provided was all that could be located through GM's diligent search. We now know that the Plaintiff was not guessing, that GM did not perform a diligent search, and that once again GM was in error regarding the completeness of its production.

Pursuant to the Court's February 7, 2005 Order, the Defendant was afforded fourteen days in which to purge its non-compliance. The Plaintiff submits that GM failed to comply with the Court's Order.

**II.  Allocation Data Deficiencies**

Contrary to GM's contention, the Plaintiff's Motion for Sanctions as to GM's production of allocation data was not done without first requesting follow-up allocation data from GM.  Specifically, both during and after the March 7-8, 2005 deposition of GM employee, Tim Jones, who is one of its most knowledgeable employees regarding GM's allocation system, Plaintiff's counsel requested that GM's counsel endeavor to follow up and confirm whether additional allocation data exists for time voids existing in GM's production, for the period preceding January 2001, and for the other Birmingham MDA dealers. (See letters dated March 14, 2005, March 23, 2005, and April 12, 2005, attached as Exhibits C, D and E, respectively.)  GM stated by letter dated March 22, 2005 that it was looking into the matters requested; however, no additional response was made until an April 15, 2005 letter from GM's counsel.  Along with this letter GM included a diskette purportedly containing "production data;" however, a review of this disc reveals that such information is not allocation data, but rather contains national sales figures which are readily available through the Automotive News, and other sources, and which the Plaintiff has already obtained.   Albeit belatedly, this letter does address and explain the reasons for certain information voids which had been questioned regarding GM's allocation data production.

GM's Opposition to the Plaintiff's Motion with respect to the allocation data is, in large part, predicated upon its document retention policy whereby GM claims that documents are destroyed after 36 months.  The flaw in this position is that numerous GM

11

witnesses have acknowledged that GM places a "hold" on a dealer's file who is involved in litigation or anticipated litigation. (Tim Jones depo. pp.51,87). In fact, Tim Jones testified that a hold had been placed on Serra Chevrolet and Edwards Chevrolet's dealer files, but no hold was placed on any of the other Birmingham MDA dealers. (Jones dep. pp.87) Given the nature of the Plaintiff's claims, which as GM's Opposition notes "alleged as part of its course of conduct theory that GM misallocated vehicles in favor of Edwards Chevrolet," the Plaintiff was certainly entitled to the allocation records for Serra Chevrolet, Edwards Chevrolet, and Edwards East. Furthermore, given the testimony of GM's allocation representative Tim Jones, who acknowledged that any discrimination in allocation requires a review of all competing dealers, the Plaintiff is entitled to the allocation records for the other Birmingham MDA dealers.

### A. Monthly Allocation Data

With respect to the File A monthly allocation data produced by GM, it is undisputed that GM has failed to produce such monthly allocation data, except as to Serra Chevrolet and Edwards Chevrolet, for the other Birmingham MDA dealers (including Edwards East), for the period from January 2001 through May 2001.

GM's Opposition erroneously contends that the Plaintiff has allocation data for the other Birmingham Chevrolet dealers for the period that the claims in this lawsuit relate to. GM attempts to support this argument by stating that, by the Plaintiff's own admission, its claims for vehicle misallocation do not begin until after the state court litigation, which GM interprets to mean after April, 2001 (the date of the jury verdict) or December 20, 2002 (date the Alabama Supreme Court rejected Plaintiffs' application for

rehearing). While the Plaintiff has stated that its vehicle misallocation claims begin after the state court litigation, this is true to the extent that the Plaintiff's vehicle misallocation claims stem, in part, from GM's authorization of Edwards Chevrolet to purchase Century Chevrolet (now known as Edwards East) in August 2000. This is further true to the extent that the Plaintiff's misallocation claims in the state court litigation were based upon vehicle allocation data produced through calendar year 1998 (when GM's changed over to the VOMS system) Accordingly, while the Plaintiff's misallocation claims arise after the state court litigation, the Plaintiff does not have monthly allocation data from the other Birmingham MDA dealers for any period prior to June 2001.

### B.   Weekly Allocation Data

It is undisputed that no File B weekly allocation data has been produced for **any** Birmingham MDA dealer prior to November 8, 2001. GM blames this deficiency on a change in GM's weekly allocation process in 2001 and therefore GM claims that it did not start retaining weekly order/placement data in normal business practice until November 2001. Again, the flaw in this position is that GM had placed a "hold" on Serra Chevrolet and Edwards Chevrolet's dealer files. Accordingly, at least with respect to these two dealers, none of this data should have been destroyed. Furthermore, at least with respect to the monthly allocation data, GM's Opposition readily states that based upon the hold placed upon the allocation data for Serra and Edwards, GM retained such monthly allocation data for Serra and Edwards from January 2001 forward and has produced it to the Plaintiff. If such a hold was in place as to Serra and Edwards, the

Plaintiff fails to see why GM destroyed the weekly allocation data with respect to these dealers.

### C. "Verification" data

GM's own allocation representative Tim Jones readily acknowledged that prior sales history is a factor used in GM's vehicle allocation process. In fact, Jones acknowledged that GM's vehicle allocation system computes its vehicle allocation for January 2001 based, in part, upon a 3-month and sometimes 12 month prior sales history of each dealer. (Jones dep. p.235-236) Given GM's allocation data production beginning January 2001, Jones admitted that there is no way for the Plaintiff to verify the accuracy of such vehicle allocations by GM.

> Q. My question to you was, how would we verify those numbers of January '01 that were carried over for previous years if the allocation records were destroyed?
>
> A. Well, I guess the dealer could go back into his records and check the records of deliveries that he may have saved.
>
> Q. But if we don't have other dealers to compare them to, we couldn't verify allocation of Serra relative to the other dealers. That would be accurate wouldn't it?
>
> A. I guess all I have to rely on is the data that we've given to you, and if you say we can't verify that, then – through your dealer's records.
>
> Mr. White: Or data back before, I think, once again. That's what you're talking about, isn't it, Tom?
>
> Mr. Baddley: Yes.
>
> The Witness: Before January 1st, correct?
>
> Mr. White: Yes.
>
> Q. We can't verify it, can we?

      A.    **I wouldn't think so, no**.

(Tim Jones dep. pp. 237-238)

While the Plaintiff is cognizant of Judge Proctor's order regarding the scope of discovery pertaining to vehicle misallocation claims to be from January 2001 forward, Tim Jones' own sworn testimony reveals that in order to verify the accuracy of GM's allocations as of January 2001, the Plaintiff must have the benefit of the prior sales history data used by GM in computing its vehicle allocations for January 2001. (Jones dep. 235-238, 313, 315-316)   Without the 3 to 12 months prior sales history for each dealer, there is no way for the Plaintiff to verify the January 2001 allocation data which has been produced by GM.   The Plaintiff must have the supporting year 2000 documentation and history in order to verify or "audit" the January 2001 allocation records produced by GM.

Finally, GM unnecessarily attempts to discredit the Plaintiff's expert, Dr. Ileo, stating that this "expert" did not know what he is talking about in his November 11, 2004 Affidavit, and further that he did not understand the data produced.  However, it was GM's own witness Tim Jones who was forced to admit that his November 19, 2004 Affadivit was in error to state that all of the columns of data on the 15 disks were produced to the Plaintiff.

    Q.    The truth of the matter is when GM originally produced the first disk in File A, it didn't have all the data fields that you reference in your affidavit?

    A.    For the original two dealers?

    Q.    Correct. They didn't have them, did they?

15

       A.      **Right. No. Did not**.

(Jones dep. pp. 98-99)

Further, at the time Dr. Ileo submitted his November 11, 2004 Affidavit, he had neither seen nor received GM's October 27, 2004 production of the additional 13 discs containing electronic allocation data for the other Birmingham area dealers. GM has conveniently forgotten that on October 27, 2004, it filed a Motion to Reconsider asking the Court to revisit its Order granting the Plaintiff's Motion to Compel, and simultaneously instructed the Plaintiff's counsel not to share such electronic data with the Plaintiff or its experts until the Court had ruled on its Motion to Reconsider. (See Doc. No. 85) Based upon such restrictions imposed by GM, Dr. Ileo had not seen such electronic data production and could not know whether this production was fully responsive to the Plaintiff's requests, and complied with the Court's Order.

      Finally, GM offers the conclusory statement that at Tim Jones' deposition, it was established that "all the data was produced" and Mr. Jones explained to Plaintiff's counsel and Dr. Ileo how the data worked. However, this is nothing more than a gross overgeneralization, which overlooks certain material facts. We know that GM's allocation production to date does not contain all of the information necessary for the Plaintiff to verify the allocation decisions made by GM with respect to all of the Birmingham MDA dealers for the relevant period. What we do know is that Tim Jones' deposition opened as many holes as it closed. Contrary to GM's contention, its allocation system is not based upon a "black and white" mathematical formula. While Jones' deposition testimony did serve to explain, in a general sense, the components and mechanics of GM's allocation system, he was repeatedly forced to admit that its system

16

allows for GM to utilize discretion, or as he stated a "business decision." Additionally, Jones was repeatedly confronted with allocation records wherein he could neither explain nor account for the basis of GM's stated allocations, but rather stated that he would have to perform additional research beyond the data produced to understand and/or explain these allocations. (Jones dep. pp.254-256 – "**All I would want to do is go check into the circumstances of this and understand why the numbers look the way they do**."; 262, 266, 267-268 –" **I'd have to go back and check the facts with the region, make sure I understood what they have and check our production records as well in that case**.")

In short, it is undisputed that substantial deficiencies continue to persist with respect to GM's allocation production. The Plaintiff submits that GM had ample prior notice to warrant its retention of such documentation. Furthermore, as stated in the Plaintiff's Motion, since GM knew that it had to retain allocation information applicable to at least Serra and Edwards Chevrolet for the period starting January 2001, no circumstances could have justified the destruction of any allocation records applicable to these two dealerships for the first ten months of 2001. Further, assuming arguendo that GM was not obligated to retain allocation information for the other Birmingham MDA Chevrolet dealerships until June 2001, GM has no justification for the destruction of allocation records and data applicable to these dealerships covering the monthly cycles from June through October 2001.

### Motion for Default Judgment

GM states that the Plaintiff's alternative motion for a default judgment is completely unjustified under the law, and further states that the Plaintiff has offered

absolutely no authority for such a request.  The Plaintiff disagrees.  Further, the Plaintiff previously submitted a memorandum of law in support of its initial Motion for Sanctions, but as a matter of convenience will briefly summarize the applicable law governing such a sanctions measure.

The entry of default judgment as a discovery sanction should be "a rare judicial act." Comisky v. JFTJ Corp., 989 F.2d 1007 (8th Cir. 1993).   However, the United States Supreme Court and the Court of Appeals for the Eleventh Circuit have recognized that such a harsh remedy is appropriate where the failure to comply with discovery orders is willful and in bad faith and the defaulted party is directly responsible for it.  Malautea v. Suzuki Motor Co. Ltd., 987 F.2d 1536 (11th Cir. 1993), National Hockey League v. Metropolitan Hockey Club, 427 U.S. 639, 96 S.Ct. 2778  (1976).  While sanctions are not appropriate where the violation is due to a party's mere inability to comply after making a good faith effort, this rule does not apply where such inability is self imposed. Pesaplastic, C.A. v. Cincinnati Milacron Co., 799 F.2d 1510 (11th Cir. 1986).  Based upon GM's continuing misconduct, it is deserving of substantial sanctions or in the alternative a granting of a default judgment.

Dismissal or a default judgment is properly entered where a willful failure to comply with a discovery order significantly impairs the opposing party's trial preparation, as it has here.   Malautea v. Suzuki Motor Co. Ltd.,   987 F.2d 1536 (11th Cir. 1993) Moreover, dismissal or default may be imposed as a sanction for a party's blatant violations of discovery orders, or an established pattern of flagrant discovery abuse showing a callous disregard of its responsibilities under the Federal Rules. Id., supra. Jaffe v. Grant, 793 F.2d 1182 (11th Cir. 1986), Properties International Ltd. v. Turner,

706 F.2d 308 (11th Cir. 1983), Emerick v. Fenick Industries, 539 F.2d 1379 (5th Cir. 1976). Default is appropriate where a party has made deliberately false or evasive responses, misleading the Court and its opponent. Malautea v. Suzuki Motor Co. Ltd., 987 F.2d 1536 (11th Cir. 1993).

Based upon GM's discovery tactics, the Plaintiff nor the Court can be confident regarding the truthfulness of any of GM's representations regarding discovery.

The Court has the discretion to determine what sanctions are appropriate or just. F.R.C.P 26, (g)(3) and 37(b)(2)(C). In determining the propriety of sanctions, the Court should consider the party's response to both oral and written orders. Malautea v. Suzuki Motor Co. Ltd., 987 F.2d 1536 (11th Cir. 1993). There are circumstances in which severe sanctions are necessary, not merely because of the Defendant's willful misconduct and resulting prejudice to the Plaintiff's ability to prepare its case for trial, but also because of the need to deter the kind of misconduct which obstructs the administration of justice, as it has in this case. National Hockey League v. Metropolitan Hockey Club, 427 U.S. 639, 96 S.Ct. 2778 (1976), Malautea v. Suzuki Motor Co. Ltd., 987 F.2d 1536 (11th Cir. 1993). The 11th Circuit has stated that it is not necessary that default be preceded by lesser sanctions when they would not be effective. Malautea v. Suzuki Motor Co. Ltd., 987 F.2d 1536 (11th Cir. 1993). "A district court is not required to fire a warning shot". Id. Severe sanctions are necessary herein based upon the repeated dilatory and stonewalling tactics employed by Defendant General Motors to date.

Respectfully submitted,

**s/ Thomas E. Baddley, Jr.**
Bar Number: ASB-2867-E42T
**s/ Jeffrey P. Mauro**
Bar Number: ABS-0478-U71J
Attorneys for Plaintiff
Baddley & Mauro, LLC
2545 Highland Avenue, Ste. 201
Birmingham, Alabama 35205
(205) 939-0090
(205) 939-0064 Fax
badmaur@bellsouth.net – E-mail

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 1, 2005, I electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Jere White, Esq. and Terrence McCarthy, Esq.

**s/ Thomas E. Baddley, Jr.**
Bar Number: ASB-2867-E42T
**s/ Jeffrey P. Mauro**
Bar Number: ABS-0478-U71J
Attorneys for Plaintiff
Baddley & Mauro, LLC
2545 Highland Avenue, Ste. 201
Birmingham, Alabama 35205
(205) 939-0090
(205) 939-0064 Fax