**FILED**
2005 May-31  PM 03:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| SERRA CHEVROLET, INC., | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | |
| v. | ) | CV-01-02682-VEH |
| | ) | |
| GENERAL MOTORS | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | | |

## MOTION TO ALTER, AMEND, VACATE, OR MODIFY ORDER GRANTING MOTION FOR SANCTIONS

Defendant General Motors Corporation ("GM") moves the Court to alter, amend, vacate, or modify its May 20, 2005 Order granting plaintiff Serra Chevrolet's ("plaintiff") Motion for Sanctions.  In support of its motion, GM would show unto the Court as follows:

## INTRODUCTION

GM respectfully requests that this Court alter, amend, vacate, or modify its May 20, 2005 Order finding GM in contempt and sanctioning GM.  GM respectfully submits that the Court's factual findings are incorrect, and that the Court erred in imposing the sanctions it did.  The discovery at issue initially was the subject of good-faith disputes about the meaning and scope of plaintiff's broad

discovery requests. Once this Court defined the scope of the requests, GM performed a timely and reasonable search of its records and produced documents to plaintiff with respect to the sales satellites. Admittedly, GM found additional documents when it searched again, but this does not change the fact that GM's initial searches were, in fact, reasonable and in compliance with the Court's discovery orders. GM should not be punished because its initial searches were not perfect, particularly here where there is no showing of prejudice to plaintiff.

Should, upon reconsideration, this Court conclude that fines and sanctions are still warranted, GM respectfully requests that this Court reconsider the fines and sanctions it imposed. The $700,000.00 monetary fine is virtually unmatched by other sanctions imposed by federal courts. Further, the non-monetary sanction striking certain affirmative defenses is overly harsh. The legal defenses this Court has stricken – res judicata, collateral estoppel, issue preclusion, and law of the case – have no relation to any delay in the production of the documents, or the period of time for which GM no longer has documents. Instead, these are strictly legal defenses. No discovery in this case – be it the thousands of documents GM has produced in a timely manner or the few documents this Court has found that GM delayed producing or no longer has in its possession – has any impact on whether some of the claims in this action are barred by the prior state court action between these same parties in which GM ultimately prevailed. This sanction does not

2

attempt to place the plaintiff on an even field with respect to any prejudice (of which there is none) it may have suffered with respect to these discovery issues.

For all these reasons and the reasons discussed below, GM requests that this Court vacate or modify its May 20, 2005 Order finding GM in contempt and imposing sanctions on GM.

## DISCUSSION

## I.   GM Conducted Three Separate Searches To Locate Records Concerning Chevrolet Satellite Agreements, Has Produced The Documents Responsive To Plaintiff's Document Requests, and Has "Seasonably" Amended Its Responses Through Supplemental Document Production, As Called For Under Rule 26(e).

**A.  The facts show that GM conducted a search of its computer records to determine the identity of Chevrolet dealers with satellites _before_ November 2004.  In fact, GM provided plaintiff a list of dealers with active satellite facilities in October 2004.**

On May 16, 2005, this Court held a show cause hearing in which it heard evidence of GM's efforts to provide plaintiff with a list of former and current Chevrolet satellite facilities in response to plaintiff's Request for Production No. 3. From the testimony of Mr. William Middlekauff, director of GM's Dealer

Contractual Group, the Court concluded that Mr. Middlekauff and his staff waited until *after* the Court imposed October 27, 2004 deadline to begin searching for the names of Chevrolet satellites. The pleadings filed with this Court and the correspondence between the parties show that, in fact, GM began its search for Chevrolet sales satellite agreements prior to the October 27, 2004 deadline and produced information to plaintiff in October 2004.[1]

On October 27, 2004, the deadline for production of the satellite information, GM's counsel sent plaintiff a letter via hand-delivery enclosing documents that were responsive to other non-satellite discovery requests made by plaintiff. In that letter, counsel for GM informed plaintiff that it needed a couple of more days to provide plaintiff with the list of Cheverolet dealers with sales satellite agreements: "With respect to Nos. 3 and 10 of your Requests for Production, my client still needs a couple more days to gather these documents but they too will be forwarded to you as soon as I have them." See Exhibit A, 10/27/04 Letter. In response, plaintiff's counsel wrote GM's counsel on October 29, 2004 and did not

---

[1] Neither plaintiff's April 1st Motion for Sanctions nor its Reply Brief raised any concern that GM had waited until after the Court's October 27th deadline had passed before it began its efforts to formulate a list of satellite facilities. The Court's show cause Order required GM to present "a witness . . . having personal knowledge as to GM's satellite program." Show Cause Order, Doc. No. 127, p. 2. GM therefore did not anticipate that plaintiff or the Court sought factual information about when GM conducted its initial record search. Mr. Middlekauff was not personally involved with the initial computer search and could not testify as to its timing. However, because the Court's Order granting sanctions is premised, at least in part, on an erroneous factual conclusion about when GM's efforts to comply began, GM wishes in this section (Part I) to set out a thorough account of the events relative to its search and production of satellite files.

object to GM's request for an extension to produce the requested documents. See

Exhibit B, 10/29/04 Letter. Specifically, plaintiff's counsel stated, "[t]his

acknowledges receipt of GM's discovery and I did not realize that you would need

several more days. You and I talked in terms of one day, but it is what it is. I am

not going to file a motion specific to that, but I will point the dates out." Id.

On October 29, 2004, just two days after the Court's deadline had passed

and on the same day as plaintiff's counsel's letter, GM provided plaintiff a list of

Chevrolet dealers with sales satellites that were compiled pursuant to the search of

GM's dealer contract file computer database. See Exhibit C, Def.'s Supp.

Response to Pl.'s Request for Prod. Shortly thereafter, GM's counsel discovered

that its October 29th production accidentally did not include a list of Chevrolet

dealers whose sales satellite agreements were no longer in existence, and

immediately informed plaintiff's counsel of the oversight. See Exhibit D, 11/9/04

Letter. GM made this disclosure in good faith and in fulfillment of its continuing

duty to supplement its discovery responses under Fed. R. Civ. P. 26(e).[2] Two days

later, GM's counsel sent plaintiff's counsel the list of Chevrolet dealers whose

---

[2] Fed. R. Civ. Pro. 26 (e) provides in part that:

> A party is under a duty seasonably to amend a prior response to . . . [a] request for production . . . if the party learns that the response is in some material respect incomplete or incorrect . . . .

sales satellites were no longer in existence that were found as a result of the computer search. See Exhibit E, 11/11/04 Letter.

As the foregoing facts and exhibits make clear, GM conducted its initial computer search for satellite sales agreements in October 2004 and provided that information to plaintiff in October.  It is an indisputable fact that GM did not wait until November 2004 as suggested at the show cause hearing, but had already provided discoverable information to plaintiff before then.  The facts further show that GM made a good-faith effort to comply with the Court's October 27th deadline to provide documents responsive to plaintiff's request, and timely supplemented the discovery when it discovered documents that were inadvertently omitted.  All of these steps taken by GM demonstrate that GM took the Court's October 27th deadline, as well as its duty to supplement the responses under Fed. R. Civ. P. 26(e), extremely seriously.

**B.     GM conducted three separate and distinct searches to provide the identity of current Chevrolet dealers with sales satellite facilities. GM's repeated supplementation of the satellite list in response to this Court's Orders is evidence of GM's good-faith attempts to provide plaintiff a complete list of satellites.**

At the May 16th show cause hearing Mr. Middlekauff testified that based on his thirty-three (33) years of working at GM, he believed that the way to compile

the most accurate and complete list of dealers with sales satellite agreements in response to plaintiff's discovery requests was to search the computer database of GM's Dealer Contract Group, a database which stored information relative to all Chevrolet dealers nationwide,[3] including those dealers having active and inactive satellite agreements.[4]  See Exhibit F, Transcript of 5/16/05 Show Cause Hearing, pp. 33-35, 47, 56.  This database represents the information and business records upon which GM conducts its day to day business.  Id. at 34.  In Mr. Middlekauff's words, "from the time that original [computer] search was done, we had assumed that we had discovered everything based on our computer search."  Id. at 56 (emphasis added).  Hindsight has revealed that the search of the database did not uncover a handful of dealers with satellite agreements; however, there is no evidence in the record to rebut Mr. Middlekauff's testimony that he had a good-faith belief that the computer search would create the most accurate and complete list.

In light of Mr. Middlekauf's well-reasoned judgment that the search of the record database would have uncovered all the Chevrolet dealers with sales satellite

---

[3] This database represents the information and business records upon which GM conducts its day to day business. See Exhibit F, Hearing Transcript, p. at 34.

[4] According to Mr. Middlekauff, when a satellite agreement is issued, a code is put in GM's computer database identifying that the specific dealer has a satellite agreement. See id. at 59.  The computer search that GM performed identified the names of those dealers with the satellite codes in the database. Id.

agreements, it was entirely reasonable—and is demonstrative of why GM's conduct is not sanctionable—that GM believed the initial list of Chevrolet satellite facilities it had provided to plaintiff's counsel was complete.

As it turns out, the October 2004 search of the record database that GM performed in search of satellite agreements did not catch all of the Chevrolet dealers with past or present satellite agreements.[5] Later, in its January 27, 2005 Motion for Sanctions, plaintiff argued that there were additional satellite facilities whose names GM had not turned over.[6] GM responded that it had provided the names of all satellites it could locate. See GM's Opposition, Doc. No. 109, p. 10. Following a hearing on February 3, 2005 on plaintiff's Motion for Sanctions, GM, despite having no knowledge that its satellite list was incomplete, took the

---

[5] Mr. Middlekauf testified that the computer's failure to return a complete list was probably due to prior human input error at the time the sales satellite agreement was issued. See Exhibit F, Hearing Transcript, p. 59. There is no evidence at all that any input error was intentional. Nor could there be since such input is entirely unrelated to the record search.

[6] Plaintiff also complained that GM had not turned over documents related to individual satellite facilities. See Pl.'s Motion for Sanctions, Doc. No. 106, p. 10. In response, GM noted that plaintiff's Request for Production No. 2 asked for documents regarding GM's "Satellite Program," which GM interpreted to mean the satellite program *as a whole.* See GM's Opposition, Doc. No. 109, p. 10-11; Exhibit G, Pl.'s Request for Production. Because GM employee Gerald Desmond testified that no documents were created for the program's implementation as a whole and because the Court's August 2004 discovery Order required GM to produce documents "within the scope of [plaintiff's] request"—which GM's counsel had thought was the list of the dealers provided—GM had not turned over any satellite documents as of the February hearing. See Exhibit H, Depo. of Gerald Desmond, p. 32-33. In the telephonic hearing on plaintiff's motion that followed, the Court informed GM that it had misread the Court's August order and that GM was to produce all documents in its possession that related to satellite facilities. GM then produced documents from the individual dealer contract files of the identified dealers and GM continuously supplemented this production by producing the documents from the few other dealers later identified with sales satellite agreements.

8

additional step of having Mr. Middlekauff directly contact GM regional field personnel throughout the country to determine whether there were other Chevrolet satellites not reflected in the search of the computer database. See Exhibit F, Hearing Transcript, p. 37, 47, 56. GM undertook this additional search because it wanted to ensure that its computer search had not failed to identify any dealers who had satellite facilities. Id. at 37, 47, 56. GM's efforts to contact its regional personnel produced the names of three additional dealers with satellite facilities, and GM, as it had done previously, supplemented its discovery responses to reflect this fact. Id. at 57.

Following the satellite search GM conducted through its regional personnel, plaintiff continued to assert that GM's production with respect to the list of satellite facilities was incomplete. As GM had already conducted what Mr. Middlekauff considered the best possible search—a search of the computer records—as well as a follow-up search through its regional personnel, GM told plaintiff it did not know of any other sales satellite agreements, but that if plaintiff had information to the contrary, it welcomed plaintiff's cooperation in identifying such dealers to make the list complete.[7] See Exhibit I, 2/14/05 Letter. While GM continued to work

---

[7] As the Court will recall, plaintiff claimed that it knew there were satellites missing from GM's list. In response, GM did what any reasonable party litigant would do—it asked plaintiff to identify those facilities so that it could provide documents for those satellites. Plaintiff cooperated in part by identifying Vaden Chevrolet in Savannah, Georgia as having a satellite facility and GM responded that it would search its files for Vaden and produce any documents

with the plaintiff to try to resolve this dispute, plaintiff surprised GM by filing another Motion for Sanctions on April 1, 2005, complaining in part that GM's satellite list was incomplete. See Pl.'s Motion for Sanctions, Doc. No. 115. The Court's show cause Order followed on May 9, 2005, in which the Court ordered GM to explain why it should not be sanctioned for failing to produce documents related to its satellite program. See Show Cause Order, Doc. No. 127.

In response to the show cause Order, GM determined that the only means it had left at its disposal to learn if there were satellite agreements not uncovered in its two previous searches was to hire a team to manually review the documents in the dealer contract files by hand. See Exhibit F, Hearing Transcript, p. 47, 58. This hand search involved the files of some four thousand one-hundred (4100) Chevrolet dealers nationwide. Id. As Mr. Middlekauf put it, the hand search "was the last step we could humanly think of." Id. at 53. As the Court is aware, GM had fourteen paralegals to perform this task and the search identified nine additional Chevrolet dealers who have or had satellite sales agreements out of the 4100 dealer files manually reviewed. Id. at 41, 47. The nine dealers found among the 4100 dealers represented less than one tenth of one percent of all its files. Id. 61. The documents related to those nine satellites were turned over to plaintiff. Id. at 9. The extraordinary effort and expense that GM incurred attempting to comply with

---

related to the satellite facility. See GM's Opposition to Pl.'s Motion for Sanctions, Doc. No. 123, p.5.

the Court's Orders is plain evidence that GM respected this Court's Orders and took those Orders seriously.

It appears from the Court's Order granting plaintiff's motion for sanctions that the Court considered GM to be under an obligation to perform the manual review of the 4,100 files by no later than February 17, 2005. The Order states that after February 17, 2005, "GM knew it had not performed a manual search of its files." Sanctions Order, Doc. No. 132, p. 7 (emphasis in original). GM acknowledges that it had not performed a manual search of its files by that date. GM was fully transparent with both plaintiff and the Court about that fact and disclosed what searches had been performed. To wit, GM's Notice of Compliance, filed on February 17, 2005, outlined what steps it had taken to follow the Court's orders, none of which indicated that GM had undertaken a manual search. See Exhibit J, Notice of Compliance, Doc. No.114. Neither the plaintiff nor this Court gave any indication that the steps GM took were inadequate or in contempt of this Court's Orders.

The reason that GM never performed a manual search until shortly before the show cause hearing is because GM believed that its other efforts, including both the computer search and the efforts to contact the regional personnel, had been sufficient. Although it had never been ordered by this Court do so, GM decided to perform the manual search so that it could further verify that its satellite

document production was complete and so that it could inform the Court at the
show cause hearing that it had done everything it could possibly think of to provide
plaintiff with satellite names and documents.[8]

In summary, GM has always understood this Court's discovery Orders to
require GM to comply with plaintiff's discovery requests and to produce satellite
related documents. GM fully respected this Court's Orders when it attempted to
comply. GM, as the party most knowledgeable about its own records, genuinely
believed that it had provided a complete list of satellite facilities after searching its
computer database. See id. at 50. Admittedly, in hindsight, the two prior searches
done by GM prior to the manual search were not perfect—in that they failed to
identify nine dealers with satellite agreements—but GM surely cannot be accused
of failing to make good-faith attempts to ensure that its list was accurate and
complete. This conclusion is consistent with existing federal case law on this
point. See Century Idem. Co. v. Aero-Motive Co., 254 F.Supp. 2d 670, 695 (W.D.
Mich. 2003) (refusing to sanction party for late production of documents where the

---

[8] It also bears noting that, to GM's knowledge, plaintiff never requested that GM search
its 4,100 files by hand and GM was never ordered to do so. Nor did plaintiff ever ask to search
the files itself, as is its right under Fed. R. Civ. P. 34. Furthermore, this lawsuit presents the first
time GM had searched for satellite sales agreements nationwide for all Chevrolet dealers because
GM had never before encountered a situation which led it to search the 4,100 Chevrolet dealer
files by hand.

late production "was the result of a good-faith oversight during a search for decades-old documents" and where the complaining party suffered no prejudice).

## II. GM Has Produced All "File A" Montly Allocation Data In Its Possession And The Limited Data It Did Not Retain – For a Six Week Period – Is Not Important To This Case.

GM respectfully submits that it was error for it to be found in contempt and to be sanctioned for not retaining a few months of File A data for the other Birmingham Chevrolet dealers. It is critical to note the extremely limited amount of File A data that is actually at issue. GM produced all File A data with regard to Serra and Edwards Chevrolet for the ordered time period, so the only data at issue is for the other Chevrolet Birmingham area dealers. Plaintiff has represented to the Court that its purported misallocation claim does not begin until "after the state court litigation" between Serra and GM. See Exhibit K, Pl.'s Opposition to GM's Motion to Dismiss, Doc. No. 51, p. 7. Judgment was entered in the state court litigation regarding vehicle misallocation on April 16, 2001. See Exhibit L, State Court Docket Sheet, p. 10. Given that GM produced data for the other Birmingham dealers starting June 1, 2001, this dispute thus covers approximately six weeks of data. GM respectfully asserts that six weeks of missing data for other Chevrolet dealers—dealers who do not make up part of plaintiff's claim of misallocation—does not have any meaningful impact on plaintiff's ability to bring

the wrongful allocation claim. This is especially true in light of the fact that GM

has produced to plaintiff three years worth of File A data for all the other

Birmingham area Chevrolet dealers. See GM's Response to Pl.'s Motion for

Sanctions, Doc. No. 100, Exhibit A, Tim Jones Affidavit, ¶ 2.

GM agrees with the Court's comment at the show cause hearing that the

issue with respect to File A data effectively presents a spoliation of evidence

analysis. See Exhibit F, Hearing Transcript, p. 79. "Under Alabama law, four

factors must be considered in deciding the appropriate remedy for spoliation of

evidence  (1) the importance of the evidence destroyed; (2) the culpability of the

offending party; (3) fundamental fairness; and (4) alternative sources of

information." Cooper v. Toshiba Home Tech. Corp., 76 F. Supp. 2d 1269, 1274

(M.D. Ala. 1999).

With respect to the relevant factors, plaintiff's counsel himself informed the

Court at the show cause hearing that the File A data has little if any importance to

his claim. When offered File A data for Edwards and plaintiff's dealership from

the year 2000—which, notably, is beyond the time frame for which the Court has

ordered GM to produce documents—plaintiff's counsel stated that "[t]hat will tell

us nothing. Absolutely nothing." Exhibit F, Hearing Transcript, p. 65. On the basis

of this comment alone, the Court would have ample grounds, upon reconsideration

of its Order, to disregard plaintiff's continued complaints about File A data.

14

Whatever the Court's ultimate decision, GM respectfully asserts that it is clear that the Court's imposition of sanctions for data that plaintiff admittedly has no use for is not appropriate.

According to plaintiff's counsel, the critical data for the allocation claim is the weekly or File B data – not File A data. Plaintiff's counsel admitted this at the show cause hearing: "What is in the File B is the weekly data, which is more critical than File A." Id. at 65 (emphasis added). Plaintiff's counsel also said, "[t]he File B data, which is the critical data, and the most important . . . ." Id. at 15 (emphasis added). Even without these admissions, the basis of plaintiff's misallocation claim is that GM misallocated vehicles to Edwards Chevrolet to favor it and misallocated vehicles to Serra to its detriment. See Exhibit M, Pl.'s Third Amended Complaint, Doc. No. 43, p. 3. Indeed, plaintiff has never even mentioned the other Birmingham Chevrolet dealers in any of its complaints about misallocation. Id.; see also, Plaintiff's Complaint, Doc. No. 1, and Plaintiff's Amended Complaint, Doc. No. 23. Plaintiff has all File A data for Serra Chevrolet and Edwards Chevrolet from January 2001 forward—pursuant to Judge Proctor's initial Discovery Order—and all but six weeks of File A data for the other Birmingham Chevrolet dealers starting after the April 16, 2001 state court litigation. See Exhibit N, Discovery Order, Doc. No. 37. In short, the only evidence at issue in the spoliation analysis is File A data, almost all of which GM

has produced to plaintiff and which even plaintiff admits is of minimal importance.

Therefore, plaintiff has failed to make a convincing showing under the first prong

of Cooper.

Second, there is no culpability under Cooper on the part of GM with respect

to the File A data.  GM placed a hold on the allocation data for Serra and Edwards

Chevrolet and that hold continues to this day.  The first time this Court ordered

GM to produce allocation data pertaining to the other Birmingham Chevrolet

dealers was August 30, 2004.  Clearly, Judge Proctor never ordered discovery of

File A data with regard to the other Birmingham dealers.  See Exhibit N,

Discovery Order. Given the allegations in this lawsuit, which only raised the issue

of misallocation with respect to plaintiff and Edwards Chevrolet, GM reasonably

interpreted Judge Proctor's Order to require production of data relating only to the

two dealerships referenced in the Complaints regarding allocation.

Continuing the analysis of Judge Proctor's Order, this Court's sanctions

Order incorrectly states that Judge Proctor ordered discovery on "GM's *allocation*

of vehicles since 2001." Sanctions Order, Doc. No. 132, p. 5 (emphasis added).

Instead, item 10 of Judge Proctor's Order allows discovery on "GM's

*misallocation* of vehicles since 2001" and makes no reference to the other dealers.

Exhibit N, Discovery Order,  p. 3 (emphasis added).  Again, the only claim of

misallocation in this case[9] has been that GM somehow favored Edwards Chevrolet

over Serra Chevrolet. A document hold was accordingly placed for the allocation

records of Serra Chervrolet and Edwards Chevrolet, but not the other Birmingham

Chevrolet dealers. GM respectfully asserts that the use of the word

"misallocation," rather than "allocation," is exactly the type of limiting language,

this Court said that item 10 lacked. See Sanctions Order, Doc. No.132, p. 5. GM

accordingly continued the litigation hold it had in place for Serra and Edwards

allocation records. To this day, plaintiff's allegations of "misallocation" are

limited solely to Edwards Chevrolet.[10] What's more, GM's conduct here,

respectfully, cannot be sanctionable in light of the scope of discovery allowed in

the state court concerning "misallocation" in favor of Edwards' Chevrolet. Indeed,

GM's initial objection to producing this data in the subsequent federal court

proceedings was based on the state court's ruling. It certainly cannot be said that

---

[9] In the prior state court litigation, where plaintiff also alleged that GM had misallocated vehicles in favor of Edwards Chevrolet, Judge Hanes limited discovery to the allocation records of Edward Chevrolet and Serra. GM's interpretation of Judge Proctor's order and actions with respect to the initial discovery requests and orders were consistent with the prior state court order and formed the basis of GM's belief that plaintiff's vehicle allocation request was limited to Edwards Chevrolet.

[10] Plaintiff's allegations with respect to vehicle misallocation state, in part, that:

> GM has willfully and wantonly continued its arbitrary, capricious and unreasonably discriminatory vehicle allocation scheme which has unduly favored and preferenced the Plaintiff's primary competitor, Edwards Chevrolet, while at the same time has unduly restricted the Plaintiff's allocation of new vehicles . . . .

Exhibit M, Plaintiff's Third Amended Complaint, Doc. No. 43, p. 3.

GM is culpable of sanctionable conduct in conducting itself as directed in the prior litigation with regard to the discovery of the other Chevrolet dealers' allocation data until otherwise directed by this court.

Third, under Cooper, fundamental fairness does not call for a punitive monetary sanction. As already stated, plaintiff is complaining about six weeks of data that plaintiff's counsel himself admits is not critical to his claims. See Exhibit F, Hearing Transcript, pp. 15, 65. Furthermore, GM demonstrated that it wished to comply with its discovery obligations by continuing the hold on the allocation data it thought was relevant based on Judge Hanes' orders, the plaintiff's complaints, and Judge Proctor's Order.

Fourth, plaintiff's counsel informed the Court at the show cause hearing that some data for this period might be available from alternative sources. Plaintiff has issued subpoenas to all of the other Birmingham area Chevrolet dealers seeking certain data from 2000 to present. See Exhibit O, Pl.'s Mot. for Second Extension of Time, Doc. No. 133. Plaintiff's counsel appears to be on the verge of reaching an agreement about getting the desired data from the other dealers.[11]  In addition, an affidavit submitted by plaintiff's expert says that the information plaintiff seeks regarding the other dealers is available from GMAC. See Exhibit P, Motion for

---

[11] Plaintiff recently informed the Court in a discovery motion that "[a]n additional two weeks would most probably result in a resolution of the issues so the Motion to Quash would be rendered moot and the subpoenas withdrawn." See Exhibit O, Pl.'s Motion for Second Extension of Time, Doc. No. 133, p. 1.

18

Leave to File Affidavit, Doc. No. 130, ¶ 7 of Exhibit A. Accordingly, plaintiff's counsel has taken steps to issue a subpoena to GMAC to obtain this data. See Exhibit Q, Notice of Intent to Serve Subpoena on Non-Party (GMAC). Also, the expert's affidavit references "sales data." See, Exhibit O. While plaintiff has not asked for this data, GM certainly would cooperate in providing this information.

In addition to the four factors applied in Cooper, the Alabama Supreme Court has stated that "[o]ne can prove spoliation by showing that a party purposefully or wrongfully destroyed a document that the party knew supported the interest of its party opponent." Wal Mart v. Goodman, 789 So. 2d 166, 176 (Ala. 2000). In this instance, there is certainly no evidence that GM purposefully destroyed any File A data that it knew supported plaintiff's interest. The File A data was deleted—for the other Birmingham Chevrolet dealers and only for a very limited period—in the ordinary course of business pursuant to the normal record retention process, not because GM thought that producing the data would support plaintiff's case. Significantly, plaintiff has not argued otherwise. Simply put, deleting the monthly allocation data in the ordinary course of business is not bad faith, especially when they are not the subject of any claim.

**III.  The Severe Sanctions Imposed By This Court Against GM Are Not
Justified and Are Excessive Under the Circumstances.**

In light of the foregoing discussion, GM respectfully asks the Court to
revisit, and ultimately to vacate, the finding of contempt and severe sanctions it
imposed on GM.  Specifically, GM respectfully submits that the sanctions imposed
far exceed those permitted by federal law.

**A.   Plaintiff has not been "prejudiced" by GM's production of
documents.**

In Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456
U.S. 694 (1982), the U.S. Supreme Court held that under Fed. R. Civ. P. 37(b)(2),
a sanction for an abuse of discovery "must be just" and "must be specifically
related to the particular 'claim' which was at issue in the order to provide
discovery."  Id. at 707 (internal citations omitted).

The Eleventh Circuit Court of Appeals has adopted a "prejudice" standard
when considering the propriety of sanctions against a party:   "Rule 37 Sanctions
are intended to prevent unfair prejudice to the litigants and insure the integrity of
the discovery process."  Gratton v. Great Am. Communications, 178 F.3d 1373,
1374 (11th Cir. 1999); see Wouters v. Martin County, Florida, 9 F.3d 924 (11th Cir.
1993) (determining whether party was prejudiced by party's non-compliance with
discovery order); Ford v. Fogarty Van Lines, Inc., 780 F.2d 1582, 1583 (11th Cir.

1986) (same); <u>see also</u> <u>In re Rubin</u>, 769 F.2d 611, 617 (9th Cir. 1985) ("The degree
to which a party is prejudiced by his opponent's failure to permit discovery is an
important factor in determining the severity of the sanction to be imposed").

In this case, plaintiff clearly has <u>not</u> been prejudiced. In retrospect, GM
wishes it had performed the manual file review at the same time it conducted its
other searches. However, plaintiff now has all the information GM found as a
result of its searches and there is still time remaining in discovery for plaintiff to
seek any additional evidence plaintiff thinks it needs.[12]  In this posture, plaintiff
has not been prejudiced by GM's delayed production of the satellite sales
agreements for the nine Chevrolet dealers. Finally, the true test of whether
plaintiff has been prejudiced is whether GM's production regarding satellites has
interfered with plaintiff's ability to present its claims at trial—a showing plaintiff
cannot make given that a trial of this cause has not yet been set.

Likewise, GM's failure to retain File A allocation data has not harmed
plaintiff because plaintiff is on the record as stating that File B, not File A,
documents are the crucial allocation documents. Moreover, plaintiff has File A
data for <u>all</u> Birmingham Chevrolet dealers from June 2001-forward and for
Edwards Chevrolet and plaintiff's dealership from January 2001-forward. It is

_____

[12] GM of course has no objection if plaintiff decides it needs to ask for additional time to
conduct this discovery.

21

critical that this Court recall that plaintiff is only complaining about the absence of **six** (6) weeks of allocation data for other dealers who are not central to this lawsuit and that plaintiff has allocation data for **thirty-six** (36) months for those same dealers. Under any test, this is at most a de minimis violation of GM's obligation under the discovery rules and plaintiff has made no colorable argument that it has been prejudiced as a result.

## B.    GM made "all reasonable efforts" to comply with the Court's discovery Orders related to satellite production.

When reviewing whether Rule 37 sanctions imposed against a party were appropriate, the Eleventh Circuit has expressly considered whether the sanctioned party "ma[d]e all reasonable efforts to comply with the [district court's discovery] order." BankAtlantic v. Blythe Eastman Paine Webber, Inc., 12 F.3d 1045, 1050 (11th Cir. 1994) (citing In re Chase & Sanborn Corp., 872 F.2d 397, 400 (11th Cir. 1989)). In this case, there can be no doubt that GM's efforts at compliance were reasonable. In short, GM first searched the computer record database for satellite information in response to the Court's August discovery Order.[13] Next, GM took the additional step in response to the Court's February Order of having Mr. Middlekauff personally contact GM's regional personnel across the country to

---

[13] As GM employee Bill Middlekauf testified, he believed that the search of the records GM relies on its own day to day business would provide the "most accurate" list. See Exhibit F, Hearing Transcript, p. 47.

determine if additional sales satellites existed and GM produced what that search uncovered.  Finally, GM performed the herculean task of searching by hand the paper documents in some four thousand one-hundred (4,100) Chevrolet dealer files to determine if there were any remaining sales satellite agreements which it had not named.

GM's actions show that not only did GM take all <u>reasonable</u> efforts to comply with the Court's discovery Orders, as required by <u>BankAtlantic</u> and <u>In re Chase & Sanborn Corp.</u>, it has now taken all <u>available</u> efforts to comply with the Court's Orders.

**C.    The $700,000 monetary sanction is without "justification" and was not accompanied by an "accounting" as required by *Carlucci v. Piper Aircraft Corp.***

In <u>Carlucci v. Piper Aircraft Corp., Inc.</u>, 775 F.2d 1440 (11th Cir. 1985), a district court assessed a $10,000 sanction against an attorney who the court determined acted in bad faith during discovery.  The appellant attorney argued that the fine was "arbitrary and based on unsupported assumptions." <u>Id.</u> at 1453.  In addressing the attorney's argument, the Eleventh Circuit noted that "the magnitude of sanctions awarded is bounded under Rule 37 only by what is 'reasonable' in light of the circumstances." <u>Id.</u>  The Court then noted that permissible purposes of sanction include:  "1) compensating the court and other parties for the added

expense caused by the abusive conduct; 2) compelling discovery; 3) deterring others from engaging in similar conduct; and 4) penalizing the guilty party or attorney." Id. (citing Roadway Express Inc. v. Piper, 447 U.S. 752, 764 (1980)).

The district court in Carlucci offered "four general justifications for its order: 1) the nature of the misconduct, 2) the fact that [the attorney's] conduct was burdensome on the court; 3) the deterrence factor underlying Rule 37; and 4) the fee that [the attorney] earned through the improper conduct." Id. However, the Court of Appeals found that the district court's explanation was not sufficient because it "failed to set forth an accounting adequate to justify the figure it adopted." Id. As a result, the Court reversed and remanded the district court on the monetary sanction issue "so that the district court may create a record accounting for costs adequate to sustain whatever sanction that court ultimately decides is justified." Id.

In this case, the Court's Order imposing a $700,000 fine on GM is not "reasonable" or "justified" in light of the circumstances surrounding the fine. See Carlucci, 775 F.2d at 1453. Moreover, the Court's Order does not "provide support for the amount of fine or cost imposed as required by Fed. R. Civ. P. 37," Id. at 1442 (emphasis added). Finally, under Carlucci, it is not possible to determine from the Court's Order in this case whether the purpose of the monetary sanction is to a) compensate the court; b) deter others from engaging in similar

conduct, or; 3) penalize GM. See id. at 1453. GM respectfully submits that whatever the purpose of the sanction, a fine in the amount of nearly three quarters of a million dollars is excessive, and manifestly not "reasonable" under Carlucci, no matter what the purpose. Further, GM submits that this amount does not reflect the burden on the Court or the opposing party in resolving this matter. Nor can the amount be justified as a necessary deterrent to GM or others, considering that a monetary sanction of a lesser amount would have sufficed. Accordingly, the Court's Order does not comply with the requirements of the Eleventh Circuit authority as to orders of this kind.

**D.**     **GM's Affirmative Defenses that were stricken by the Court bear no relation to GM's conduct during discovery and, therefore, that sacntion is inappropriate.**

As noted above, the U.S. Supreme Court in Compagnie des Bauxites de Guinee ruled that a Rule 37 sanction "must be specifically related to the particular 'claim' which was at issue in the order to provide discovery." 456 U.S. at 707. In other words, the sanction must have a nexus to the wrong committed.

Here, the satellite documents and allocation data sought by the plaintiff have no relationship whatsoever to GM's defenses that the Court struck, namely, that plaintiff's claims are barred by res judicata, issue preclusion, judicial estoppel, or the law of the case doctrine. See GM's Answer to Plaintiff's Amended

Complaints, Doc. No. 116, p. 7-8; Sanction Order, Doc. 132, p. 8. GM asserts

those defenses are based on opinions issued by the Alabama Supreme Court in

2001 and 2002 affirming a summary judgment in favor of GM relating to GM's

legal right to terminate plaintiff's Gardendale satellite location and holding that

plaintiff's prior misallocation claim was barred by the statute of limitations. See

Exhibit R, Alabama Supreme Court Opinions. Significantly, none of the satellite

or File A discovery at issue in this case relates to those judicial decisions. As an

example of the lack of connection between the discovery and the striking of the

defenses, it cannot be said that plaintiff's delayed opportunity to examine the

documents from the nine dealerships identified in GM's most recent search has

anything to do with the Alabama Supreme Court decisions that provide GM with

the defenses of res judicata, collateral estoppel, issue preclusion, and law of the

case. GM is not aware of any document which relates to these defenses other than

the Alabama Supreme Court opinions and the summary judgment which they

affirmed. Because there is no nexus between plaintiff's document requests and the

affirmative defenses stricken, the Court's sanction as to these defenses is improper

under Compagnie des Bauxites.

> **E.    The Court's striking of GM's defenses violates due process**
> **because GM's conduct did not threaten to interfere with the**
> **rightful decision of the case.**

As a corollary to GM's argument that its conduct has not prejudiced plaintiff, the discovery issue will not interfere with the trier of fact's decision as to the merits of this case. By contrast, the Court's decision to strike GM's affirmative defenses severely infringes upon GM's due process rights because it strips GM of the opportunity to be heard on these defenses. As the Ninth Circuit Court of Appeals has held, "[s]anctions interfering with a litigant's claim or defenses violate due process when imposed merely for punishment of an infraction that did not threaten to interfere with the rightful decision of the case." In re Rubin, 769 F.2d 611, 618 (9th Cir. 1985) (citations omitted) (emphasis in original); Fjelstad v. Am. Honda Motor Co., 762 F.2d 1334, 1338 (9th Cir. 1985).

Here, it is clear that the Court's Order striking certain affirmative defenses will interfere in a material way with GM's legal defenses in this case. Without these defenses, GM loses the benefit of a crucial defense to plaintiff's case—that is, that many of plaintiff's claims have already been finally litigated and are forever barred by the doctrine of res judicata. It is also clear that neither GM's delay in producing the information on the Chevrolet dealers with satellite agreements nor the unavailability of six weeks of the File A data "threatens to interfere with the rightful decision of the case." In re Rubin, 769 F. 2d at 618. As a result, the Court's sanction striking three of GM's defenses violates GM's due process rights under In re Rubin and is due to be vacated.

27

## IV.   **CONCLUSION**

For the foregoing reasons, GM respectfully requests this Court to alter,

amend, vacate or modify its May 20, 2005 Order granting plaintiff's Motion for

Sanctions.

_____
One of the Attorneys for Defendant
General Motors Corporation

OF COUNSEL:

Jere F. White, Jr.
Terrance W. McCarthy
Sanford G. Hooper
LIGHTFOOT, FRANKLIN & WHITE, LLC
The Clark Building
400 20th Street North
Birmingham, Alabama 35203
(205) 581-0700
(205) 581-0799 ~ facsimile

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 3 (   , 2005, I electronically filed the foregoing
with the Clerk of the Court using the CM/ECF system which will send notification
of such filing to Thomas E. Baddley, Jr., Esq. and Jeffrey P. Mauro, Esq.

_____
Of Counsel