FILED
2005 Jun-13  PM 04:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **SERRA CHEVROLET, INC.** ) | |
| ) | |
| **PLAINTIFF,** ) | |
| ) | |
| **V.** ) | **CASE NO:  2:01-cv-2682-HS** |
| ) | |
| **GENERAL MOTORS** ) | |
| **CORPORATION,** ) | |
| ) | |
| **DEFENDANT.** ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO ALTER, AMEND, VACATE OR MODIFY ORDER GRANTING MOTION FOR SANCTIONS

COMES NOW the Plaintiff, Serra Chevrolet, Inc., and files this Opposition to General Motors' (hereinafter "GM") Motion to Alter, Amend, Vacate, or Modify the Court's Order granting sanctions, and as grounds therefore the Plaintiff says as follows:

1.     That by Order dated May 20, 2005, the Court sanctioned the Defendant the sum of $700,000, struck certain affirmative defenses and has partially restricted GM's ability to cross examine the Plaintiff's expert pursuant to its prior finding of contempt and consistent with its prior admonitions and terms of its Order entered on February 7, 2005.

2.      That GM had ample opportunity to cure its production deficiencies and comply with the Court's repeated discovery Orders prior to the accrual of the Court-imposed sanctions, but failed to do so.

3.      GM has filed a Motion to Alter, Amend, Vacate, or Modify this Order, arguing that the Court has abused its authority, that its factual findings are incorrect, and that it was error to enter sanctions against the Defendant.

## A.    The Court's Sanction Order is Reasonable, Appropriate, and Supported by the Record

GM argues that should the Court should vacate the sanctions Order entered against it or, in the alternative, should the Court conclude that fines and sanctions are still warranted upon reconsideration, GM requests that the Court reconsider the amount and nature of the fines and sanctions imposed. To this end, GM's Motion completely ignores the procedural history of the case.

The Court's sanction Order is not only appropriate, but essential to maintain the integrity of the orders entered by the Court. GM's repeated recalcitrance throughout discovery is well supported in the record, has prejudiced the Plaintiff, and has significantly impeded the orderly progression of this case to trial. After more than fourteen (14) months where crucial discovery has remained outstanding and incomplete despite

2

numerous admonitions and extensions granted by the Court, the Court has properly concluded that the Defendant's conduct demonstrates a callous disregard of its responsibilities owed to the Court and the Plaintiff. Moreover, the Defendant's misconduct was taken in the face of repeated warnings by the Court that its failure to provide complete information would result in the imposition of severe sanctions.

The Court's entry of sanctions herein is not only amply supported by the record, but is well supported under the law, including the Federal Rules of Civil Procedure. Rule 37(b)(2) gives district court's broad discretion to fashion appropriate sanctions for violations of discovery orders. The Court's discretion is guided by the egregious discovery history of the case, as well as the Court's determination that the Defendant's discovery practices as a whole have been conducted with a complete disregard for the letter and spirit of the Federal Rules of Civil Procedure. GM's actions throughout discovery in this litigation demonstrate not only an intent to delay the proceedings, but to obfuscate the truth. GM has improperly objected to discovery, has furnished information which is incomplete and unreasonably narrow, has deliberately delayed compliance with the Court's discovery Orders, and has blatantly violated other Court-ordered discovery. The imposition of less severe sanctions would not serve to change or deter GM's misconduct, and

therefore, the Court's sanctions herein are not an abuse of discretion. See

Maleutea v. Suzuki Motor Company, Ltd., 987 F.2d 1536 (11th Cir. 1993)

Rule 37(b)(2) expressly provides a range of sanctions that a district

court may impose upon parties and their attorneys for failure to comply with

the court's discovery orders. It provides that the court, in its discretion may

impose, among others, the following sanctions: (1) the court may order that

disputed facts related to the violated order be considered established in

accordance with the claim of the party obtaining the sanctions order; (2) the

court may refuse to permit the violating party to raise certain defenses, or it

may prohibit that party from opposing certain claims or defenses of the party

obtaining the sanctions order; (3) the court may strike any pleadings or any

parts of the pleadings of the violating party, stay the proceedings, or even

dismiss the action or enter a judgment of default against the violating party;

and (4) the court may consider the violation a contempt of court. In addition

to these sanctions, Rule 37 allows for compensating the court and other

parties for the added expense caused by the abusive conduct. In fact, Rule

37(b)(2) provides:

> In lieu of any of the foregoing orders or in addition thereto, the
> court shall require the party failing to obey the order or the
> attorney advising that party or both to pay the reasonable
> expenses, including attorneys' fees, caused by the failure,
> unless the court finds that the failure was substantially justified
> or that other circumstances make an award of expenses unjust.

4

See Levin & Associates, P.C. v. Rogers, 156 F.3d 1133 (11th Cir. 1998).

Pursuant to the authority vested in the Court by Rule 37 (b), the Court properly entered monetary sanctions against GM in precisely the manner and amount it had warned GM for continued noncompliance with its February 7, 2005 Order. In addition, the Court properly struck affirmative defenses raised by GM which also was specifically threatened in its February 7, 2005 Order. GM cannot now complain of that which it had direct notice and knowledge and made a calculated decision to ignore. Severe sanctions are necessary not just because of the Defendant's willful misconduct and resulting prejudice to the Plaintiff's ability to prepare their case for trial. Both the Supreme Court and the Eleventh Circuit have recognized that harsh sanctions, including default judgments, are necessary because of the growing need to deter the kind of misconduct which obstructs the due administration of justice, as it has in this case. See National Hockey League v. Metropolitan Hockey Club, 427 U.S. 639, 643, 96 S.Ct. 2778, 2780, (1976).

GM has deliberately disregarded the Court's Orders and, by a calculated decision, sought to delay the prosecution of the case and obtain an improper advantage in this litigation. Now, when its scheme backfired, GM asks the court for a slap on the wrist and to start over. Furthermore, GM's belated attempt to comply does not make lesser sanctions appropriate. In

fact, GM's eleventh hour production does not alter the fact that it willfully refused to honor and comply with the Court's repeated discovery orders. At best, it is an effort to escape the consequences of non-compliance by offering to do what it has been repeatedly ordered to do months before. These sanctions are not only reasonable and appropriate, but are in fact lenient given the level of disrespect demonstrated by the Defendant, and considering the availability of more severe remedies which a court can enter in such circumstances.

Hereinbelow, rather than restating that which it has already been fully briefed and set out in its prior pleadings on this issue, the Plaintiff will try to limit its response to address those arguments raised in GM's current Motion.

## B. The Sanctions Imposed are Not Excessive

GM unpersuasively argues that the sanctions imposed herein are excessive, and far exceed that permitted by federal law and Eleventh Circuit authority. Courts have inherent power to enforce compliance with their lawful orders through civil contempt. Citronelle-Mobile Gathering, Inc. v. Watkins, 943 F.2d 1297 (11th Cir. 1991). The Court has the power to impose coercive and compensatory sanctions . In re Chase and Sanborn Corp. v. Nordberg, 872 F.2d 397 (11th Cir. 1989).

6

Case 2:01-cv-02682-VEH-PWG Document 136 Filed 06/13/05 Page 7 of 31

In <u>In re Grand Jury Proceedings (Bank of Novia Scotia)</u>, 740 F.2d 817,832 (11th Cir. 1984), cert denied, 469 U.S. 1106, 105 S. Ct. 778 83 L.Ed.2d 774 (1985), the Eleventh Circuit affirmed the district court's finding of civil contempt and the imposition of a $1,825,000 fine imposed upon the Bank of Novia Scotia based upon the defendant's continuous disregard for the court's orders. In <u>In re Grand Jury Proceedings</u>, the district court imposed a $25,000 per day fine which was to begin five days after the court's order and continuing until the Bank complied with a subpoena. In reviewing the district court's sanction order, the Eleventh Circuit noted that nothing had been substantially done by the Bank until the $25,000 per day fine imposed by the court started to accumulate. The Court stated that "the flurry of activity undertaken by the Bank to discover documents after the trial court entered its order of contempt cannot save the Bank from the consequences of its previous extensive pattern of delay. <u>Id</u>. The Court further noted that the district court had been extremely patient, and had given the Bank ample chances to comply with the subpoena. Accordingly, the Court noted that the remedy for violation of the district court's order was civil contempt, and the imposition of a coercive fine is not improper and will be reversed only for an abuse of discretion. As such, the Court determined that the order of contempt as well as the $1,825,000 sanctions imposed did

7

not constitute an abuse of discretion. Id.

In re Grand Jury Subpoena Duces Tecum, 955 F.2d 670 (11th Cir. 1992), the Eleventh Circuit reiterated that the "imposition of coercive sanctions by way of fines is generally an area in which appellate courts must rely heavily on the informed exercise of the district court's discretion," and therefore stated its reluctance to find unreasonableness or arbitrariness in the absence of clear abuse. In affirming the district court's exercise of its coercive civil contempt power, the Court recognized that the district court's tailored sanction was imposed to avoid the harms of the Defendant's continued recalcitrance and further noted that the defendant had ample opportunity to comply with the subpoena and the district court's order prior to the accrual of monetary sanctions.

Similar to the above cited authority, the Court herein has not only been extremely patient with GM's continued recalcitrance throughout discovery, as well as its repeated non-compliance with its Orders, but the Court fashioned a sanctions order which not only put GM on direct notice of the sanctions which would be imposed for its continued non-compliance, but further afforded the Defendant with an additional 14 days during which GM had ample opportunity to comply prior to the accrual of such monetary sanctions.

Next, GM argues that the Court has failed to provide any support for the amount of this fine or cost imposed as required by Rule 37. However, the Defendant has completely ignored the Court's February 7, 2005 Order which expressly warned GM that its continued non-compliance after February 17, 2005 would result in monetary sanctions of $50,000 per day for 14 days, and thereafter the Court would begin to strike affirmative defenses.

The Court's Order serves to compensate the Plaintiff, compel fully responsive discovery from the Defendant, deter GM from continuing to engage in further misconduct, as well as to deter others from engaging in similar misconduct, and finally to penalize GM. The Plaintiff submits that the imposition of lesser sanctions would have little or no effect on the Defendant. Furthermore, given the nature of the Plaintiff's claims and the relief sought, the imposition of lesser sanctions would justify the risk-reward analysis considered by GM when deciding whether to continue forward with its course of conduct.

The Plaintiff submits that it has expended significant money and time as a result of GM's discovery abuse tactics for which there is a need to be compensated.[1]

---

[1] The Plaintiff intends to file petition for attorney's fees, costs and expenses to reimburse and compensate the Plaintiff for the unnecessary time and expense incurred as a result of the Defendant's malfeasance.

## C.  GM Failed to Conduct a Diligent or Thorough Search for the Satellite Data

GM's Motion argues that it performed a timely and reasonable search of its records and produced documents to the Plaintiff with respect to the sales satellites.  However, as the Court aptly determined, such a statement is belied by the record and could not be further from the truth.

In support of its Motion to Alter, Amend, Vacate or Modify, GM argues that the Court's Order contains factual inaccuracies which render its Order inappropriate.  To this end, GM contends that the Court's Order erroneously states that the Defendant waited until after the Court imposed October 27, 2004 deadline to begin searching for the names of Chevrolet satellites, as its pleadings and correspondence between the parties reflects that GM did provide certain information to the Plaintiff on October 29, 2004.[2]  Based upon this perceived mischaracterization of the record facts, GM asks this Court to overlook its discovery abuse tactics which  have permeated this litigation, and conclude that its search was timely and reasonable and its production made in good faith.

First, the portion of the Court's Order which references the testimony of GM's witness Mr. Middlekauf, expressly recognized that he "had no

---

[2] This fact was never raised by GM at the Show Cause hearing. Further, the testimony of Mr. Middlekauf regarding whether GM's initial computer search had not occurred until the first part of November 2004 was simply that he had no personal knowledge.

10

personal knowledge" GM had searched earlier than the first part of November, 2004 for the documents ordered to produced, and that he did not dispute William Hepburn's testimony that GM had not searched until the first part of November, 2004, for the documents ordered to be produced. The Court's Order further enumerates five (5) other areas of testimony offered by Mr. Middlekauf which demonstrated gross malfeasance by GM. Furthermore, the Court's entry of sanctions herein is based upon its determination that GM's discovery practices in this litigation as a whole have been conducted with a complete disregard for the Court's discovery orders, as well as a disregard for the letter and spirit of the Federal Rules of Civil Procedure.

While GM may have performed its computer search before November 2004, it does not negate the fact that GM's initial production to the Plaintiff took place on October 29, 2004 -- AFTER the time prescribed by the Court. More importantly, this October 29, 2005 response was grossly deficient as it merely listed the names of 23 dealerships which GM determined had "active" satellite agreements. The Plaintiff has repeatedly advised the Defendant and the Court that this list was grossly inadequate and incomplete without affording the Plaintiff any accompanying information regarding the nature and term of each such satellite's operations, the basis for GM's

approval for such satellite operations, as well as the basis for GM's renewal, non-renewal, conversion to a full point, or termination. Although GM supplemented this response on November 11, 2004 to provide the names of 12 additional dealership who had satellite agreements which had been terminated or not renewed, from this point until after the Court's February 7, 2005 Order which granted, in part, the Plaintiff's Motion for Sanctions, GM erroneously maintained the position that that it had conducted a thorough and diligent search of "all available records."

GM's Motion concedes that only after the Court's February 7, 2005 Order did GM bother to take the "additional step" of having Mr. Middlekauf contact GM regional field personnel throughout the country to determine whether there were other Chevrolet satellites not reflected in the search of the computer database." (See GM's Motion to Alter, Amend, pp.9) GM purports to argue that this "additional step" went above and beyond its discovery obligations. However, this step had been mandated by the Court pursuant to its two prior discovery Orders. Specifically, during the Court's August 27, 2004 hearing on the Plaintiff's Motion to Compel, the Court specifically instructed GM's counsel regarding the scope of its production obligations as follows:

Mr.McCarthy:    Yes, Your Honor.  I want to clarify that General Motors, as far as the satellite dealers across the country, that's something that general – **that there are dealer files that would say who has a satellite dealer.**

I thought when you asked – when you asked about the satellite documents before, I thought you were talking about documents creating the satellite program, which is one of their discovery requests.

The Court:    **No,   no.    Creating,   evidencing,   terminating, implementing, continuing.  If it has to do with the satellite program and it's a document, then you need to produce it.**

Mr. McCarthy:    What we do have its there's over seven thousand dealers across the country and each of those dealers has dealer files.  What it would require GM to do is to look through, to sort through all seven thousand dealers across the country.[3]

The Court:    You don't know which of your dealers are satellite dealers?

Mr. McCarthy:    Not unless we search through all of the dealer files or if we contacted the hundred and fifty or so zone managers across the country and asked them to do it.

The Court:    I suggest you contact your hundred and fifty zone managers.

Mr. McCarthy:    Yes, Your Honor.

The Court:    **And then you produce the documents** –

Mr. McCarthy:    Yes, Your Honor.

---

[3] While counsel states that there are over 7000 dealers, GM's Motion states that it manually reviewed approximately 4100 dealer files.

The Court:          -- **that relate to the satellite**.

Mr. McCarthy:      Yes, Your Honor.

The Court:          Any satellite, any GM satellite as to any document that's
                    within the scope of their request. A hundred and fifty
                    contacts, I'll give you sixty days to do that.

(Motion to Compel Hearing Transcript, pp. 9-11) (emphasis added).

Thereafter, by Order dated February 7, 2005, the Court granted, in

part, the Plaintiff's Motion for Sanctions and specifically stated:

> "The Court finds that GM violated this Court's Order
> compelling production, entered on August 28, 2004, by failing
> to provide documents in its possession and control relating to
> specific satellite dealerships. These documents were requested
> in items number 2, 3, and 4 of the Plaintiff's requests for the
> production of documents and were ordered by this Court to be
> produced no later than October 27, 2004. The Defendant
> General Motors Corporation is directed to purge its
> noncompliance by providing, by the end of business on
> Thursday, February 17, 2005, all documents responsive to the
> Plaintiff's request for the production of documents. Failure to
> comply fully with its production obligations and this Court's
> orders will result in the imposition of sanctions against General
> Motors in the amount of $50,000 for every day that GM
> remains out of compliance. If GM remains out of compliance
> thereafter, the Court will begin striking GM's defenses."

Such terms clearly put GM on direct notice of its obligation to exhaust any

and all means available to locate and produce responsive documentation to

the Plaintiff. However, despite such admonitions and threatened sanctions

by the Court, GM once again failed to properly act to discharge its discovery

obligations.     In fact, GM's shortcomings in this regard are demonstrated

by the testimony of GM's own designated witness, William Hepburn, who

testified on February 11, 2005 as follows:

> a. that the source of all information concerning the Chevrolet
> satellite dealerships would be the dealer files[4], which were
> maintained within the Dealer Contract Group department.
> (Hepburn depo. pp.88-89).
>
> b. that while the hard copy dealer files which contained the
> satellite information were maintained in his Department, neither
> he, his staff nor anyone else reviewed the dealer files. (Hepburn
> depo. pp. 88).
>
> c. that to his knowledge, no request was made of the Chevrolet
> zone or branches for such information; (Hepburn depo. pp.71, 88).
>
> d. That to his knowledge, business records were readily available
> to GM; however, no such records were reviewed, but rather only
> electronic data was searched. (Hepburn depo. pp.88).
>
> e. that he does not know of any attempt made by anyone to review
> the hardcopy files to check for satellite agreements. (Hepburn
> depo. pp. 81).

Despite this uncontroverted testimony by its own witness, GM

intentionally failed and refused to conduct a search of such dealer file

records, but instead continued to rely on a simple computer search of its

records. Nevertheless, GM's Motion purports to argue that it undertook

"extraordinary effort" by employing 14 paralegals to manually review the

documents in the dealer contract files by hand. However, GM should have

---

[4] Despite Heburn's testimony, when Mr. Middlekauf was shown the dealer file which had been produced
for Vaden Chevrolet, he could not find a copy of the Dealer Sales and Service Agreement, demonstrating at
least in this instance that not all documentation was contained within the dealer's file.

performed a manual search of its dealer file records within the initial 60 day time period afforded by the Court in its August 27, 2004 Order. In fact, the only reason GM conducted this manual search on May 13 and 14, 2005, was because the May 9, 2005 Show Cause Order directed GM to appear in Court on May 16, 2005 to state why the Court should not sanction GM for its continued malfeasance.

Lastly, GM argues that the Plaintiff had never requested that GM search its dealer files, and further that the Court never ordered GM to do so. Such a contention is unpersuasive as the Plaintiff has repeatedly stated in its pleadings with the Court that William Hepburn had testified that the dealer files were the sole source of all satellite information, and yet to his knowledge neither he nor anyone in his department had bothered to review such dealer files for responsive documents.    Furthermore, it is undisputed that the Plaintiff repeatedly advised GM that additional satellites existed which had not been disclosed and that additional satellite information remained outstanding. Nevertheless, GM largely ignored such protests by the Plaintiff and thereby failed and refused to produce any information as to Vaden Chevrolet, the satellite facility testified to in Hawaii, the Anchorage, Alaska satellite, or others until after the Plaintiff had filed its third Motion for Sanctions on April 1, 2005.    Moreover, the Plaintiff understood the

16

Court's prior Orders to require GM to search all available records, which would necessarily have included its dealer files.

The Court has properly determined that the record, including the testimony of William Hepburn and William Middlekauf, clearly reflects that GM wholly failed and refused to conduct any type of manual search of its dealer file records until after this Court entered its May 9, 2005 Show Cause Order requiring GM to appear before the Court to show cause why it should not be sanctioned for failing to comply with the Court's discovery Orders. Therefore, any plea for leniency based upon its grossly belated search of its dealer files on May 13 and 14, 2005, is unavailing.

## D.    The Plaintiff has been Prejudiced by GM's Discovery Deficiencies

GM argues that sanctions are not appropriate or justified because the Plaintiff has not been prejudiced by GM's inadequate and/or untimely production. Contrary to this contention, the Plaintiff has been materially prejudiced by GM's discovery abuse tactics as well as its deficiencies in its production. First, the Plaintiff has been prejudiced through the repeated delays in the orderly prosecution of its claims. Second, the Plaintiff has been caused to expend unnecessary time and money in having to constantly seek and demand fully responsive and complete production from GM,

through its repeated review of GM's piecemeal production, and through the repeated and lengthy filings with the Court to remedy such production deficiencies as well as to extend the discovery and disclosure deadlines.[5] Finally, the Plaintiff has been prejudiced, and continues to be prejudiced, by GM's lack of complete documentation regarding its satellite facilities. As stated in the Plaintiff's prior pleadings, as well as at oral argument, GM's production to date with respect to the other satellite facilities which have been disclosed largely consists of the satellite agreement itself (which GM admits is a standard form agreement), and in some cases some limited correspondence. GM continues to proceed under the premise that such limited information is all that is required to be produced with respect to the other satellite facilities. Illustrating this flawed position, GM's Motion plainly states, "plaintiff has not been prejudiced by GM's delayed production of the satellite sales agreements for the nine Chevrolet dealers."

The Plaintiff submits that with very few exceptions, GM's production to date concerning its other satellite facilities lacks any internal GM documents, memoranda, evaluations or meaningful correspondence which either reference or pertain to the basis for GM's initial approval of the

---

[5] In fact, the Plaintiff will be forced to file yet another motion to extend the July 1, 2005 expert disclosure deadlines given GM's June 3, 2005 letter advising that it does have "shipment data" for Edwards Chevrolet and Edwards East for the period from January 1, 200 forward. This disclosure will be discussed in more detail hereinafter.

18

satellite, or the basis for GM's renewal, non-renewal, conversion to a full point, or termination. Without such documentation, the Plaintiff has been, and will continue to be, prejudiced in its ability to compare the manner in which GM treated and evaluated the Plaintiff's satellite facility to the manner in which GM treated and evaluated its other satellite facilities. Such a comparison is relevant and necessary to support the Plaintiff's allegation that GM acted in bad faith and/or with ulterior motive in terminating the Plaintiff's satellite facility. Without the benefit of complete satellite data from GM, the Plaintiff will be materially prejudiced and disadvantaged in presenting its case.

## E.    Allocation Data Deficiencies

### 1.    File A Monthly Allocation Data

With respect to the File A monthly allocation data produced by GM, it is undisputed that GM has failed to produce such monthly allocation data for the other Birmingham MDA dealers (including Edwards East), for the period from January 2001 through May 2001.

The Court's May 20, 2005 Order properly determined that GM violated Judge Proctor's January 28, 2004 Order, which required GM to produce, inter alia, the File A data for the period earlier than 36 months prior

19

to such Order. To this end, the Court properly determined that GM was on notice of the Plaintiff's request and entitlement to such File A data, and found unreasonable GM's interpretation of its document preservation and production obligations as limited only to vehicle allocations for Serra and Edwards Chevrolet. The Court further concluded that GM has made a practice throughout this action of unreasonably narrow interpretations of discovery requests and Court Orders.

GM's Motion argues that it was error for the Court to find GM in contempt with respect to File A data. To this end, GM erroneously argues that the Plaintiff has allocation data for the other Birmingham Chevrolet dealers for the period to which the claims in this lawsuit relate. GM attempts to support this argument by stating that, by the Plaintiff's own admission, its claims for vehicle misallocation do not begin until after the state court litigation, which GM interprets to mean after April, 2001 (the date of the jury verdict) and, therefore, given GM's production of such File A data for the other dealers which begins in June 2001, GM contends that this dispute only covers 6 weeks of missing data. Such a statement is factually inaccurate. While the Plaintiff has stated that its vehicle misallocation claims begin after the state court litigation, this is true to the extent that the Plaintiff's vehicle misallocation claims stem, in large part,

20

from GM's authorization of Edwards Chevrolet to purchase Century Chevrolet (now known as Edwards East) in August 2000. This is further true to the extent that the Plaintiff's misallocation claims in the state court litigation were based upon vehicle allocation data produced through calendar year 1998 (when GM changed to the VOMS system). Accordingly, while the Plaintiff's misallocation claims arise after the state court litigation, it is undisputed that the Plaintiff DOES NOT have the File A monthly allocation data for the other Birmingham MDA dealers for any period prior to June 2001. As a result, GM's contention that the missing data only covers 6 weeks is erroneous.

Next, GM erroneously argues that the Plaintiff has acknowledged at the Show Cause Hearing that the File A monthly data has little if any importance to the Plaintiff's claims. Again, such a contention is meritless. While it is undisputed that the File B data contains more detailed data and information than the File A data, and therefore allows the Plaintiff a more meaningful opportunity to analyze, assess and compare the respective vehicle allocations by GM among its Birmingham MDA dealers, this does not mean that the File A data is meaningless. The Plaintiff has at all times maintained that it needs the File A and File B data with respect to the Birmingham MDA dealers in order to perform its analysis in determining

21

whether there has been disparate treatment in the allocation of vehicles. In fact, it is undisputed that the File A and File B data, taken together, comprise the data upon which its allocation system is based.

## 2.    File B Weekly Allocation Data

It remains undisputed that no File B weekly allocation data has been produced for **any Birmingham** MDA dealer prior to November 8, 2001. GM asserts that this deficiency is due to a change in GM's weekly allocation process in 2001 and therefore GM claims that it did not start retaining weekly order/placement data in normal business practice until November 2001.

The Court's May 20, 2005 Order found that because GM's representative, its trial counsel and in house counsel all represented that no File B data was retained prior to the first week of November 2001, when GM began to retain File B data, and because this action was filed on October 23, 2001, the Court did not find the failure of GM to retain File B data prior to November 7, 2001 to constitute an abuse of discovery.

The Plaintiff respectfully submits that the flaw in GM's position is that GM had admittedly placed a "hold" on the Serra Chevrolet and Edwards Chevrolet's dealer files. Accordingly, pursuant to this hold policy, none of

this File B data should have been destroyed with respect to these two dealers. In fact, GM has readily stated in its pleadings that it retained this File A monthly allocation data for Serra and Edwards Chevrolet from January 2001 forward based upon the hold placed upon the allocation data for Serra and Edwards. Accordingly, given this "hold" policy with respect to Serra and Edwards Chevrolet, the Plaintiff fails to understand how GM destroyed or did not save the File B weekly allocation data during the same period that it consciously elected to retain the File A data for these dealers.

It is undisputed that GM has made repeated misrepresentations to the Plaintiff and the Court as to the availability of additional allocation data and documents to the Plaintiff's discovery. To illustrate, pursuant to his November 23, 2004 sworn Affidavit, GM's designated allocation representative, Tim Jones, stated, "GM has produced the data upon which its new vehicle allocation activity is based for the time periods set forth above." We now know that this statement was categorically false as the File B order placement data had not been produced, and purportedly does not exist, for any of the Birmingham MDA dealers prior to November 8, 2001. It is noteworthy that while the Court directly ordered GM to produce its allocation data concerning all of the Birmingham area dealers as early as August 27, 2004, **the first time the Plaintiff was advised** that the File B

data had not been "saved[6]" and therefore was not available for any of the Birmingham MDA dealers was during Tim Jones' deposition -- more than six (6) months later -- on March 6, 2005. The Plaintiff submits that such a disclosure should have been made well before Jones' March 2005 deposition as the Plaintiff had already filed 2 separate Motion for Sanctions based, in part, upon such allocation data deficiencies. The Plaintiff suggests that GM's failure to timely disclose its alleged destruction of such File B data at a bare minimum exemplifies GM discovery tactics which have included offering as little information as possible, and thereby causing the Plaintiff to expend significant time, effort and expense to obtain responsive discovery. At worst, such an untimely disclosure calls into question the veracity of GM's representation that such File B data was destroyed in 2001, concomitantly with its utilization of such data for its allocation decisions.

## 3.   GM Advises that Additional Allocation Data is Now Available for Production

Serious doubts as to the veracity of GM's representations to the Court and Plaintiff regarding the availability of further allocation data continues to

---

[6] While GM represented to the Court during the May 18, 2005 hearing that the File B data had been destroyed as early as 2001, Tim Jones simply stated that the data was not saved. The Plaintiff submits that it is difficult to believe that during this 2001 time period, and while GM was making allocation decisions around the country, the data upon which its vehicle allocations were being made were contemporaneously being destroyed. Such a concomitant destruction of data is completely inconsistent with any reasonable retention policy. In fact, Tim Jones never stated that this data was immediately destroyed, but rather stated that the data was not "saved" because GM changed its dealer order management process.

24

persist. Specifically, **since the Court's May 18, 2005 hearing**, the Plaintiff has received further information casting doubt upon the veracity of GM's representations to the Court and Plaintiff regarding the existence of additional allocation data sought by the Plaintiff. Based upon GM's representations that it had destroyed the File B weekly allocation data prior to November 8, 2001, the Plaintiff has been forced to determine whether such allocation data is available elsewhere and thereby has issued third party subpoenas to the other Birmingham MDA dealers.[7]

By letter dated June 3, 2005, upon recognition of the Plaintiff's communication with John Galese regarding the production of certain allocation records from the other Birmingham MDA dealers, counsel for GM has now advised the Plaintiff that GM does maintain what it terms as "shipment data" for Edwards Chevrolet and Edwards East for the time period from January 1, 2000 forward and has offered to produce such data which shows the number and model of new vehicles shipped to Edwards Chevrolet and Edwards East. (See GM Counsel's June 3, 2005 Letter, attached as Exhibit A) GM's letter attempts to reconcile the sudden availability of such data with its prior representations that no further allocation data exists by stating that "shipment data" is not allocation data.

---

[7] As the Court is aware, Plaintiff's counsel and John Galese, Esq., counsel for the other Birmingham MDA dealers, have been communicating in an effort to resolve the consolidated objections filed on behalf of the Birmingham MDA dealers to the Plaintiff's third party subpoenas.

The Plaintiff submits that such a statement is nothing more than a semantics game, and amply demonstrates another misrepresentation to the Plaintiff and the Court regarding the availability of additional responsive documents. The Plaintiff has repeatedly advised GM that it needs allocation data reflecting not only the number and types of vehicles **"earned"** by the Birmingham MDA dealers under GM's VOM's allocation system, but also the number and types of vehicles **actually received or "shipped"** to each of these dealers for the critical time period of January 1, 2001 forward, as well as for the year 2000 given the Plaintiff's discovery of the fact that Edwards East was authorized by GM to begin operations in August 2000, as well as Tim Jones' acknowledgment that the Plaintiff would need the prior sales history of these dealers in order to verify the accuracy of the January 2001 allocations made by GM. Since Mr. Jones' deposition in March 2005, GM has maintained the position that no further allocation records were retained by GM for the time period prior to November 8, 2001. However, we now are being advised that GM does, in fact, have "shipment data" showing the number and model of new vehicles shipped to Edwards Chevrolet and Edwards East for the time period from January 1, 2000 forward. The Plaintiff submits that this admission is yet another glaring example of the word games, and unduly narrow interpretations which GM has employed

throughout discovery. While the letter written by counsel for GM states that this "shipment data" is not allocation data, the Plaintiff disagrees. Shipment data is clearly a component of GM's allocation data which has been sought by the Plaintiff. Irrespective of GM's unconvincing attempt to differentiate between "shipment data" and "allocation data," GM should have previously advised the Plaintiff and the Court that such shipment data was available and could be produced.

## CONCLUSION

Based upon the foregoing, the Plaintiff respectfully requests that the Court deny the Defendant's Motion to Alter, Amend, Vacate or Modify the Court's Order entering sanctions against GM.

Respectfully submitted,

THOMAS E. BADDLEY, JR.
ASB-2867-E42T

JEFFREY P. MAURO
ASB-0478-U71J

**BADDLEY & MAURO, LLC**
2545 Highland Avenue, Ste. 201
Birmingham, Alabama 35205
(205) 939-0090

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing
pleading upon all counsel of record listed below:

Jere F. White
Terence W. McCarthy
LIGHTFOOT, FRANKLIN
The Clark Building
400 20th St N
Birmingham AL 35203-3202

by depositing same in the United States Mail, postage prepaid, on this the
__13__ day of ____June____, 2005.

THOMAS E. BADDLEY, JR.

28

**EXHIBIT "A"**

# LIGHTFOOT FRANKLIN & WHITE LLC
### TRIAL & APPELLATE COUNSEL

TERRY W. MCCARTHY                    EMAIL: TMCCARTHY@LFWLAW.COM                    DIRECT DIAL (205) 581-1512

June 3, 2005

**Via Facsimile**

Thomas E. Baddley, Jr., Esq.
Baddley & Mauro, LLC
2545 Highland Avenue, Suite 201
Birmingham, Alabama 35205

      **Re:** *Serra Chevrolet, Inc. v. General Motors*

Dear Tom:

It is my understanding from talking to John Galese that you have asked him to produce documents that would reflect what new Chevrolet vehicles were delivered by GM to Edwards Chevrolet and Edwards East from January 1, 2000 forward. It is also my understanding that you told him that you asked GM for this information but were told that GM does not have it. I have reviewed your document requests in the subpoenas directed to Edwards but I have never seen those requests directed at GM. We have certainly never advised you that GM does not have such data reflecting new vehicle shipments. You previously asked us for GM's allocation data for certain Chevrolet dealerships, which we have provided for the time periods available. However, I have never seen a request to GM for shipment data, which is not allocation data.

The reason I am writing is to advise that GM does have data which shows the number and model of new vehicles shipped to Edwards Chevrolet and Edwards East by GM for the time period that you are seeking. We would be happy to provide that data to you to save the dealerships the time and expense of gathering this information. If you would prefer to work with John and get this information from the dealerships, that is certainly your prerogative, but my proposal would make it easier on John and his clients.

Thomas E. Baddley, Jr., Esq.
June 3, 2005
Page 2

_____

     Please let me know as soon as possible if you would like for me to ask GM to gather this
data for Edwards Chevrolet and Edwards East. Meanwhile, if you have any questions, please
feel free to give me a call.

                               Very truly yours,

                               Terry W. McCarthy

cc:   John Martin Galese, Esq.
      Jere F. White, Jr., Esq.