FILED
2006 Jul-17  PM 04:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **SERRA CHEVROLET, INC.** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **V.** | ) | **CASE NO:  2:01-cv-2682-VEH** |
| | ) | |
| **GENERAL MOTORS** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

### PLAINTIFF'S SUPPLEMENTAL SUBMISSION IN SUPPORT OF ITS MOTION FOR SANCTIONS

COMES NOW the Plaintiff, Serra Chevrolet, Inc., and pursuant to the Court's Order dated July 7, 2006, hereby files this supplemental submission in support of its Motion for Sanctions against General Motors (hereinafter "GM") and as grounds therefore says as follows:

1. That by Order dated May 20, 2005, the Court found GM in contempt and sanctioned the Defendant the sum of $700,000, consistent with its prior admonitions and the express terms of its prior Order entered on February 7, 2005.

2. GM appealed the Court's Sanction Order, and on April 13, 2006, the Eleventh Circuit issued an opinion which affirmed in part, reversed in part and remanded the matter back to the Court for further

proceedings consistent with its Order.  Specifically, the Eleventh Circuit affirmed the Court's finding of contempt with respect to the satellite data, reversed its finding of contempt regarding the allocation data, and remanded the matter for the Court to set forth a detailed basis or justification for the amount of monetary sanctions assessed against GM for such contempt.

3.     Since the Court entered its May 20, 2005 Sanctions Order, the Plaintiff has uncovered additional and new information which may assist the Court on remand from the Eleventh Circuit, and further submits that such information constitutes additional grounds for sanctions against GM.  Of notable significance, and despite GM's repeated representations to the contrary, the Plaintiff has learned that additional new retail Chevrolet allocation data long sought by the Plaintiff was, in fact, at all times available for production.  Furthermore, the Plaintiff has confirmed that an additional satellite dealership exists – i.e. Island Chevrolet in Hawaii – yet its existence was repeatedly denied and specifically disavowed by GM's witness, William Middlekauf.

4.     As suggested by the Court in its May 20, 2005 Sanction Order, GM has not only remained out of compliance well beyond the Court's Order, but in some respects such non-compliance continues to persist.  Based upon GM's continued defiance of the Court's Orders, and more significantly

because of its repeated misrepresentations to the Court through its pleadings, and in open court by and through the sworn testimony of William Middlekauf, the Plaintiff respectfully suggests that severe sanctions are not only justified, but that further sanctions may be warranted.

**A.    Plaintiff Has Learned that GM Witness William Middlekauf Falsely Testified Regarding the Existence of a Satellite in Hawaii**

If the Court recalls, information obtained through the February 22, 2005 deposition testimony of GM representative Stan Moore revealed that a satellite dealership known as "Hilo Motors" was located in Kona, Hawaii. As a result, the Plaintiff thereafter specifically requested information from GM pertaining to this satellite dealership in Hawaii.  Nevertheless, despite Stan Moore's testimony, GM misleadingly responded in its April 15, 2005 pleading that "there is currently no Chevrolet dealership in Hawaii called Hilo Motors." (Doc. 123 , pp.6)

Contrary to GM's representation, an internet search by the Plaintiff revealed that the dealership formerly known as Hilo Motors had changed ownership and was now known as Island Chevrolet, Buick, Cadillac, Pontiac and GMC.[1]  This internet search further reflected that Chevrolet had, in fact,

---

[1] In December, 2001, Clark Automotive Group, Inc. purchased the assets of Hawaii Motors, Inc., and thereafter began operating the dealership under the name Island Chevrolet, Buick, Cadillac, Pontiac and GMC.

maintained its presence on this island, including GM's continued authorization of two Chevrolet locations.

Based, in part, upon this discrepancy between GM's representations and the information proffered by the Plaintiff as a result of its internet research, the Court by Order dated May 9, 2005, directed GM to produce a witness at the May 16, 2005 Show Cause hearing "having personal knowledge as to GM's satellite program and dealerships in the State of Hawaii." At this hearing, GM's designated representative William Middlekauf unequivocally testified that he had previously covered this area as a zone manager, and after researching the records, was able to conclude that there was no satellite dealership in Hawaii.

> The Court:      Well, I'll just ask him. Are you affirmatively stating that there was never a satellite operation in Hawaii?
>
> The Witness:    To the best of my knowledge, in researching the records, plus my time as zone manager covering that area, I've never been aware of any satellites in the State of Hawaii.
>
> The Court:      Informal or any other type?
>
> The Witness:    That's correct.

(See Exhibit A, May 17, 2005 Hearing transcript, pp.88-89)

Following this hearing, the Plaintiff directly contacted Island Chevrolet. At this time, Mr. Mike Chagami, Island Chevrolet's Treasurer, advised that Island Chevrolet operates out of two locations -- a main dealership and a satellite facility -- which are approximately 100 miles apart. (See Affidavit of Michael Chagami, attached hereto as Exhibit B)  Mr. Chagami further stated that Island Chevrolet's main dealership point is located in Hilo, HI, while its satellite facility is located in Kona, HI  and has been in operation since the early 1980's. Id.

The Plaintiff also contacted Richard Henderson, the former owner/dealer operator of Hawaii Motors, Inc.  Mr. Henderson advised that due to the rapid growth of the Kona area, in approximately 1979 General Motors authorized his dealership to open and operate a supplemental facility in Kona, in order to adequately serve its assigned area of responsibility, to satisfy its obligations under the Dealer Sales and Service Agreement, and to meet its customers' needs. (See Affidavit of Richard Henderson, attached hereto as Exhibit C)  Mr. Henderson further acknowledged the intended longevity of this satellite facility, stating that based upon the representations made by General Motors, the Kona facility would continue its operations as long as the main dealership in Hilo continued to be renewed.  Id.

Such information unequivocally demonstrates that the sworn testimony of Mr. Middlekauf, who GM unilaterally designated as its most knowledgeable witness for the Court's  May 16, 2005 Show Cause Hearing, was misleading at best, or at worst, categorically false.  Such Affidavit testimony further demonstrates GM's continuing failure to search for and obtain full and accurate information as ordered by the Court.

Finally, as has been stated previously, the Plaintiff has been prejudiced, and continues to be prejudiced, by GM's lack of complete responses to the satellite discovery ordered by the Court.  GM's production with respect to those Chevrolet satellite facilities identified to date largely consists of the satellite agreement itself (which GM acknowledges is a standard form agreement).[2]  With very few exceptions, GM's production pertaining to its other Chevrolet satellite facilities lacks any internal GM documents, memoranda, evaluations or meaningful correspondence which either references or pertains to the basis for GM's initial approval of the satellite, or the basis for GM's renewal, non-renewal, conversion to a full point, or termination.  Time and time again, the Plaintiff has advised GM

---

[2] GM's satellite data production is based upon its erroneous belief that the satellite agreement itself is all that is required to be produced with respect to the other satellite facilities.  In fact, as GM's Appellate Brief plainly stated, "plaintiff has not been prejudiced by GM's delayed production of the satellite sales agreements for the nine Chevrolet dealers." (emphasis added).

that merely providing a list of the satellite dealerships, along with a copy of their standard form satellite agreement with GM, is grossly inadequate and incomplete,[3] for without complete production, the Plaintiff will continue to be materially prejudiced in its ability to offer comparator evidence regarding the manner in which GM treated and evaluated the Plaintiff's satellite facility to the manner in which GM treated and evaluated its other satellite facilities.  Such comparator evidence is necessary to support the Plaintiff's ADDCA claims that GM acted in bad faith, with ulterior motive, and in a manner inconsistent with any of its other satellite dealerships, when it terminated the Plaintiff's satellite facility.

**B.    GM Has Subsequently Advised That New Chevrolet "Shipment Data" Are Retained And Can Be Produced**

As the Court is aware, GM has repeatedly represented to both the Plaintiff and the Court that the weekly new retail Chevrolet allocation data (designated at all times herein as the FILE B data) applicable to Birmingham MDA Chevrolet dealers were not saved for any period prior to November 2001.  Based upon this and related representations, the Plaintiff sought to

---

[3] While GM has failed to produce any further satellite data, GM's counsel advised the Plaintiff's counsel after the Court's May 2005 Sanction Order, by letter dated June 30, 2005 that it would be willing to make the dealer contract files of all dealers previously identified as having a satellite available for review in Detroit.  Plaintiff's counsel declined such an offer and responded that all such data had repeatedly been ordered to be produced to the Plaintiff, as contemplated by the Court's prior Orders.

obtain supplemental allocation data from other Birmingham MDA Chevrolet dealers via third party subpoenas.  In this regard, after the Court's May 2005 hearing on the Sanctions Motion, Plaintiff's counsel and counsel for the other Birmingham MDA Chevrolet dealers, John Galese, Esq. worked to determine what new retail Chevrolet supply information such dealers have maintained that might be responsive to the Plaintiff's request for supplemental allocation data.

Tellingly, when GM realized that the Plaintiff and counsel for the other MDA dealers were communicating to determine what documents existed to satisfy the Plaintiff's requests, GM immediately advised by letter dated June 3, 2005, that it did have and would be willing to produce "shipment data" showing the number and model of new Chevrolets supplied to Birmingham MDA Chevrolet dealers for the time period from January 1, 2000 forward.  GM attempted to reconcile the availability of these new Chevrolet shipment data with its prior representation (i.e., that no additional allocation data existed) by stating that "shipment data" are not allocation data.  However, the Plaintiff submits that this assertion is grossly misleading in that it constitutes a distinction with little difference.  In the absence of complete File B new retail Chevrolet allocation data, corresponding "shipment data" were   certainly a material component of the missing

allocation data which had been long sought by the Plaintiff.  Shipment data reveal the actual new Chevrolets supplied by GM.

The record reflects the Plaintiff's repeated requests to GM for complete allocation data reflecting not only the number and types of new retail Chevrolets "earned" by the Birmingham MDA Chevrolet dealers under the VOMS allocation system of GM, but also the number and types of retail vehicles actually received (and thereby "shipped") to each of these dealers for the time period of January 1, 2001 forward, as well as for the year 2000 given that Edwards East began operations in approximately August 2000.[4] Since Mr. Jones' deposition in March 2005, GM has maintained the steadfast position that no further new retail Chevrolet allocation records were retained by GM for the time period prior to November 8, 2001.  However, after the issuance of the third party subpoenas to the other Birmingham MDA Chevrolet dealers, the Plaintiff was quickly advised that GM did possess and would be willing to produce "shipment data" showing the number, model, and dates of new vehicles supplied to  Birmingham MDA Chevrolet dealers for the time period from January 1, 2000 forward.  The Plaintiff submits that this belated admission as to the availability of detailed new Chevrolet supply

---

[4] GM's own new Chevrolet allocation representative, Tim Jones, readily acknowledged that the Plaintiff would need the prior retail sales history of these dealers in order to verify the accuracy of the January 2001 allocations made by GM. (Jones dep., pp. 235-236)

data is yet another example of the abusive discovery tactics which GM has employed throughout this litigation.

**C.      Allegedly Missing FILE A Allocation Data Were "Suddenly" Located Only Through - Extraordinary Efforts By The Plaintiff**

Based upon GM's representation that it had also destroyed the monthly new retail Chevrolet File A data applicable to certain Birmingham MDA Chevrolet dealers for the period January 2001 through May 2001, the Plaintiff issued a third party subpoena to Electronic Data Systems (EDS), a company formerly owned by GM and with whom GM contracts to maintain its allocation data, purge this information pursuant to GM's document retention policy, and provide other mainframe data storage and retention services.

After the issuance of this subpoena, the Plaintiff was contacted by counsel for EDS, who advised that despite GM's representations to the contrary, the allegedly destroyed new retail Chevrolet File A data was available and could be produced for all Birmingham MDA Chevrolet dealers.  Thereafter, and during the September 9, 2005 deposition of Steve Gergics, EDS' representative most knowledgeable regarding the information at issue, the Plaintiff discovered that the  previously designated "destroyed" File A data were, in fact, available at all times.  More significantly, the

Plaintiff further discovered that the failure to produce the requested File A data stemmed from the fact that the original request from GM to EDS did not include the time period January 2001 through May 2001.  (Gergics dep. pp.35, 37)[5]   Indeed, Mr. Gergics conceded that there was no problem or difficulty in retrieving new retail Chevrolet File A data for this time frame:

> Q.     All right.  Is it your understanding that the original request from GM back long ago to retrieve allocation did not request this time frame?
>
> A.     Correct, as far as I can – as far as I can –
>
> Q.     As far as you know.
>
> A.     Yes. Um-hum.
>
> Q.     Do you know if anyone – and you may not know this.  Do you know if anyone from EDS told GM or communicated to GM that that data did not exist or had not been saved?
>
> A.     Not that I recall.
>
> Q.     Okay.
>
> A.     No.

(Gergics depo, pp.37-38)

\*    \*    \*    \*    \*    \*    \*

> Q.     Do you recall having any conversations with [GM's representative] about data that you could not find or did not exist?

---

[5] The Plaintiff submits that this is yet another example of GM unilaterally narrowing the scope of the Plaintiff's discovery, despite the Court's prior Orders.

A.     No. No.  Not that I recall.

Q.     Do you recall any particular problem or difficulty in retrieving the allocation data that [GM's representative] wanted?

A.     Not that I recall.

(Gergics dep. pp.67)

Thereafter, GM formally filed a Notice of Supplemental Production pleading on September 2, 2005, acknowledging that no File A data for any Birmingham MDA Chevrolet dealer had been destroyed by its document retention policy.

Paralleling GM's belated disclosure as to the availability of the "shipment data," as well as its mistruths about the nature and extent of its efforts to search for and locate other responsive documents, this belated discovery that complete new retail Chevrolet File A data did, in fact, exist once again was the result of the Plaintiff's pursuit and involvement of another third party, EDS (formally owned by GM), and only came after the Plaintiff had issued a third party deposition notice and accompanying document request to EDS.  The Plaintiff submits that it should have been advised as to the existence of  complete File A data much sooner, and submits that had the Plaintiff not initiated its third party document request to EDS, such information never would have been forthcoming from GM.

12

**D.   GM Has Failed To Timely Produce Material New Chevrolet Allocation Information Distinguishing "Fleet" From "Retail" Vehicles**

At all times prior to the September 2005 submission of the expert report by Technical Associates, Inc. (TAI) on behalf of Plaintiff, GM represented that it had produced all of the information available and necessary to address the issue of whether the VOMS allocation system of GM, which is applicable to the new retail Chevrolets that it supplies to dealers, had been applied in an arbitrary, capricious and/or discretionary manner.  Based upon GM's representations, the Plaintiff's experts (TAI) performed an analysis of the new Chevrolet allocation data produced by GM (including File A, File B, and "shipment data"), and determined that GM had, in fact, engaged in new vehicle supply misallocation practices that unduly favored Edwards Chevrolet and Edwards East to the economic detriment of the Plaintiff.

Approximately four months after the submission of the Plaintiff's expert report by TAI, GM submitted its January 2006 expert report from Urban Science Applications, Inc. (USAI), which attempted to rebut the findings of TAI regarding GM's misallocation of new vehicle supplies. USAI's report stated, in part, that TAI's findings were fatally flawed because TAI had failed to distinguish new "retail" Chevrolets from new "fleet"

13

Chevrolets in analyzing the "shipment data" components of GM's allocation data production.   However, the absence of any segmentation between "retail" and "fleet" vehicles in the TAI expert report was the result of GM's failure to notify the Plaintiff that these shipment data differed from GM's File A and File B data in that the latter pertain only to new "retail" Chevrolets.   GM further failed to provide the Plaintiff and its experts with the information necessary to segment "fleet" and "retail" new Chevrolets in GM's shipment data. [6]

This deficiency in GM's production of new Chevrolet allocation data was readily acknowledged during the February 7, 2006 deposition of the USAI expert for GM, Sharif Farhat, who admitted that the shipment data provided to the Plaintiff and TAI did not contain the appropriate "field" or column of data necessary to segregate fleet from retail vehicles. (Farhat dep. pp.59-60)   Mr. Farhat also admitted that he later received the requisite information by contacting GM's new vehicle allocation representative, Tim Jones, who provided Farhat with the supplemental information required for his segmentation analysis. (Farhat dep., pp.59-60)   Nevertheless, at no time did GM bother to advise the Plaintiff that this additional field of data and

---

[6]  Because Files A and B consist of "retail" data, as well as that the misallocation claim before the Court involves the "retail" component of GM's VOMS allocation system, TAI understood and relied upon the fact that GM's allocation production only included data concerning "retail" vehicles, and did not include "fleet" vehicles.

attendant instructions had been requested and provided to USAI for its allocation analysis.  Mr. Farhat further conceded that, given the nature of the allocation data produced to the Plaintiff, and without the supplemental information he received from GM, there was no way that the Plaintiff's experts could have known or determined which vehicles were fleet and which were retail. (Farhat dep., pp. 60)[7]

Despite material deficiencies in its production of new retail Chevrolet allocation data, GM nevertheless attempts to benefit from these failings by criticizing the damage report of the Plaintiff's experts.  Such tactics have pervaded every aspect of this proceeding.  GM has repeatedly and purposely sought to limit and deprive the Plaintiff of critical, Court-ordered discovery and, thereafter, sought to use this lack of production to its advantage in this litigation by arguing that the Plaintiff cannot support its damage claims.

The Plaintiff has been materially prejudiced by GM's repeated discovery abuse, and non-compliance with the Court's discovery orders.  These abusive tactics have caused the Plaintiff to expend substantial time and money in continually having to ask its experts (TAI) to evaluate the status of GM's piecemeal and inadequate production, in constantly having to

---

[7] GM will undoubtedly argue that Farhat subsequently provided the Plaintiff with this additional information in conjunction with the filing of his expert report in January 2006.  However, the flaw with this position is that the Plaintiff's experts were deprived of such necessary information during the time they prepared and filed their expert report in September 2005, and yet GM seeks to criticize the Plaintiff's expert report based upon such deficiencies.

demand of GM that it fully and accurately respond to discovery requests, and in repeatedly having to come before the Court as an ultimate means of remedying the continuous state of non-compliance.

These substantial cost burdens began almost two years ago as a result of the numerous deficiencies in GM's production of Files A and B allocation data, as well as its satellite data deficiencies. These cost burdens have continued since the production of new Chevrolet "shipment data" by GM, which form the basis for USAI's criticism that TAI did not separate new "retail" and "fleet" Chevrolets in its expert report. In addition to the fact that such criticism has its roots in GM's abusive discovery tactics, the USAI expert report makes many representations as to the contents of GM's shipment and other allocation data that are not readily verifiable. As a result, additional meticulous examinations have been performed by the Plaintiff's experts and have compounded the cost burdens borne by the Plaintiff in this litigation.

GM's repeated recalcitrance throughout discovery is well supported in the record, has materially prejudiced the Plaintiff and caused it to bear enormous costs, and has significantly impeded the orderly progression of this case to trial. The Defendant's conduct demonstrates an utter disregard of its responsibilities owed to the Court and the Plaintiff. Moreover, the

misconduct of GM has occurred in the face of repeated warnings by the Court that GM's failure to provide complete information would result in the imposition of severe sanctions. For these reasons, the Plaintiff submits that substantial sanctions are indeed warranted and should be imposed.

**E.     GM'S Opposition to the Plaintiff's Motion to Supplement is Without Merit.**

GM erroneously contends in its Opposition to Plaintiff's Motion to Supplement that the Plaintiff's misallocation claims are barred by the doctrine of judicial estoppel, as well as the law of the case doctrine. However, GM's argument is based upon its own unduly restrictive and erroneous interpretation of the Plaintiff's prior statement that the misallocation claims presented in this action occurred after the state court litigation. Contrary to GM's narrow interpretation, and as set forth in detail in the Plaintiff's Opposition to GM's Motion for Summary Judgment, the Plaintiff asserts that such claims occurred after the state court litigation insofar as (1) the Plaintiff's state court misallocation claims were based solely upon GM's former National Order File allocation system[8] and thereby GM allocation data produced through calendar year 1998; and (2) the Plaintiff's misallocation claims in this action arose under GM's new VOMS

---

[8] It is undisputed that as of December 1998, GM ceased using it NOF allocation system in favor of it new Vehicle Order Management System (VOMS).

system and arise from GM's authorization of Edwards Chevrolet to purchase Century Chevrolet (now known as Edwards East) in August 2000. In fact, it is undisputed that the Plaintiff neither alleged nor litigated any misallocation claim pertaining to either GM's VOMS system or Edwards purchase of Century in the state court action.

Tellingly, GM ignores the specific allegations raised in the Plaintiff's Third Amended Complaint, which clearly states that GM's award of Century Chevrolet was "arbitrary, capricious and unreasonably discriminatory to the Plaintiff and thereby violated Alabama Code § 8-20-4(2)" by, among other things, allowing Edwards Chevrolet "to receive an additional allocation of new vehicle from GM, over and above the allocation received by the Plaintiff. (Doc 43,pp.2) While GM has been on pleadings notice of the Plaintiff's vehicle misallocation claims implicated by GM's award of Century to Edwards, it nevertheless attempts to argue that the Plaintiff's misallocation claim are barred, principally because Judge Proctor's discovery order provided for discovery on "GM misallocation of vehicles since 2001." However, GM has conveniently overlooked the fact that this Order also provided for discovery pertaining to "(3) the Century Chevrolet dealership awarded to Edwards Chevrolet." (Doc.36 pp2) Accordingly, the Plaintiff's misallocation claims, insofar as they relate to Edwards purchase

of Century and GM's concomitant award to Edwards East of an additional allocation (known as a "temporary allocation quantity") of 418 unearned vehicles, as set forth in the Plaintiff's Opposition to GM's Motion for Summary Judgment, are not barred by judicial estoppel.

GM next argues that any supplemental information bearing upon its failure to produce allocation data as ordered by the Court is barred by the law of the case and the remand order from the Eleventh Circuit concerning the sanctions issue.  GM attempts to support this position by citing to the Eleventh Circuit's determination that no sanctions were in order with respect to the allocation discovery disputes between the parties, as well as the Court's statement in dicta that any allocation data prior to April 2001 was "irrelevant," based upon the Plaintiff's prior statement that limited its misallocation claim to events occurring after the state court litigation.

As stated hereinabove and in its Opposition to Summary Judgment, the Plaintiff never limited its allocation claim to the period beginning April 16, 2001 (after the state court litigation ended) as referenced in the Eleventh's Circuit's opinion.   The Plaintiff submits that this misunderstanding of the underlying record by the Court is due to the fact that this issue was neither addressed nor decided by this Court, was not fully briefed by the parties to the Eleventh Circuit, and therefore was not properly

before the Court on appeal.  Accordingly, the Eleventh Circuit's statement to this end was dicta and therefore does not constitute the law of the case, as it was unnecessary to the Court's ultimate finding that the District Court abused its discretion in sanctioning GM for its non-compliance in producing fully responsive allocation data.  In fact, the basis for the Eleventh Circuit's decision in this regard lies in its whole cloth acceptance of GM's argument and representation that based upon its retention policy, "the data from January 2001 until June 2001 regarding other Chevrolet dealers in Birmingham had been destroyed." (11th Cir. Opinion, pp. 24)    Based upon its acceptance of this position by GM, the Eleventh Circuit held as follows:

> "When ordered to produce the data on August 27, 2004, GM complied and produced all that it had – allocation data from June 2001 forward.  **GM could not produce what it did not possess.**  Although the destruction of the documents by GM may have required the district court to engage in a spoliation analysis under Alabama law, see Wal-Mart Stores, Inc. v. Goodman, 789 So.2d 166, 176 (Ala. 2000), **the district court abused its discretion when it held GM in civil contempt and imposed sanctions for the failure by GM to obey the order of the district court to produce documents GM did not possess**. See Pesaplastic C.A., 799 F.2d at 1520 ("A party held in contempt may defend his failure to obey a court's order on the grounds that he was unable to comply.").

(Opinion, pp.24-25) (emphasis added).

Contrary to this holding, and based upon the new information discovered by the Plaintiff after the entry of the Court's May 20, 2005

Sanction Order, we now know that GM had not destroyed such allocation data in accordance with its documents retention policy, but rather had systematically failed and refused to request the retrieval of such data from EDS, despite the Court's repeated warnings and threatened sanctions. As a result, the Eleventh Circuit's finding in this regard was error. Additionally, while the Eleventh Circuit noted that any spoliation issue was mooted based upon the GM's September 2, 2001 notice of production of such allocation data, such a finding, again, was based upon an erroneous determination that it was unknown to GM that such data was retained by a third party (EDS).

Lastly, GM erroneously relies upon the Eleventh Circuit's statement that any allocation data from January 1, 2001 through April 16, 2001 was "irrelevant" in arguing that the Plaintiff's subsequent discovery of the existence of such allocation data should be of no legal import. However, the flaw in this position is twofold. First, as stated above, this statement by the Eleventh Circuit was dicta. Secondly, such a statement directly conflicts with the undisputed testimony of GM's own allocation representative, Tim Jones, who readily acknowledged: (1) that in order to determine whether a dealer has been discriminated against or treated unfairly in the allocation process required a review of its competing dealers' allocation records (Jones dep. pp.91); and (2) that the File A monthly allocation data for January 2001,

is based, in part, upon the prior sales history of each dealer, going back as far as 12 months. (Jones depo. pp.235-236).  As such, and as conceded by GM's own allocation expert, in order to determine whether GM's vehicle allocations were proper for a given time period requires a review and analysis of the prior sales history of each dealer, going back as far as 12 months, thereby rendering such prior allocation data as being highly relevant.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff respectfully requests that the Court consider this newly discovered information in conjunction with its instructions on remand from the Eleventh Circuit and thereby imposes severe sanctions on GM for its repeated and calculated discovery abuse tactics which have permeated this litigation, and which have substantially prejudiced the Plaintiff in its prosecution of its case.  The Plaintiff further requests that if the Court enters sanctions against the Defendant for such misconduct, that it be allowed to petition the Court for attorneys' fees, costs and expenses incurred by virtue of the Defendant's misconduct, and for such other, further and different relief to which the Plaintiff may otherwise be entitled.

Respectfully submitted,

**s/ Jeffrey P. Mauro**
Bar Number: ABS-0478-U71J
Attorneys for Plaintiff
Baddley & Mauro, LLC
2545 Highland Avenue, Ste. 100
Birmingham, Alabama 35205
(205) 939-0090
(205) 939-0064 Fax
jpmauro@baddleymauro.com   E-mail

## CERTIFICATE OF RETENTION OF AFFIDAVITS

I hereby certify that I will retain the original signed affidavits in my file for a period of one year after the completion of the case.

## CERTIFICATE OF SERVICE

I hereby certify that on  July 17, 2006, I electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  Jere White, Esq. and Terrence McCarthy, Esq., John Galese, Esq.

**s/ Jeffrey P. Mauro**
Bar Number: ABS-0478-U71J
Attorneys for Plaintiff
Baddley & Mauro, LLC
2545 Highland Avenue, Ste. 100
Birmingham, Alabama 35205
(205) 939-0090
(205) 939-0064 Fax
jpmauro@baddleymauro.com   E-mail