FILED
2006 Jul-31  PM 03:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

SERRA CHEVROLET, INC.,          )
                                )
    Plaintiff,                  )
                                )          CIVIL ACTION NO.
v.                              )
                                )          CV-01-HS-2682-S
GENERAL MOTORS                  )
CORPORATION,                    )
                                )
    Defendant.                  )

## GM'S RESPONSE TO PLAINTIFF'S AMENDED MOTION FOR SANCTIONS AND GM'S COUNTER-MOTION FOR SANCTIONS

Defendant, General Motors Corporation ("GM"), in response to Plaintiff's Amended Motion for Sanctions, and in support of its Counter-Motion for Sanctions, hereby shows the Court as follows:

## I.    Introduction

In its latest Motion for Sanctions, Plaintiff blatantly misleads the Court, violates previous mandates of this Court and the Eleventh Circuit, and, finally, attempts to relitigate issues that Plaintiff already raised in the Eleventh Circuit and which that Court ruled on. The arguments made in the motion are wholly improper and nothing more than a transparent attempt to divert attention from the merits of this case and the pending summary judgment motion.

Fact and expert discovery in this case ended long ago and the merits stage has finally been reached. In fact, GM's Motion for Summary Judgment has been fully briefed and is ripe for consideration. Yet, even though we are at the merits stage of this case, Plaintiff continues to try to make this a case about discovery in order to divert the court's attention from the merits. Plaintiff's harassment of GM must stop, and stop now.

GM has incurred enormous expense and time responding to Plaintiff's abusive discovery tactics as well as defending a "misallocation claim" that the Eleventh Circuit found was outside the scope of this lawsuit. Indeed, the Eleventh Circuit did more than just that. Because of Plaintiff's prior representations to this Court, admissions and testimony, it found that not just the misallocation claim itself, but *discovery* concerning claimed misallocation prior to April 16, 2001 was "irrelevant." Plaintiff's current filing pretends as though the Eleventh Circuit ruling *never* happened by raising issues that it says occurred in misallocation discovery concerning the time period prior to April 16, 2001. As the Eleventh Circuit held, such discovery is "irrelevant."

Because Plaintiff has continued to violate the mandates of this Court and the Eleventh Circuit, GM requests that it be reimbursed for its costs related to defending Plaintiff's improper misallocation claim since the date

of the Court's ruling on GM's Motion to Dismiss on February 16, 2005

(including its expert witness fees), Plaintiff's flagrant discovery abuse, and

this latest motion.

## II.    Argument and Citation of Authority

Plaintiff's motion asks this Court to sanction GM for the following:

(1) the alleged false testimony of William Middlekauf at the previous Show

Cause hearing concerning an alleged satellite agreement with a Hawaii

dealership; (2) the timing of GM's production of shipment data; (3) the

timing of the production of certain File A allocation data for the dealers

other than Serra and Edwards Chevrolet; and (4) the format in which GM

produced the shipment data.  In the final section of the motion, Plaintiff also

makes the specious argument that it is allowed to bring a misallocation claim

for events that occurred in 2000 despite what the Eleventh Circuit held.  The

Motion should be summarily denied.

As the Court is aware, the Eleventh Circuit reversed this Court's

imposition of sanctions based on GM's failure to retain certain allocation

data from January 1, 2001 to June 1, 2001. Serra Chevrolet, Inc. v. General

Motors, Corp., 446 F.3d 1137, 1148-49 (11th Cir. 2006).  The Court also

remanded the issue back to this Court for the limited issue of deciding what

sanction would be appropriate for GM's late production of satellite facility

information.[1]  Id.  Plaintiff's current arguments ask this Court to revisit

issues that have already been decided adversely to Plaintiff by the Eleventh

Circuit, and asks this Court for relief over and above that authorized by the

Eleventh Circuit.  Plaintiff's attempt to avoid the mandate of the Eleventh

Circuit is wholly improper.

An appellate mandate binds a lower court on remand.  Ins. Group

Comm. v. Denver & R.G.W.R. Co., 329 U.S. 607, 612 (1947); Piambino v.

Bailey, 757 F.2d 1112, 1119 (11th Cir. 1985).  Specifically, "[a] trial court,

upon receiving the mandate of an appellate court, may not alter, amend, or

examine the mandate, *or give any further relief or review*, but must enter an

order in strict compliance with the mandate."  Piambino, 757 F.2d at 1119

---

[1] On remand, the Eleventh Circuit provided two guideposts for the Court to
use.  First, the Eleventh Circuit noted that "[t]he costs to the court of the
numerous motions, hearings and orders are an appropriate consideration."
Serra, 446 F.3d at 1156.  Second, quoting Carlucci, the Eleventh Circuit
stated that this Court "'may also find that the fine is better deemed costs to
be paid in full or in part to Serra or its attorneys for their litigation expenses
in compelling the relevant discovery.'"  Id. (quoting Carlucci v. Piper
Aircraft Corp., 775, F. 2d 1440, 1454 (11th Cir. 1985)).  Thus, the only issue
pending on remand with respect to the late production of the satellite
information is the sanctions amount to be imposed consistent with the
remand order.  Nothing in Plaintiff's motion remotely addresses the
Eleventh Circuit's mandate, which said that an appropriate sanction would
be to require GM to reimburse Plaintiff for the costs associated with
obtaining the additional satellite related discovery.  Since Plaintiff has not
provided the Court with any such information, Plaintiff's motion should be
denied.

(emphasis added). Accordingly, the Court must not rehear any of Plaintiff's arguments that have already been decided, nor may the Court review the Eleventh Circuit's opinion, except for purposes of executing the mandate.

As this Court has previously stated, it "is not an appropriate role for any District Court" to review the Eleventh Circuit's ruling. USX Corp. v. Tieco, Inc., 227 F.R.D. 680, 691 (N.D. Ala. 2004) (finding that the grant of a new trial would be an inappropriate review of the Eleventh Circuit's ruling). Yet, that is exactly what Plaintiff asks this Court to do. This Court should decline Plaintiff's invitation to error.

This should end the Court's inquiry into this Motion. In any event, should this Court review these issues, the Motion should be denied. The lion's share of these issues have already been addressed in Plaintiff's brief to the Eleventh Circuit, and none of them has any merit.

A.   Plaintiff is precluded from bringing a misallocation claim for events that occurred prior to April 16, 2001, which makes the majority of Plaintiff's motion irrelevant.

GM will address the last part of Plaintiff's motion first, as it is most glaringly at odds with the Eleventh Circuit's decision and Plaintiff's prior admissions and representations to this Court. The majority of Plaintiff's motion seeks sanctions because it says GM did not produce data (be it File A data, shipment data, the format of the data, etc.) related to its misallocation

claim ***based on events that took place prior to April 16, 2001***.  In support of

its position, on pages 17-22 of its motion, Plaintiff somehow argues that its

misallocation claim – which it now claims is based on alleged misallocation

concerning Edwards East that occurred in 2000 – is not barred.  The truth,

however, is that the Eleventh Circuit's opinion decided this issue against

Plaintiff, and that decision is final.

In its Opinion, the Eleventh Circuit specifically held that Plaintiff's

own admissions have limited its misallocation claim to acts and omissions

occurring <u>after</u> April 16, 2001.  Indeed, the Eleventh Circuit's opinion could

not be more clear:

> The district court ignored the admission by Serra
> that limited its misallocation claim to the period
> beginning April 16, 2001, when the state court
> litigation between Serra and GM ended.  Serra
> stated that "GM's acts and omissions *after the*
> *state court litigation* are the basis for its
> misallocation claim." (emphasis added). . . . Serra
> specifically limited its misallocation claim in an
> admission on June 2, 2004,[2] almost three months

---

[2] As the Court will recall, as set forth in GM's pending Motion for Summary
Judgment, GM moved to dismiss Serra's misallocation claim on the basis of
res judicata in that Plaintiff had raised a misallocation claim in state court
which went to verdict in April 2001 and was reversed by the Alabama
Supreme Court.  In a successful attempt to have the Court deny GM's
motion to dismiss, Plaintiff represented to the Court that "GM's acts and
omissions *after the state court litigation* are the basis for its misallocation of
vehicles claim herein." (Doc. No. 51, p. 7).  Having won that victory,
Plaintiff now attempts to reverse course, ignore that judicial admission, and
now says that the claim is based on events in 2000.  The plaintiff's obvious

> before the August 27, 2004 hearing.  The
> admission rendered irrelevant any allocation data
> from January 1, 2001, through April 16, 2001.

Serra, 446 F.3d at 1148.

Despite this clear mandate from the Eleventh Circuit, Plaintiff

remarkably calls GM's position an "unduly restrictive and erroneous

interpretation of Plaintiff's prior statement" regarding the scope of its

misallocation claim.  Plaintiff's Motion, p. 17.  How so?  GM is not

interpreting anything.  GM is citing the clear words and holding of the

Eleventh Circuit: Serra's misallocation claim is limited to events which

occurred after April 16, 2001, and discovery which concerns allocation data

prior to April 16, 2001 is "rendered irrelevant."

Plaintiff's attempt to "explain away" the Eleventh Circuit's ruling on

this issue is shocking: it says that the Eleventh Circuit just got it wrong.

Plaintiff's Motion p. 19.  Plaintiff says that the Eleventh Circuit just did not

understand what happened, and that this Court should disregard the Eleventh

Circuit's mandate and accept Plaintiff's about face.  This, of course, is not

allowed.  The Eleventh Circuit heard, and rejected, Plaintiff's attempt to

---

attempt to extricate itself from this binding admission is a clear example of
bad faith.  Indeed, had Plaintiff been truthful with the Court when GM filed
its Motion to Dismiss and said that its misallocation claim was based on
events in 2000, the claim would have been dismissed and the Court and GM
would have been spared the enormous time, effort, and expense associated
with Plaintiff's prosecution of this claim over the past year and a half.

- 7 -

change what it said and that ruling is the law of the case. See Ex. 1,

Plaintiff's Appellee Brief, pp. 50-51.

If Plaintiff thought that the Eleventh Circuit did not "get it right," it

was free to file an application for rehearing to correct the "error." It did not

do so. Or, it could have filed a petition for writ of certiorari with the United

States Supreme Court. Again, it did not do so. That being the case, the

Eleventh Circuit's ruling is final and binding.

Plaintiff also argues that the Eleventh Circuit's finding on this issue

was mere "dicta." This is nonsense. The Eleventh Circuit unequivocally

stated that "the district court abused its discretion for two reasons," and the

first of those reasons specifically has to do with the fact that Serra

specifically limited its misallocation claim to events after April 16, 2001.

Serra Chevrolet, 446 F.3d at 1148.

As if the Eleventh Circuit ruling were not enough, Plaintiff's own

admissions about the time frame of its allocation claim say it all. Sworn

testimony and representations to the Court are supposed to mean something,

but they apparently mean nothing to Plaintiff because Anthony Serra and

Plaintiff counsel made the same admission in Mr. Serra's deposition:

> Q: Okay. And so you are not claiming any
> damages for anything, then, that occurred prior to
> the *trial* of the State Court action?

A: I don't believe I am.

MR. BADDLEY: That's correct.

Ex. 2, A. Serra depo., pp. 322-23 (emphasis added).[3]

No amount of after-the-fact rationalization can change this admission. The Eleventh Circuit has determined that Plaintiff cannot "take back" its prior admission, and it certainly cannot change the sworn testimony of its corporate representative.

So, based on the Eleventh Circuit opinion and the admissions out of Plaintiff's own mouth, the truth is that Plaintiff is only allowed to state a claim for misallocation based on events which occurred after April 16, 2001, and discovery into periods prior to that is "irrelevant." Because the misallocation claim is based on events which occurred in 2000, its claim is barred. Further, because its claim is barred, as the Eleventh Circuit has mandated, any discovery sought in support of that claim was "rendered irrelevant," and disputes about such discovery cannot be the basis for any sanction.

---

[3] This testimony not only bars Plaintiff's misallocation claim, but it also bars Plaintiff's AGSSA claim and the claim that GM should not have approved the sale of Century Chevrolet to Leon Edwards, all of which occurred before April 2001.

B. GM's records do not show that the Clark Automotive dealership in Hawaii has a Satellite Agreement with GM and William Middlekauf did not falsely testify at the Show Cause Hearing on May 16, 2005.

As this Court is aware, the Eleventh Circuit remanded GM's sanction with regard to the satellite facility documents for the sole basis of determining what sanction would be appropriate given the guidelines articulated in the Eleventh Circuit's opinion. Plaintiff, however, again claims that this Court should ignore a clear mandate from the Eleventh Circuit and, instead, further sanction GM because of "newly discovered information." This information is not "newly discovered." The affidavits attached to Plaintiff's motion are nearly a year old. Worse, the affidavits were withheld from GM, this Court and the Eleventh Circuit until after briefing on GM's summary judgment motion was completed. This tactic, however, makes no difference because the affidavits are meaningless.

Plaintiff argues that GM should be sanctioned because "GM witness William Middlekauf falsely testified regarding the existence of a satellite in Hawaii." Plaintiff's Motion, p. 3. In support of this argument, Plaintiff relies on two affidavits which, Plaintiff says, show that Clark Automotive has a satellite location. Like the rest of Plaintiff's argument, this accusation is demonstrably false and the timing of Plaintiff raising this "issue" a year after obtaining the "newly discovered" information shows that. To put it

plainly, Plaintiff's purpose in raising this issue now is to concoct some sort of discovery issue to avoid consideration of the merits.

Because one of the affidavits Plaintiff attached claims that Clark Automotive has a "satellite," Plaintiff claims Mr. Middlekauf testified falsely. Nonsense. The fact that Clark Automotive operates from two locations is not "new" information. Indeed, Mr. Middlekauf informed the Court of these two locations at the Show Cause hearing:

> Q: And how many dealerships does Clark Automotive Group have on the big island of Hawaii?

> A: It has two full, two full sales and service points.

Ex. 3, Hearing Transcript, p. 45.

As the Court will recall, Mr. Middlekauf brought the original GM dealer contract file for Clark Automotive to the Show Cause hearing, but Plaintiff counsel did not bother to look at it. Id.; Ex. 4, Middlekauf affidavit. Mr. Middlekauf testified that he had reviewed the file (as well as the files for all other Hawaii Chevrolet dealers), that there was no information or documents reflecting a satellite agreement with Clark Automotive or any other Hawaii dealer, that he had contacted regional personnel inquiring about the existence of a satellite agreement with Chevrolet dealerships in

Hawaii, and that he was not aware of any satellite agreement with Clark Automotive. Id.

Attached as Exhibit 4A is a copy of GM's dealer contract file for Clark Automotive, which Mr. Middlekauf brought to the Show Cause hearing. The file shows that the dealership has two *permanent* sales and service locations. Ex. 4, Middlekauf affidavit, ¶ 4. Neither is a temporary satellite location. There is no satellite agreement in the file, no other correspondence or documents which reference a satellite agreement, and there is no notation in the premises addendum or dealer agreement that either location is a "satellite." Id. Rather, Clark Automotive has two permanent full sales and service locations, which is exactly what Mr. Middlekauf testified his review of the file revealed. Id.[4] Had Plaintiff wanted to ask Mr. Middlekauf any follow-up questions or to examine the dealer file, it could have but it did not.

_____

[4] Plaintiff attaches two affidavits to its motion. The first is from Richard Henderson, the prior owner of the Clark Automotive dealership and dealer/operator from 1963 through 2001. It does not use the word "satellite." The other affidavit was signed by Michael Chagami, the current Secretary-Treasurer of Clark Automotive. While Mr. Chagami uses the term "satellite" in his affidavit, that does not somehow change or affect the written contractual documents between GM and Clark, reflected in the Chevrolet dealer contract file, which control whether Clark Automotive has an approved satellite location.

Moreover, it makes no difference how an affiant categorizes a particular dealer location. What is important is that the contractual records do not show that Clark Automotive has ever had a satellite agreement (as Mr. Middlekauf said), and GM made those records available at the Show Cause hearing. Preferring to create a discovery dispute, Plaintiff has never even bothered to review the file, yet it is Plaintiff who seeks sanctions.

GM requests that the Court impose sanctions on Plaintiff because its conduct with respect to claiming Mr. Middlekauf testified "falsely" and the affidavits in particular should not be tolerated. Notably, the affidavits with the "newly discovered" evidence Plaintiff relies upon were executed in August 2005 – almost a year ago. Yet, Plaintiff purposefully did not bring them to GM's attention, the Court's attention, or the Eleventh Circuit's attention until after GM filed its Motion for Summary Judgment. Had Plaintiff truly been interested in obtaining information surrounding Clark Automotive, Plaintiff could have reviewed the documents at the May 2005 hearing or, at a minimum, raised the issue in August 2005, and the issue could have been addressed eleven months ago. Instead, Plaintiff waited, saving the "issue" for a time, like now, when it needed to create a diversion to avoid the merits of the case. This is yet another example of Plaintiff's strategy to seek out discovery disputes and avoid the merits of this case at all

costs. Again, Plaintiff's conduct here is all the more contemptuous because the Clark Automotive dealer contract file was made available at the Show Cause hearing yet Plaintiff counsel refused to look at it.

Plaintiff has gone too far. Not only has it shirked its duty to try to work out any disputes with opposing counsel in good faith, it sat on this information for nearly a year and filed a public document accusing Mr. Middlekauf of testifying falsely. This is unprofessional, unethical, and Plaintiff should be sanctioned to discourage others from this type of conduct.

Plaintiff also apparently wants GM to be sanctioned because, Plaintiff claims, it "continues to be prejudiced" because GM allegedly has not produced "all" the documents pertaining to the Chevrolet satellite agreements that have been identified. Plaintiff's Motion, p. 6. In making this argument, Plaintiff alleges that "GM's satellite production is based upon the erroneous belief that the satellite agreement itself is all that is required to be produced with respect to the other satellite facilities." Id. at p. 6, n. 2. Plaintiff's argument is incorrect and absolutely distorts the record.

At the outset, it is important to note that Plaintiff has already made this argument to the Eleventh Circuit. Indeed, the argument in its motion is nearly a "cut and paste" of a portion of its appellate brief. Ex. 1, Plaintiff's

Appellee Brief, p. 62. Obviously, Plaintiff cannot make the same argument in this Court that has already been heard and rejected on appellate review.

Next, Plaintiff's argument that GM has "limited" its satellite production to the satellite agreements themselves is another blatant distortion of the record. The Court is fully aware of the three step process that GM used to locate these documents, which culminated in a hand search of all 4,100 Chevrolet dealer contract files. Documents discovered by GM concerning Chevrolet satellite agreements have been produced – not just the satellite agreements.

Finally, because Plaintiff has consistently complained that it was entitled to "more" satellite related documents, and to try to do everything possible to not engage in more discovery disputes, GM informed Plaintiff counsel on June 30, 2005, that GM would make the original Chevrolet dealer contract files available for Plaintiff to inspect in Detroit where they are kept in the normal course of business. Ex. 5, 6/30/05 letter. Plaintiff, who has argued that these very files are the "source of all information concerning the Chevrolet satellite dealerships," ***decided not to review the documents***. See, Ex. 1, Plaintiff's Appellee Brief, p. 43. Notably, Plaintiff counsel has been to Detroit in the very building where these files are kept at least three times since this offer was made (including at least two times since

obtaining the "newly discovered" information), but has never reviewed the files offered by GM. If Plaintiff truly believes other "critical" documents from the dealer contract files existed, one would think that Plaintiff counsel would have at least taken the time to actually review the files GM offered to him during one of his trips to Detroit. GM submits Plaintiff's failure to review the dealer contract files with this "critical" information shows what is at play here – the calculated, tactical attempt to manufacture a discovery issue to avoid the merits of this case.

By making the dealer contract files available for inspection, GM fully complied with its obligations under Fed. R. Civ. P. 34. See Rowlin v. Ala. Dept. of Public Safety, 200 F.R.D. 459, 462 (M.D. Ala. 2001) ("The party complies with [Rule 34] if it affords opposing sides equal access to the information sought.") (citing Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus, *Federal Practice and Procedure*, § 2213, at 429-31). Given that GM's June 30, 2005 offer (as well as Mr. Middlekauf's offer of the Clark Automotive file) has fully complied with any obligations under Rule 34, there is simply no basis for Plaintiff's motion with respect to the "satellite" information.

- 16 -

C.   There is no basis to sanction GM for its production of shipment
     data.

Plaintiff argues that GM should be sanctioned for GM's alleged "late"

production of "shipment data." This argument is flawed for numerous

reasons. Indeed, like most of the arguments raised in its motion, much of

Plaintiff's argument regarding the shipment data mirrors what Plaintiff

argued to the Eleventh Circuit. Ex. 1, Plaintiff's Appellee Brief, pp. 52-54.

First, Plaintiff seeks to sanction GM over data used to support a

misallocation claim for the year 2000, a time period that the Eleventh Circuit

has ruled is not at issue and to which discovery was "irrelevant."

Second, once again, Plaintiff's ignores the truth. Here, the truth is that

Plaintiff never issued a singled discovery request to GM seeking shipment

data. Indeed, even Plaintiff counsel has acknowledged that GM's

production of shipment data did not violate any order of this Court. Ex. 12,

2/23/06 letter.

As the record shows, Plaintiff never asked GM to produce **shipment**

data. Rather, at the outset of the case, Plaintiff asked GM to produce

**allocation** data. Ex. 6, Plaintiff's Request for Production, No. 11.[5]

Allocation data is the data which shows by model which vehicles are

_____

[5] As the Eleventh Circuit has recognized, GM has produced all allocation
data that it was obligated to produce in this case. Serra, 446 F.3d 1149.

- 17 -

allocated to a particular dealer based on a complex computer program (i.e.,

"File A" and "File B"). Shipment data, on the other hand, simply shows

when a particular vehicle allocated was shipped to a dealer. Allocation data

and shipment data are separate and distinct, as evidenced by the fact that

they are not even kept in the same department within GM. Ex. 14, Tim

Jones depo. (3/23/06), p. 6.

In April 2005, Plaintiff requested shipment data – not from GM – but

through subpoenas to all Birmingham Chevrolet dealers. See e.g., Ex. 7,

Dealer subpoena, No. 2. Comparing the requests Plaintiff made to the

dealers with its discovery requests to GM, it is clear that Plaintiff never

made this request to GM. Compare Ex. 6, No. 11 to Ex. 7, No. 2. After GM

reviewed the subpoenas, GM *volunteered* to produce the shipment data for

all Birmingham Chevrolet dealers to save the other dealers the time and

expense of gathering and producing this information. Ex. 8, 6/3/05 letter.

Plaintiff accepted GM's offer, and the data was produced several months

before the discovery cutoff and several months before Plaintiff completed its

expert report on allocation. Unbelievably, now, a year later, Plaintiff asks

this Court to sanction GM for *voluntarily* producing information well before

the discovery cutoff and well before Plaintiff's expert completed his

allocation report.

Plaintiff's accusation that GM "hid the ball" and that the shipment

data was "newly discovered" is false, Plaintiff knows it, and Plaintiff should

be sanctioned by the Court for making this accusation. Indeed, after GM

produced the File A and File B allocation data, Plaintiff counsel extensively

questioned GM's allocation employee, Tim Jones, over a two day period on

March 8 and 9, 2005. In response to the questioning, in the presence of

Plaintiff's allocation expert witness, Mr. Jones informed Plaintiff counsel

explicitly that shipment data was not included with the allocation data, but it

could be obtained from another source:

> Q: Can you tell from the allocation data given to us
> when a vehicle was shipped to a dealer?
>
> A: No.
>
> Q: Can you tell from the allocation data given to us
> when the vehicle hits the dealer's lot?
>
> A: No.
>
> Q: Those things that I asked you can all be
> ascertained from other sources of information, can
> they not?
>
> A: Yes.

Ex. 9, T. Jones depo. (3/9/05), p. 281.

At the end of the deposition, GM counsel informed Plaintiff counsel

that if he wanted any additional information based on what he learned in the

- 19 -

deposition, all he needed to do was put it in a letter and GM would get the information to him. Id. at p. 325. It is undisputed that Plaintiff counsel never asked GM for the shipment data before he issued the subpoenas to the Birmingham Chevrolet dealers. When Plaintiff finally asked the dealers for the data through subpoenas, GM volunteered to produce it, Plaintiff counsel accepted the offer, GM produced it, and now Plaintiff argues GM should be punished for this conduct.

If all of this were not enough to sanction Plaintiff, this is: Plaintiff now argues that GM is "grossly misleading" when it claims that shipment data and allocation data are different things. Plaintiff's Motion, p. 8. The proof that Plaintiff is playing games with the truth and this Court does not come from GM, it comes directly from Plaintiff's counsel. When GM's outside allocation expert witness testified that shipment data and allocation data are different, ***Plaintiff's counsel agreed***:

> A: Well, I don't necessarily categorize the shipment data as allocation information. Shipment data was furnished to me as part of Dr. Ileo's analysis. And I did supplement that file, yes.
>
> Q: (By Mr. Baddley) All right. I have two questions: Number one, I think you are going to be surprised, ***but I think I agree with you***. Shipment data is not allocation data, is it?
>
> A: No sir.

Ex. 10, S. Farhat depo., pp. 55-56 (emphasis added).

Thus, Plaintiff counsel agreed with GM's expert witness on the record that shipment data and allocation data are not the same thing. Yet, when GM says exactly that, Plaintiff counsel says that GM is "grossly misleading." It is this sort of tactic and distortion this Court should not accept from Plaintiff.

    D.    <u>GM cannot be sanctioned for its production of File A Data.</u>

As this Court is aware, GM previously believed that EDS, an outside vendor it contracts with to retain allocation data, had, pursuant to GM's 36 month document retention policy, discarded all File A data for the other Birmingham Chevrolet dealers prior to June 1, 2001. As soon as GM realized this was not correct, it informed the Court and produced the data to Plaintiff. Ex. 11, Notice of Production, 9/2/05 (Doc. No. 152). Now, more than ten months after GM produced the data, Plaintiff wants GM to be sanctioned for not discovering the data sooner.

First, this issue too has already been addressed by the Eleventh Circuit. Specifically, the Eleventh Circuit held that GM should not have been sanctioned with regard to the File A Data. <u>Serra Chevrolet, Inc. v. General Motors Corp.</u>, 446 F.3d 1137, 1148 (2006). Indeed, the Eleventh Circuit considered, and rejected, these same arguments raised here about the

timing of the production of this data, as portions of Plaintiff's argument were essentially cut and pasted from its Eleventh Circuit brief. Ex. 1, Plaintiff's Appellee Brief, pp. 54-55.[6] As this Court has noted, it "is not an appropriate role for any District Court" to review the Eleventh Circuit's ruling, USX Corp., 227 F.R.D. at 691, and this Court should not do so here.

Even if this Court was allowed to sit in review of the Eleventh Circuit's ruling, Plaintiff has not been "prejudiced" by the timing of GM's production of the few weeks of File A allocation data.[7] As the Eleventh Circuit recognized, GM produced complete allocation data for Serra and Edwards Chevrolet -- the only dealers Plaintiff had identified as being relevant to the misallocation claim. Serra, 446 F.3d at 1148. Because of Plaintiff's "after the state court litigation" admission, the only File A data at issue is approximately 6 weeks of data for the other Birmingham Chevrolet dealers, which also was produced prior to the submission of Plaintiff's expert report. Plaintiff's expert did not even use any File A data for any Chevrolet dealers, including Serra or Edwards, even though GM produced all of it well before Plaintiff's expert report on allocation was due.

---

[6] GM's Notice of Production was made part of the record on appeal on November 23, 2005.

[7] In fact, Plaintiff has not been prejudiced by any of the arguments raised in its motion.

E.    GM produced the shipment data as kept in the ordinary course of business and did not violate any court order or discovery request with its production.

Finally, Plaintiff claims that GM should be sanctioned because it produced the shipment data in the format as kept in the normal course of business and not in the format Plaintiff wished it had been produced. Specifically, Plaintiff claims that when GM produced the shipment data, the data should have been segregated between fleet and retail shipments. This claim, too, is meritless and ignores the truth.

1.    Plaintiff has admitted that GM violated no Orders with regard to the production of the shipment data, and Plaintiff never requested the data from GM.

At the outset, it is critical to note that GM has not violated any discovery request or court order on this issue. In fact, Plaintiff counsel has admitted so, as he previously informed GM that he "never suggested that GM's production of shipment data violated any Orders in this case." Ex. 12, 2/23/06 letter. Yet, despite this prior admission to GM, Plaintiff now claims that GM's production of shipment data was "non-complian[t] with the Court's discovery orders." Plaintiff's Motion, p. 15. Notably, Plaintiff does not and cannot point to a single Order or discovery request which was allegedly violated because there are none.

Indeed, Plaintiff's entire argument over shipment data is frivolous and sanctionable because, as previously noted, Plaintiff never submitted a single interrogatory or request for production to GM asking for shipment data. And, when GM voluntarily agreed to produce it, Plaintiff never asked for the data to be segregated among fleet and retail. In fact, Plaintiff's only formal request for shipment data in this case was directed to the Birmingham Chevrolet dealers – not GM -- and the words "fleet" and "retail" were nowhere to be found in the request. Ex. 7, Dealer subpoena.

On June 3, 2005, GM volunteered to produce the "data which shows the number and model of new vehicles shipped to Edwards Chevrolet and Edwards East by GM" from January 1, 2000 forward. Ex. 8, 6/3/05 letter. On June 6, 2005, Plaintiff counsel accepted the offer, and GM later agreed to provide Plaintiff with this same information for all Birmingham dealers. Ex. 13, 6/6/05 letter. There is no dispute that GM produced exactly what it agreed to produce, and there is no dispute that GM produced the shipment data as kept in the normal course of business.

2.    Plaintiff never asked for the shipment data to be segregated between fleet and retail.

Although Plaintiff counsel and GM exchanged voluminous correspondence about the shipment data, at no time did Plaintiff counsel ask for the shipment data to be segregated between fleet and retail. In fact, when

- 24 -

GM previously asked Plaintiff counsel to identify when he requested the shipment data to be segregated, he responded by saying he had no intention of responding to this "interrogatory." Ex. 12, 2/23/06 letter. The undisputed fact is that GM produced the data as kept in the normal course of business and Plaintiff never asked for the data to be broken down in any other way. GM cannot now be sanctioned for not doing something it was never asked to do. The fact that Plaintiff seeks sanctions here is further evidence of Plaintiff's abusive and harassing conduct.

### 3. GM produced the data to Plaintiff in the exact same format that it was produced to GM's own experts.

GM produced the shipment data to its own experts in the exact same format that it was produced to Plaintiff. That is, GM produced the data as it was kept in the normal course of business. See Ex. 14, T. Jones depo. (3/23/06), pp. 34-35. Neither Plaintiff's expert nor Urban Science had the shipment data originally broken down by fleet and retail. GM does not segregate the shipment data between fleet and retail in the ordinary course of business. Producing data or documents as kept in the ordinary course of business is not only acceptable, but it is a party's obligation under the rules.[8]

_____

[8] In fact, the amended Rule 34 of the Federal Rules, which goes into effect this December, states that "if a request does not specify the form or forms for producing electronically stored information, a responding party *must produce the information in a form or forms in which it is ordinarily*

Had GM produced the data in some manner other than as kept in the ordinary course of business, Plaintiff almost certainly would have accused GM of "manipulating" the data.

On September 28, 2005, Dr. Ileo signed his allocation expert report, which relied exclusively on shipment and delivery data. After Urban Science began its review of Dr. Ileo's report, it asked GM if it could break the shipment data down into fleet and retail and GM did so. Ex. 10, S. Farhat depo., p. 59. Thus, in response to a request from its expert, on or about December 1, 2005, GM provided the data to Urban Science in segregated form. Approximately two weeks later, the expert report of Urban Science was provided to Plaintiff counsel along with all the documents and data Urban Science relied upon, including the shipment data segregated by fleet and retail, as is required by the Rules concerning expert disclosure.[9]

Finally, this whole issue is apparently Plaintiff's attempt to divert attention from a fundamental error committed by its expert. As stated

---

*maintained* or in a form or forms that are reasonably useable." Fed. R. Civ. P. 34(b)(ii) (effective December 1, 2006) (emphasis added).

[9] Plaintiff argues that its experts were "deprived" of this necessary information when they filed their expert report in September 2005. This argument is simply untenable. Plaintiff had the data as kept in the normal course of business and never asked for it to be broken down into fleet and retail. Had Plaintiff's expert or attorney asked for it to be broken down, as Urban Science did, GM would have done so.

previously, in addition to the shipment data, Dr. Ileo also relied upon delivery data (which is different from shipment data) for his expert report. It is undisputed that the delivery data was originally produced to Plaintiff in a segregated format, as GM keeps the delivery data segregated into "fleet" and "retail" in the ordinary course of business. See Ex. 14, T. Jones depo. (3/23/06), p. 37; Ex. 10, S. Farhat depo., pp. 57-59. Dr. Ileo had the delivery data segregated when it was initially produced and a mere novice could review the delivery data and distinguish between the fleet and retail data. See Ex. 15, Delivery data excerpt. Dr. Ileo, however, ignored this and improperly included both fleet and retail deliveries in his analysis anyway, rendering his analysis, as he admits, meaningless. See GM's Motion for Summary Judgment, pp. 40-42. Thus, Plaintiff's game here is to shift focus from this fundamental error by its expert by again trying to create a discovery dispute where there is none.[10]

In sum, Plaintiff wants to sanction GM on this issue despite the following facts: (1) Plaintiff never requested shipment data from GM; (2) Plaintiff counsel previously indicated that GM did not violate any Court Order regarding its production of the shipment data; (3) the shipment data

---

[10] As GM demonstrated in its summary judgment motion, when only retail shipments and deliveries are used (which Dr. Ileo admits is the proper analysis), there is absolutely no evidence of misallocation, even under Plaintiff's theory.

was timely produced; (4) Plaintiff never asked for the shipment data to be broken down by fleet and retail; and (5) GM provided the shipment data as kept in the normal course of business, only provided it to its experts in segregated form when asked, and when Dr. Ileo had delivery data broken down between fleet and retail, but included both fleet and retail deliveries in his analysis anyway.

And, finally, all this information was sought in conjunction with a claim and covers a time period which the Eleventh Circuit has held was barred as a matter of law as a result of Plaintiff's own admissions and representations to this very Court, rendering discovery into it "irrelevant."

WHEREFORE, GM respectfully requests that Plaintiff's Amended Motion for Sanctions be denied. GM further requests that Plaintiff be sanctioned for its harassing conduct, and that Plaintiff be required to reimburse GM for its costs, expenses, expert fees, and attorneys fees in defending its inappropriate claim for misallocation, as well as Plaintiff's latest Motion.

s/Terrence W. McCarthy
One of the Attorneys for Defendant
General Motors Corporation

- 28 -

OF COUNSEL:
Jere F. White, Jr. (WHI007)
Terrence W. McCarthy (MCC119)
Sanford G. Hooper  (HOO033)
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
The Clark Building
400 North 20th Street
Birmingham, Alabama  35203
(205) 581-0700
(205) 581-0799 (fax)

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Thomas E. Baddley, Jr., Esq. and Jeffrey P. Mauro, Esq.

s/Terrence W. McCarthy
Of Counsel