FILED
2006 Aug-07  PM 01:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **SERRA CHEVROLET, INC.** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **V.** | ) | **CASE NO:  2:01-cv-2682-VEH** |
| | ) | |
| **GENERAL MOTORS** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

## PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE AND COUNTER MOTION FOR SANCTIONS

COMES NOW the Plaintiff, Serra Chevrolet, Inc., and hereby files this Reply to Defendant General Motors Corporation's ("GM") Response to Plaintiff's Amended Motion for Sanctions and Counter Motion for Sanctions and as grounds therefore says as follows:

GM's latest response, while filled with much of the same rhetoric, half-truths and outright misrepresentations previously made to the Court and Plaintiff, also takes on a bolder approach – to somehow claim that  the Plaintiff, and not GM, should be sanctioned by the Court.  Such an approach is a transparent attempt to attack the Plaintiff rather than try to defend its untenable and egregious prior misrepresentations to the Court.

1

GM asks the Court to overlook the current posture of the case. However, we must not forget that it has been GM's flagrant discovery abuse tactics, misrepresentations to the Court, and violations of this Court's discovery Orders which have grossly impeded the orderly prosecution of this matter, has caused the Plaintiff to devote substantial time, cost and expense to overcome such discovery abuse tactics, and if gone unchecked would have afforded GM with a decided advantage in this litigation. GM also conveniently ignores the fact that the Eleventh Circuit has already affirmed this Court's finding of willful non-compliance of its obligations and the Court's Orders with respect to the satellite data.

The thrust of GM's Response is an unpersuasive argument that the information submitted by the Plaintiff is not new, but rather is designed to divert the Court's attention away from the merits of the case. Such a contention is unfounded. As stated in the Plaintiff's Motion to Supplement, the purpose of the Plaintiff's supplemental submission is to apprise the Court of information which has been uncovered **after** the Court entered its May 20, 2005 Sanctions Order, given the remand instructions by the Eleventh Circuit to this Court. While GM repeatedly states that the Plaintiff has intentionally withheld this information from the Court for almost a year as part of a designed scheme to divert attention away from the merits of the

case, GM ignores the fact that the sanctions order was on appeal from June 2005 through April 13, 2006.  In fact, the Plaintiff's Motion to Supplement Plaintiff's previously filed Motion for Sanctions was filed promptly thereafter on May 9, 2006 and was granted by the Court by Order dated July 7, 2006.

Contrary to GM's contention, the Plaintiff has submitted this information to aid the Court in its determination of appropriate sanctions against GM on remand and to further request that severe and perhaps further sanctions are warranted.  GM's Motion attempts to misinterpret the Eleventh Circuit's instructions on remand regarding sanctions and thereby downplay the nature and amount of sanctions which are appropriate.

The Plaintiff will not restate that which has already been set out in its prior pleadings, but will try to limit its response to address those arguments raised in GM's Response.

## I.      Middlekauf's Testimony Was Indeed False

GM's contention that William Middlekauf's prior testimony at the Show Cause hearing is accurate and not inconsistent with the newly submitted information by the Plaintiff represents just another installment in a

lengthy catalog of misleading statements and misrepresentations by GM to the Court.

GM contends that the dealer contract documents brought by Middlekauf to the May 16, 2005 Show Cause hearing (and attached as Exhibit 4 to its Response) support Middlekauf's testimony that Clark Automotive Group had "two <u>full</u> sales and service <u>points</u>," (May 16, 2005 Transcript pp.45) and that "there are <u>absolutely</u> no references to any satellite agreements <u>or inferences</u> to satellites at all" in Hawaii. (Transcipt pp. 58) Middlekauf further stated that in researching the records, plus his time as zone manager in the area, he was unaware of any satellites, informal or any other type. (Transcript pp.88-89).[1]   However, contrary to GM's position, a review of the dealer contract documents, which Middlekauf stated that he personally examined, quickly reveals the following:

1)  There is only <u>one</u> Dealer Sales and Service Agreement between GM and Clark Automotive d/b/a Island Chevrolet, Cadillac, Buick, Pontiac, GMC  (hereinafter "Island Chevrolet"), despite the presence of two dealership locations (See Doc. S-GMFED 5324-5374, Exhibit A)

2)   Island Chevrolet's Location and Premises Addendum attached to its Dealers Sales and Service Agreement reflects two locations: the Hilo

---

[1] At the May 16, 2005 Show Cause hearing, the Court made clear to Middlekauf its interest in knowing about any satellite, stating "I don't care if it's official or formal, I want to know about it." (May 16, 2005 Transcript pp.34)

location designated as the "MAIN" location (See Doc. S-GMFED 5329),
and the Kona location denoted as being "100.0 MILES FROM MAIN"
(Doc. S-GMFED 5329)

Clearly, this reference to a "Main" dealership in Hilo and another
facility in Kona "100 miles from main" does not support Middlekauf's
testimony of two separate full point dealerships.  Nevertheless, GM attempts
to manipulate Middlekauf's testimony to conform to the record evidence by
now arguing that the dealer contract file for Clark Automotive shows that
the dealership "has two permanent sales and service locations."  However,
GM well knows that such a statement is not consistent with Middlekauf's
unequivocal testimony before this Court of "two <u>full</u> sales and service
<u>points</u>." and GM knows that such a contention is misleading.[2]  In the end,
the documents speak for themselves and clearly reflect that there is one main
dealership location (the Hilo dealership facility), and a satellite or
supplemental sales and service location (the Kona facility).

If the foregoing were not enough, the Affidavit testimony of Island
Chevrolet's representative, Michael Chagami, and the prior owner of Hawaii

---

[2] GM knows that a full <u>point</u> dealership is a specific term of art meaning a dealership having a dealer sales
and service agreement with the manufacturer, its own dealer code, and receiving its own allocation of
vehicles from the manufacturer.  Further, while GM now offers that the Kona facility performs sales and
service, it also knows that many of its satellites were authorized to perform sales and service operations.

Motors, Richard Henderson, certainly dispel the accuracy of Middlekauf's testimony as both affidavits clearly reflect:

a)  Island Chevrolet had its "main" dealership in Hilo, Hawaii and a satellite or supplemental facility located in Kona, Hawii.

b)  Island Chevrolet is assigned one dealer code (or Business Associate Code) by GM's Chevrolet Division, and therefore the dealership received one allocation of vehicles from GM, which it uses to support both the main dealership and the Kona satellite location.

c)  That the satellite location has been in operation since the early 1980s.

GM purports to take issue with the fact that because Mr. Henderson's Affidavit does not use the word "satellite," it is somehow inconsistent with Mr. Chagami's reference to a "satellite." However, GM knows better than anyone that its satellite facilities are consistently referred to as "supplemental locations" or "supplemental facilities."  In fact, GM's own documents reflect its use of such terminology to describe a "satellite." Perhaps the best example of GM's use of such terminology is reflected in the Plaintiff's July 18, 1988 Satellite Agreement with GM.  A review of this Satellite Agreement, which authorized the Plaintiff to open and operate the satellite facility in Gardendale (which is at issue in this lawsuit), nowhere

contains the word "satellite," but rather repeatedly refers to the Plaintiff's Gardendale facility as a "supplement facility" or a "supplemental location." (see July 18, 1988 Satellite Agreement, attached hereto as Exhibit B)

It is noteworthy that GM now refers to Island Chevrolet's dealership facilities as two, <u>permanent</u> sales and service facilities, as such a contention is wholly inconsistent with its position taken throughout this litigation that the satellite program was terminated, and that all satellites were "temporary" or experimental facilities. In fact, this current position offered by GM actually supports the Plaintiff's allegation that GM had repeatedly represented that its Gardendale satellite was never intended to be "temporary, but would be a "permanent" sales and service facility as reflected in GM's own internal documents.

While GM seeks to claim otherwise, the stark reality is that the Affidavits of Mr. Chagami and Mr. Henderson (and even the Island Chevrolet dealer contract documents) reflect that since the early 1980s, Hawaii Motors, and now Island Chevrolet, had its "main" dealership facility in Hilo, as well as a satellite or supplemental facility in Kona. GM understands better that anyone else that a single dealer sales and service agreement, and a single dealer code mean that there is one recognized dealership, and not as Middlekauf represented "two full point dealerships."

Further, it is beyond comprehension why, given the Plaintiff's specific inquiry regarding Island Chevrolet, as well as the Court's May 9, 2005 Order instructing GM to produce a witness knowledgeable to testify regarding this dealership, GM never bothered to contact its own dealer in furtherance of obtaining a definitive answer to a simple question.

## II.    GM Misinterprets and Improperly Seeks to Expand the Scope of the Eleventh Circuit's Opinion

Throughout its Response, GM cites to the Eleventh Circuit's opinion to argue, in the first instance, that any evidence or  information by the Plaintiff which sheds light on GM's prior and continued misrepresentations regarding its compliance and/or inability to produce allocation data is irrelevant, and secondly that the Plaintiff's misallocation claims are somehow barred.  However, such an interpretation of the Eleventh Circuit's opinion is misguided and represents a blatant misinterpretation of the Court's decision.

### A.    GM's Misrepresentations Regarding its Allocation Data is Not Irrelevant.

GM desperately clings to the observation made in the Eleventh Circuit's opinion that the allocation data from January 1, 2001 through April

16, 2001 is "irrelevant."   GM relies on this observation as a means of arguing that any information pertaining to its allocation data is irrelevant. GM's need for such an extrapolation, while improper, is understandable since the record clearly reflects that GM has repeatedly misrepresented material facts to the Court regarding both the nature of its efforts to comply with the Court's discovery orders, and the existence of further responsive allocation data.  The Plaintiff submits that the Court is entitled to consider such additional information, <u>uncovered after the Court entered its Sanctions Order against GM</u>, in order to properly evaluate the nature, extent and intent behind GM's repeated non-compliance with its orders when fashioning appropriate sanctions against the Defendant, as countenanced by the Eleventh Circuit.

While GM contends that any new information regarding such allocation data is "irrelevant" for the purpose of imposing sanctions for its satellite discovery abuses, the Plaintiff submits that such information is relevant to demonstrate the total lack of candor exhibited by GM and to highlight the lengths GM has taken to prohibit the orderly prosecution of this matter.  Further, such information is certainly relevant to refute GM's contention that its only wrongdoing, in hindsight, was its failure to manually review the dealer contract files earlier as ordered by the Court.  Finally, such

information is clearly relevant to show that GM was not merely careless in its failure to produce fully responsive satellite documents, but rather engaged in a deliberate and calculated effort to limit the scope of its search for responsive allocation and satellite documents, as well as to intentionally limit the scope of its requests to agents to retrieve such documents.

B.    The Plaintiff's Misallocation Claims Are Not Barred.

GM unpersuasively attempts to argue that the merits of the Plaintiff's misallocation claims have already been decided and disposed of, because the Eleventh Circuit stated that the district court failed to consider the Plaintiff's statement that its misallocation claim occurred "after the state court litigation."   GM relies on this statement, alone, to represent a dispositive ruling on the merits of the Plaintiff's misallocation claims.  However, such an interpretation is unfounded and unsupported.  First and foremost, this Court has neither addressed nor decided the merits of the Plaintiff's misallocation claims.  Because the merits of the Plaintiff's misallocation claims were in no way part of the appeal to the Eleventh Circuit on the Sanctions Order, nothing prevents this Court from considering such an issue. In fact, this Court is free to determine what effect, if any, the Plaintiff's alleged admission has on the Plaintiff's misallocation claims.  As such,

GM's contention is nothing more than a transparent attempt to improperly expand the law of the case to an issue having nothing to do with the Court's Sanctions Order.

The doctrine of the law of the case comes into play only with respect to issues previously determined. Quern v. Jordan, 440 U.S. 332 (1979). "While a mandate is controlling as to matters within its compass, on the remand a lower court is free as to other issues." Id. (citations omitted). Therefore, it is essential to determine what issues were actually decided in order to define what is the law of the case. This requires a careful reading of the reviewing court's opinion: observations or commentary touching upon issues not formally before the reviewing court do not constitute binding determinations. See Quern v. Jordan, 440 U.S. 332 (1979).

Because the issue before the Eleventh Circuit solely pertained to whether this Court's Sanction Order against GM was proper, the Eleventh Circuit's statement that the Plaintiff has limited its misallocation claim to acts after the state court litigation is not an integral part of its decision so as to trigger the law of the case constraints upon this Court. Instead, the Court's statement in this regard was mere dicta as the Court's opinion to reverse the sanctions regarding GM's allocation data deficiencies was ultimately based upon the following determination:

"When ordered to produce the data on August 27, 2004, GM complied and produced all that it had – allocation data from June 2001 forward. **GM could not produce what it did not possess. . . . . . , the district court abused its discretion when it held GM in civil contempt and imposed sanctions for the failure by GM to obey the order of the district court to produce documents GM did not possess**."

(Opinion, pp.24-25) (emphasis added).

The Eleventh Circuit's failure to fully consider and address this issue regarding the Plaintiff's alleged admission can be demonstrated by the fact that the Court overlooked the Plaintiff's specific allegations in its Third Amended Complaint that GM's approval for Edwards Chevrolet to purchase Century Chevrolet **in August of 2000** caused the Plaintiff damages, including a deprivation of its fair share of vehicles while favoring Edward East with an allocation of vehicles in excess of that which it had earned. Such allegations have not only been specifically pled, but have also been ruled as permissible areas of discovery in Judge Proctor's January 28, 2004 Order.

In short, because the issue of this purported admission by the Plaintiff that its misallocation claims against GM occurred after the state court litigation had neither been addressed nor resolved by this Court, the Eleventh Circuit's reference to this admission was mere dicta as it was not

properly before the Court, and therefore it is neither the law of the case nor binding precedent.

### III.    Refuting GM's Comments

a)    GM's counter motion for sanctions is essentially limited to two paragraphs of its Response. (See GM's Response, pp.2-3)   Given the systemic abuses and continued recalcitrance which has been demonstrated by GM throughout this litigation, any such relief is due to be denied.

b)    GM contends that the Plaintiff asks this Court to revisit issues already decided adversely to the Plaintiff by the Eleventh Circuit, and that the Plaintiff seeks relief over and above that authorized by the Eleventh Circuit.   However, the Plaintiff submits that some of this information constitutes grounds for further sanctions against GM or, at a bare minimum, should be considered by this Court when articulating a rationale for its sanctions order against GM with respect to the satellite data as countenanced by the Eleventh Circuit.

c)    Because the Affidavits of Mr. Chagami and Mr. Henderson were executed in August 2005, the Defendant erroneously concludes that the Plaintiff has purposefully and improperly failed to bring this information to GM's attention, the Court's attention or the Eleventh Circuit's attention until

after GM filed its motion for summary judgment.  Again, such a position is meritless.  First, as stated above, when the Plaintiff discovered this information, GM had already appealed this Court's Sanctions Order, and this information was clearly not part of the record on appeal.  Further, GM's appeal of this Order remained pending from June 2005 through April 13, 2006.  After the Eleventh Circuit issued its opinion, the Plaintiff promptly filed a Motion to Supplement with this Court on May 9, 2006, which the Court granted on July 7, 2006.  Accordingly, the Plaintiff cannot be said to have improperly withheld such information.  Finally, consistent with its position on discovery throughout this litigation, GM contends that it was the Plaintiff's responsibility to immediately divulge information demonstrating GM's failure to produce complete and accurate responses to discovery, or which reflected GM's misrepresentations to the Court, ostensibly so that GM could quickly alter, amend or recant its prior position to conform to all currently available information possessed by the Plaintiff.

   d)    GM contends that the Plaintiff should not complain about a lack of complete satellite data because GM's counsel informed Plaintiff's counsel on June 30, 2005 that it would be willing to make the Chevrolet dealer contract files available for inspection in Detroit where such records are kept in the ordinary course of business.  However, the Plaintiff rejected such an

offer and advised GM to produce fully responsive documents to the Plaintiff as instructed by the Court because such an offer by GM was beyond untimely.  GM waited long after the Court compelled the production of such data, after repeated motions for sanctions had been filed by the Plaintiff, and even after the Court had entered its Order finding GM in contempt and imposing sanctions against the Defendant for such recalcitrance.   This history behind the Plaintiff's efforts to obtain such data, as well as the Court's Orders, dictated that fully responsive documents were to be produced to the Plaintiff, as opposed to an offer to inspect documents kept in the ordinary course of GM's business, which should have been made at the outset, and not more than one year later.

e)     GM contends that the Plaintiff requested allocation data, but never shipment data from GM, and only requested such shipment data from the other Birmingham MDA Chevrolet dealers.  The Plaintiff submits that the reason for the difference in these requests is because the other Chevrolet MDA dealers would not have allocation data, which is only possessed by GM.   However, the Plaintiff knew that each dealer would have records showing the timing and number of vehicles (by model) shipped to their dealership by GM.

GM further contends that the Plaintiff knew shipment and allocation data were different, and therefore argues that because shipment data was not specifically requested, it was not produced to the Plaintiff.   However, GM completely overlooks the fact that the Plaintiff had requested from GM information showing what vehicles were allocated and received (i.e. or shipped to) by the other Birmingham MDA dealers.  At a bare minimum, shipment data is clearly a component of the allocation data requested of GM by the Plaintiff and GM's clever use of semantics to limit the scope of the Plaintiff's request for allocation data should not be tolerated given its discovery abuses practices throughout this litigation.

**IV.    Substantial Sanctions are Warranted by GM's Misconduct**

Pursuant to the Eleventh Circuit's opinion instructing this Court to provide a rationale for any sanctions it deems appropriate, the Plaintiff respectively submits that substantial sanctions are warranted and should be imposed against GM.   In fact, the Eleventh Circuit offered no opinion regarding the amount of the sanctions imposed, but rather found fault with this Court's failure to create a record of its reasons for the imposition of any fine to afford meaningful review by the Court on appeal.

Given the history of this case, and in light of the information uncovered <u>after</u> this Court entered its May 18, 2005 Sanctions Order, there should be little dispute that GM's candor and credibility with the Court and the Plaintiff in these proceedings has been seriously lacking.  As reflected above, and through prior pleadings, time and time again, GM has been found to have grossly misrepresented material facts regarding the existence of responsive documents and its compliance with the Court's Orders.  GM's bold allegation that the Plaintiff's counsel has been "unethical and unprofessional" stretches the bounds of reason for its own professionalism and ethics have clearly been shown to take a backseat to its primary goal of continuously obstructing and prejudicing the Plaintiff and abusing the judicial process at all cost, in an attempt to secure any advantage in this litigation.

As enumerated in the Plaintiff's brief with the Eleventh Circuit, there exists ample authority for the imposition of substantial sanctions against GM.  Substantial sanctions are not only appropriate, but are essential to maintain the integrity of the Orders entered by the Court.  The imposition of severe sanctions against GM is supported by the record, has been authorized by the Eleventh Circuit, and is well supported under the law.  Rule 37(b)(2) gives district courts broad discretion to fashion appropriate sanctions for

violations of discovery orders.  Severe sanctions are necessary not just because of GM's willful misconduct and brazen disregard for the Court's Orders, but because of the growing need to deter the kind of misconduct which obstructs the due administration of justice, as it has in this case.

Both the Supreme Court and the Eleventh Circuit have recognized that harsh sanctions, including default judgments, are necessary because of the growing need to deter the kind of misconduct which obstructs the due administration of justice, as it has in this case.  See <u>National Hockey League v. Metropolitan Hockey Club</u>, 427 U.S. 639, 643, 96 S.Ct. 2778, 2780, (1976).

In <u>Martin v. Automobili Lamborghini Exclusive, Inc.</u>, 307 F.3d 1332 (11th Cir. 2002), the district court imposed sanctions in excess of $1.5 million based upon the parties' continual and flagrant abuse of the judicial process.  In affirming the imposition of sanctions, the Eleventh Circuit acknowledged that severe sanctions were justified. Id. at 1335-36.  However, the Court vacated the order imposing such sanctions as "jointly and severally" against the parties, as one of the parties did not have the net worth to pay the full amount of the sanctions. Id. at 1337.  While the Court acknowledged that the record demonstrated no abuse of discretion as to one of the parties, the Court remanded the matter for the district court to assess

the amount of sanctions against each party as appropriate in light of their individual resources. Id. at 1338.

In In re Grand Jury Proceedings (Bank of Novia Scotia), 740 F.2d 817,832 (11th Cir. 1984), cert denied, 469 U.S. 1106, 105 S. Ct. 778 83 L.Ed.2d 774 (1985), the Eleventh Circuit affirmed the district court's finding of civil contempt and the imposition of a $1,825,000 fine imposed upon the Bank of Novia Scotia based upon the defendant's continuous disregard for the court's orders. The district court imposed a $25,000 per day fine which was to begin five days after the court's order and continuing until the Bank complied with a subpoena.  In reviewing the district court's sanction order, the Eleventh Circuit noted that nothing had been substantially done by the Bank until the $25,000 per day fine imposed by the court started to accumulate.  As such, the Court determined that the order of contempt as well as the $1,825,000 sanctions imposed did not constitute an abuse of discretion. Id.

In In re Grand Jury Subpoena Duces Tecum, 955 F.2d 670 (11th Cir. 1992), the Eleventh Circuit reiterated that the "imposition of coercive sanctions by way of fines is generally an area in which appellate courts must rely heavily on the informed exercise of the district court's discretion," and therefore stated its reluctance to find unreasonableness or arbitrariness in the

absence of clear abuse. In affirming the district court's exercise of its coercive civil contempt power, the Court recognized that the district court's tailored sanction was imposed to avoid the harms of the defendant's continued recalcitrance and further noted that the defendant had ample opportunity to comply with the subpoena and the district court's order prior to the accrual of monetary sanctions. Id.

In Matter of Trinity Industries, Inc., 876 F.2d 1485 (11th Cir. 1989), the Eleventh Circuit affirmed the district court imposition of civil contempt sanctions against Trinity Industries, and determined that the district court's setting of sanctions at $10,000 per day was entirely reasonable. Id. The Court's determination of reasonableness was based upon the fact that Trinity Industries was a Fortune 500 company having vast financial resources, and its acknowledgement that the sanction amount had to be substantial enough to compel Trinity to comply with the contempt orders. Id.

Similar to the above cited authorities, this Court has not only been extremely patient with GM's continued recalcitrance throughout discovery, as well as its repeated non-compliance with its Orders, but the Court fashioned a sanctions order which not only put GM on direct notice of the sanctions which would be imposed for its continued non-compliance, but afforded the Defendant with additional time and ample opportunity to

comply prior to the accrual of such monetary sanctions.  GM's repeated and continued misrepresentations to the Court as well as its refusal to comply with the Court's discovery orders evidences willful and deliberate contumacy which makes obvious the need for the Court to resort to coercive tactics to secure compliance with its contempt order.  The imposition of lesser sanctions would have little or no effect on the Defendant.

In light of the foregoing, the Plaintiff respectfully requests that the Court re-impose the monetary sanctions contemplated by its February 7, 2005 Order, but extend the time frame for which such sanctions are to be assessed, given GM's willful failure to comply with the Court's Order. Alternatively, the Plaintiff suggests that the Court could reduce the amount of the daily sanction fine while at the same time extend the length of time for which such daily fine would be assessed in light of GM's continued non-compliance with the Court's Orders.  In either event, the Plaintiff submits that given the financial resources of the Defendant, any order by the Court must be substantial so as to deter further misconduct, and thereby render any cost-benefit approach to discovery utilized by the Defendant to be unworkable.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff respectfully requests that the Court consider this newly discovered information in conjunction with its instructions on remand from the Eleventh Circuit and thereby impose severe sanctions on GM for its repeated and calculated discovery abuse tactics which have permeated this litigation, and which have substantially prejudiced the Plaintiff in its prosecution of its case.   The Plaintiff further requests that if the Court enters sanctions against the Defendant for such misconduct, that it be allowed to petition the Court for attorneys' fees, costs and expenses incurred by virtue of the Defendant's misconduct, and for such other, further and different relief to which the Plaintiff may otherwise be entitled.

Respectfully submitted,

s/ Jeffrey P. Mauro
MAU-007
Attorneys for Plaintiff
Baddley & Mauro, LLC
2545 Highland Avenue, Ste. 100
Birmingham, Alabama 35205
(205) 939-0090
(205) 939-0064 Fax
jpmauro@baddleymauro.com   E-mail

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 7, 2006, I electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  Jere White, Esq. and Terrence McCarthy, Esq., John Galese, Esq.

> s/ Jeffrey P. Mauro
> MAU-007
> Attorneys for Plaintiff
> Baddley & Mauro, LLC
> 2545 Highland Avenue, Ste. 100
> Birmingham, Alabama 35205
> (205) 939-0090
> (205) 939-0064 Fax
> jpmauro@baddleymauro.com   E-mail